ACCEPTED
03-15-00416-CV
7113395
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/25/2015 6:30:05 PM
JEFFREY D. KYLE
CLERK

CASE NO. 03-15-00416-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/25/2015 6:30:05 PM
JEFFREY D. KYLE
Clerk

_____

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

_____

## APPELLANTS' OPENING BRIEF

_____

Wm. Charles Bundren, Esq.
Attorney-in-Charge
State Bar No. 03343200
2591 Dallas Parkway
Suite 300
Frisco, Texas 75034
Telephone:214.808.3555

SEPTEMBER 17, 2015          **ORAL ARGUMENT REQUETSED**

# IDENTITY OF THE PARTIES AND COUNSEL

1.  Appellants are Oak Mortgage Group, Inc., Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay, Plaintiffs and Counter Defendants in the district court.

2.  Appellants were represented in the district court and are represented in this court by Wm. Charles Bundren, Esq. of Frisco, Texas.

> Wm. Charles Bundren, Esq.
> Texas State Bar No. 03343200
> WM.CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
> 2591 Dallas Parkway
> Suite 300
> Frisco, Texas 75034
> Telephone: 214.808.3555
> Facsimile: 972.624.5340
> E-mail: Charles@bundrenlaw.net

3.  Appellee, and Defendant and Counter-plaintiff in the district court is:

> Ameripro Funding, Inc

4.  Appellee in this court and Defendant and counter-Plaintiff were represented in the district court and are represented in this court by;

> Susan Burton, Esq.
> State Bar No.      03479350
> GRAVES DOUGHTERY HEARON & MOODY
> P.C.
> 401 Congress., Suite 2200
> Austin, Texas 78701
> Telephone: (512) 480-5600
> Telecopier: (512) 480-5862 (facsimile)
> E-mail:        sburton@gdhm.com

5. The district court trial Judge who signed the temporary injunction order that is the subject of this appeal is the Hon. Gisela D Triana Judge Presiding for the 345th Judicial District of Travis County, Texas

# STATEMENT REGARDING ORAL ARGUMENT

Appellants believe that oral argument will assist the court in reviewing the rules of applicable law to this important case. Appellants do not believe that this case can be determined on the basis of the briefs alone. Oral argument will assist the court in being able to reach the correct result. Appellants request that the court set this matter for oral argument.

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| IDENTITY OF THE PARTIES AND COUNSEL | 1 |
| STATEMENT REGARDING ORAL ARGUMENT | 3 |
| TABLE OF CONTENTS | 4 |
| INDEX OF AUTHORITIES | 7 |
| STATEMENT OF THE CASE | 14 |
| ISSUES PRESENTED FOR REVIEW | 15 |
| STATEMENT OF FACTS | 15 |
| SUMMARY OF THE ARGUMENT | 18 |
| STANDARD OF REVIEW | 20 |
| ARGUMENT AND AUTHORITIES | 21 |

I. THE TEMPORARY INJUNCTION ORDER IS VOID BECAUSE IT DOES NOT COMPLY WITH THE REQUIREMENTS OF RULE 683 AND THERE IS NO EVIDENCE IN THE RECORD TO SUPPORT THE ELEMENTS NECESSARY TO OBTAIN A TEMPORARY INJUNCTION. ... 21

II. THE DISTRICT COURT ERRED IN APPLYING THE NON-SOLICITATION PROVISIONS OF THE CONTRACTS TO REAL ESTATE HOMEBUILDERS AND CONDOMINIUM DEVELOPERS, REAL ESTATE SALES AGENTS, AND OTHER REAL ESTATE PROFESSIONALS INVOLVED IN THE REAL ESTATE INDUSTRY BECAUSE THEY ARE NOT "CUSTOMERS" OF AMERIPRO UNDER THE PLAIN READING OF THE CONTRACTS. ... 27

III..THE DISTRICT COURT ERRED IN CONCLUDING THAT RESIDENTIAL HOME AND CONDOMINIUM BUILDER, AND REAL ESTATE SALES AGENT CONTACT INFORMATION IS A TRADE SECRET BECAUSE SUCH INFORMATION IS PUBLIC INFORMATION AND CAN NEVER BE DETERMINED TO BE A TRADE SECRET, AND IS NOT THE CONFIDENTIAL AND PROPRIETARY INFORMATION OF AMERIPRO. 33

IV. THE DISTRICT COURT ERRED IN GRANTING THE TEMPORARY INJUNCTION BECAUSE AMERIPRO FAILED TO PROVE PROBABLE, IMMINENT AND IRREPARABLE INJURY CAUSED BY THE PREVIOUS POSSESSION OF CONFIDENTIAL INFORMATION OF AMERIPRO. 39

V. THE DISTRICT COURT ERRED IN GRANTING THE TEMPORARY INJUNCTION BECAUSE AMERIPRO HAS AN ADEQUATE REMEDY AT LAW FOR CONTRACTUAL DAMAGES AND THERE IS NO IRREPARABLE INJURY SUFFICIENT TO JUSTIFY THE TEMPORARY INJUNCTION. 44

VI. THE DISTRICT COURT ABUSED ITS DISCRETION AND ENTERED AN OVERBROAD TEMPORARY INJUNCTION IN WHICH THERE IS NO NEXUS BETWEEN THE ENJOINED CONDUCT AND ANY IMMINENT AND IRREPARABLE INJURY TO AMERIPRO. 54

PRAYER 58

CERTIFICATE OF SERVICE 58

CERTIFICATE OF WORD COMPLIANCE 59

APPELLANTS' APPENDIX TAB

TEMPORARY INJUNCTION ORDER 1

NOTICE OF APPEAL 2

5

SUPPLEMENTAL COUNTER PETITION      3

SUPPLEMENTAL COUNTERCLAIM      4

DAMAGES ALLEGED BY AMERIPRO      5

EMPLOYMENT AGREEMENT      6

# INDEX OF AUTHORITIES

**PAGE**

**CASES**

*Adust Video v. Nueces County*,
    996 S.W.2d 245(Tex. App.--Corpus Christi 1999, no pet.)    22

*Allan J. Richardson & Assocs v. Andrews,*
    718 S.W.2d 833 (Tex. App. -- Houston [14th Dist.]
    1986, no writ).    37

*Big D Props., Inc. v. Foster*,
    2 S.W.3d 21 (Tex. App.--Fort Worth 1999, no pet.).    22

*Butnaru v. Ford,*
    84 S.W.3d 198 (Tex. 2002)    44,48

*Brandon v. Copper,*
    591 S.W.2d 553 (Tex. App. -- Amarillo 1979, writ ref'd n.r.e.).    36

*Byrd Ranch, Inc. v. Interwest Sav. Assoc*.,
    717 S.W.2d 452 (Tex. App.--Fort Worth 1986, no writ)    22

*Canteen Corp. v. Republic of Tex. Props., Inc.,*
    773 S.W.2d 398 (Tex. App.--Dallas 1989, no writ)    45,50

Cardinal Health Staffing Network, Inc. v. Bowen
    106 S.W.3d 230 (Tex. App.-- Houston [1st Dist.] 2003, no pet.    41,50

*Computek Computer & Office Sups. v. Walton,*
    156 S.W.3d 221 (Tex. App. -- Dallas 2005, no pet.).    54

*Cornelison v. Offshore Entm't Corp*.,
    No. 13-02-00452-CV, 2002 Tex. App. LEXIS 8618, at *4-5
    (Tex. App.--Corpus Christi Dec. 5, 2002, no pet.)    22

*Dallas Gen. Drivers v. Wamix, Inc.*
    295 S.W. 873 (Tex. 1956)    47

*Down Time-South Texas, LLC v. Elps,*
    2014 Tex. App. LEXIS 3047, 2014 WL 1464320, at *7
 (Tex. App. -- Corpus Christi-Edinburg, March 20, 2014, no pet.)          43

*Downer v Aquamarine Operators, Inc. ,*
    701 S.W.2d 238 (Tex. 1985)          20

*Electronic Data Sys. Corp. v. Powell*,
    508 S.W.2d 137 (Tex. Civ. App.-Dallas 1974, no writ).          44

*EMSL Analytical, Inc. v Younker,*
    154 S.W.3d 693 (Tex. App. -- Houston [14th Dist.] 2004, no pet.)          42

*Fairfield Estates L.P. v Griffin,*
    986 S.W.2d 719 (Tex. App. -- Eastland 1999 no Pet)          21.

*Farmers Ins. Exch. v. Leonard,*
    125 S.W. 85(Tex. App. -- Austin 2003, pet. denied).          30

*Frey v. Decordova Bend Estates Owners Ass'n*
    647 S.W. 246 (Tex. 1983)          45

*Gallagher Headquarters Ranch Dev., Ltd v. City of San Antonio*,
    303 S.W,3d 700, 702 (Tex. 2010).          30

*Gen. Homes, Inc. v. Wingate Civic Assoc*.,
    616 S.W.2d 351 (Tex. Civ. App.--Houston [14th Dist.] 1981, no writ) 22

*Ghidoni v. Stone Oak, Inc.*
    966 S.W. 2d 573, (Tex. App. -- San Antonio 1998, no writ).          21,55

*Guy Carpenter & Co. , Inc. v Provenzale*,
    334 F.3d 459 (5th Cir. 2003)          40

*Harbor Perfusion, Inc. v. Floyd,*
    45 S.W.3d 713 (Tex. App.—Corpus Christi 2001, no pet.)          20

*InterFirst Bank San Felipe, N.A. v. Paz Const. Co*.,
    715 S.W.2d 640 (Tex. 1986)          22

*Interox Am. v. PPG Indus.*,
736 F.2d 194 (5th Cir. 1984)                                          35,37

*Intercontinental Terminals Co. v. Vopak N. Am., Inc,*
354 S.W.3d 887 (Tex. App. -- Houston [1st Dist.] 2011, no pet. )     23

*Fasken v. Darby*,
901 S.W.2d 591 (Tex. App. -- El Paso 1995, no writ)                  24

*In re Union Pac. R.R.*,
294 S.W.3d 589 (Tex. 2009)                                           38

*In re Bass,*
113 S.W.3d 735(Tex. 2003).                                           38

*Kewanee Oil Co. v. Bicron* Corp.,
416 U.S. 470 (1974)                                                  36

*Kotz v. Imperial Capital Bank,*
319 S.W.3d 54 ( Tex. App. -- San Antonio 2010, no pet.)              24

*Lamons Metal Gasket Co. v. Traylor,*
361 S.W.2d 211 (Tex. App. -- Houston 1962, writ ref'd n.r.e.)        38

*Law v. William Marsh Rice Univ*.,
123 S.W.3d 786 (Tex. App. -- Houston [14th Dist.] 2003, pet denied)  21

*Levine v. Bayne, Snell & Krause, Ltd.,*
40 S.W.3d 92 (Tex. 2001)                                             30

*Letson v. Barnes*,
979 S.W.2d 414 (Tex. App. -- Amarillo 1998, pet. denied).            26

*Matlock v. Data Processing Security*, Inc.,
618 S.W.327(Tex. 1981).                                              55

*Mareno v. Baker Tools, Inc.*
808 S.W.2d 208 (Tex. App. -- Houston [1st Dist.] 1991, no writ).     24

*Markel v. World Flight, Inc.*
    938 S.W.2d 74 (Tex. App. -- San Antonio 1996, no pet.)     47

*Minexa Ariz, Inc. v. Staubach,*
    667 S.W.2d 563 (Tex. App.-- Dallas 1984, no writ).     46,50

*M-I, LLC v. Stelly,*
    2009 U.S. Dist. LEXIS 65866, 2009 WL 2355498 at *7
    (S.D. Tex. July 30, 2009)     41

*Monsanto Co. v. Davis*,
    25 S.W.3d 773 (Tex. App.--Waco 2000, pet. denied)     22

*NMTC Corp v. Conarroe,*
    99 S.W.3d 865 (Tex. App. -- Beaumont 2003, no pet.)     42

*Numed, Inc. v. McNutt*,
    724 S.2d 432 (Tex. App. -- Fort Worth 1987, no writ)     37

*Noell v. City of Carrollton*
    431 S.W. 3d 682 (Tex. App. -- Dallas 2014, pet denied)     49

*Priest v. Tex. Animal Health Comm'n,*
    780 S.W.2d 874 (Tex. App. -- Dallas 1989, no writ)     49

*Primary Health Physicians, P.A. v Sarver,*
    309 S.W.3d 662 (Tex. App. -- Dallas 2012, no pet.)     42

*Progressive Cty. Mut. Ins. v. Kelley*,
    284 S.W.805, (Tex. 2009)     30

*Qwest Comms. v. AT&T Corp,*
    24 S.W3d 334 (Tex. 2000)     22

*Reliant Hosp. Partners v. Cornerstone Healthcare Grp. Holdings, Inc.*,
374 S.W.3d 488 (Tex. App. -- Dallas 2012, pet. denied)     37

*Reach Group, LLC v. Angelina Group,*
    173 S.W.3d 834 (Tex. App. -- Houston [14 Dist.] 2005, no pet)     45,47

*Sands v. Estate of Buys*,
160 S.W.3d 684 (Tex. App. -- Fort Worth 2005, no pet.)        35,37

*SCM Corp. v. Triplett Co.*,
399 S.W.2d 583 (Tex. App. -- San Antonio 1996, no writ)        35

*State v. Southwestern Bell Tel Co.*,
526 S.W.2d 526, (Tex. 1975).        54

*State v. Heal*,
917 S.W.2d 6 (Tex. 1996)        20

*State & Cty. Mut. fire Ins. v. Macias*,
83 S.W.3d 304 (Tex. App.-- Corpus Christi, 2002).        30

*Stoner v. Thompson*,
553 S.W.2d 150
(Tex. Civ. App.--Houston [1st Dist.] 1977, writ ref'd n.r.e.)        22

*Sun Oil Co. v. Whitaker*,
424 S.W.2d 216 (Tex. 1968)        44

*Tenet Health Ltd. v. Zamora,*
13 S.W. 3d 464 (Tex. App. -- Corpus Christi 2000, pet. dism'd w.o.j.) 20

*Tex. HealthCare Info. Council v. Seton Health Plan, Inc.,*
94 S.W.3d 841 (Tex. App.-- Austin 2002, pet. denied)        41

*Town of Palm Valley Texas v. Johnson,*
87 S.W.3d 110 (Tex. 2001),        49

*The Republican Party of Texas v. Dietz,*
940 S.W. 2d 86 (Tex. 1997).        21, 55

*Tranter, Inc. v. Liss*,
2014 Tex. App. LEXIS 3398, 2014 WL 1257278 at *7
(Tex. App. -- Fort Worth, March 27, 2014 no pet.)        43

*Tri-State Pipe and Equiq, Inc. v S. Cnty Mut. Ins. Co.*,
8 S.W. 394 (Tex. App.-- Texarkana 1999, no pet.)        45

*Twister B.V. v. Newton Research Partners*,
  364 S.W.3d 428 (Tex. App. -- Dallas, no pet.)                        35

*Rimkus Consulting Group, Inc. v. Cammarata*,
  255 F.R.D. 417 (S.D. Tex. 2008)                                      40

*Sharma v. Vinmar Int'l Ltd.*,
  231 S.W.3d 405 (Tex. App. -- Houston [14th Dist.] 2007, no pet.)    40

*Tom James Co. v Mendrop*,
   819  S.W.2d 251 (Tex. App.--Fort Worth 1991, no writ)              52

*Univ. Interscholastic League v. Torres*,
  616 S.W.2d 355 (Tex. Civ. App.--San Antonio 1981, no writ)          22

*Villalobos v Holguin,*
  208 S.W.2d 871 (Tex. 1948)                                          21

*Walling v. Metcalfe*,
  863 S.W.2d 56 (Tex. 1993)                                           20,44

*Webb v. Glenbrook Owners Ass'n, Inc.*
  298 S.W.3d 374 (Tex. App. -- Dallas 2009, no pet.)                  49

*Wissman v. Boucher*,
  240 S.W.2d 278(Tex. 1951)                                           35,37

*W. R. Grace & Co. v. Henson,*
  2007 Tex. App. LEXIS 6771, 2007 WL 2389547 at *3
  (Tex. App. -- Corpus     Christi August 23, 2007, no pet.)          40,52

## **STATUTES**

Tex. Civ. Rem. Code §134A.002(6)                                      Passim

## **Rules**

TEX. R. CIV. P. 683                                                   Passim

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY 348 (5th ed. 1979)                    32

UNIFORM TRADE SECRETS ACT                    36

## STATEMENT OF THE CASE

Plaintiffs, Oak Mortgage Group, Inc. (referred to herein as "Oak"), Michael H. Nasserfar, (referred to herein as "Nasserfar"), Michael E. Task (referred to herein as "Task") and Tycord R. Gosnay, (referred to herein as "Gosnay") (referred to herein collectively as "Appellants") sued Ameripro Funding, Inc. (referred to herein as "Ameripro") (*see,* Clerk's Record, (hereinafter referred to as "CR ___") at 3-39) for, *inter alia*, breach of contract and unfair business practices. Nasserfar, Task and Gosnay were formerly at will employee residential loan origination officers for Ameripro who resigned on January 16, 2015 from Ameripro and then began working as residential loan origination officers for Oak. Ameripro answered the suit and filed a counterclaim (CR 40-43) against Appellants alleging, *inter alia*, breach of contract by Nasserfar, Task and Gosnay, and subsequently filed an application for temporary injunction. (CR 44-68).

The district court heard evidence on Ameripro's application for temporary injunction on May 26 and May 27, 2015. On June 16, 2015, the Hon. Gisela D. Triana, Judge presiding, entered a Temporary Injunction Order. (*See* Appendix attached to this Brief referred to as "App. ___" at 1; CR at 223-227 ). Appellants perfected their accelerated appeal to this court from the Temporary Injunction Order on July 6, 2015 ( App. 2; CR 230-235).

## ISSUES PRESENTED FOR REVIEW

The issues presented for review are:

1. Whether the Temporary Injunction Order is void because it does not comply with the requirements of Rule 683 and there is no evidence in the record to support the elements necessary to obtain a temporary injunction?

2. Whether the district court erred in applying the non-solicitation provisions of the contracts to real estate homebuilders and condominium developers, real estate sales agents, and other real estate professionals involved in the real estate industry because they are not "customers" of Ameripro under the plain reading of the contracts?

3. Whether the district court erred in concluding that residential home and condominium builder, and real estate sales agent contact information is a trade secret because such information is public information and can never be determined to be a trade secret, and is not the confidential and proprietary information of Ameripro?

4. Whether the district court erred in granting the Temporary Injunction because Ameripro failed to prove probable, imminent and irreparable injury caused by the previous possession of confidential information of Ameripro?

5. Whether the district court erred in granting the Temporary Injunction because Ameripro has an adequate remedy at law for contractual damages and there is no irreparable injury sufficient to justify the Temporary Injunction? and,

6. Whether the district court abused its discretion and entered an overbroad temporary injunction in which there is no nexus between the enjoined conduct and any imminent and irreparable injury to Ameripro?

## STATEMENT OF FACTS

Oak and Ameripro are competitors in the residential loan mortgage origination business. Nasserfar, Task and Gosnay worked as loan officers for Ameripro responsible for originating residential mortgage loans. Nasserfar, Task

15

and Gosnay were at will employee's and pursuant to their contracts retained the right to resign at any time without notice and without cause and, likewise, Ameripro retained the right to terminate the employment of Nasserfar, Task and Gosnay at any time without notice and without cause. (*See,* App. 6 -- employment agreement; RR at Vol.2 Ameripro Exhibits 9, 10, 11, 13, 15, 16, 17, and 18). Nasserfar and Task, as they were permitted to do pursuant to their employment contracts, terminated their employment with Ameripro on January 16, 2015 (RR at Vol.4 Applicant's Exhibits 2 and 3), and at the time of the resignations, Nasserfar and Task returned to Ameripro the laptop computers that had been issued to them. *Id.* Gosnay resigned on January 15, 2015. (RR at Vol. 4 Applicant's Exhibit 4), and returned the laptop computer to Ameripro. Nasserfar, Task and Gosnay began working for Oak on January 19, 2015. The employment agreements with Nasserfar, Task and Gosnay were drafted by Ameripro and not negotiated by Nasserfar, Task and Gosnay. (RR at Vol. 3 at 70, L15-25). Ameripro admits that the employment agreements do not define the term "customer." (RR at Vol. 3 at 71, L1-11).

Ameripro was unhappy that it's at will employee's had decided to resign and sent demand letters claiming that contact information of home builders and residential developers was a "trade secret" of Ameripro. (RR at Vol. 4 Applicant's Exhibit 5). The information that Ameripro contends is a trade secret is readily

16

available in the public domain and can be obtained by a simple Google search to find contact information of the builders Ameripro claims are trade secrets. (RR at Vol. 4 Plaintiffs Exhibits 52- 64; RR at Vol. 3 123-126).

At the time of the temporary injunction hearing, Appellants did not have in their possession any paper or electronic files which Ameripro claimed was its property. All electronic and paper files were returned to Ameripro prior to the temporary injunction hearing and non were retained by Appellants. (RR at Vol. 3 at 122, L21 -- 123 L5; Plaintiffs' Exhibit 34 at RR Vol. 4; RR at Vol. 3 at 73 L18-78, L1, and 85, L6 - 86, L 23; ). Prior to the temporary injunction hearing all electronic files claimed by Ameripro to be its property were removed from all electronic devices of Nasserfar, Task, Gosnay and Oak and returned to Ameripro. *Id.*

Chad Overhauser, the President of Ameripro, admitted that Ameripro has no agreements, no contracts and no business relations with homebuilders and residential developers such as Brohn Homes, Seahome Residences, and Clark Wilson Builders and does not pay nor receive any money or other consideration from homebuilders and residential developers for any products or services. (RR Vol. 2 at 109-111). Overhauser admitted that Ameripro's customers are the borrowers borrow money from Ameripro to purchase residential real estate. (RR. Vol 2 115, L9-21).

17

## II.

## SUMMARY OF THE ARGUMENT

An applicant for a temporary injunction bears the burden of proving that the temporary injunction and the specific acts which are enjoined are necessary in order to prohibit imminent and irreparable injury to the applicant. In this case, Ameripro failed to offer evidence at the temporary injunction hearing of any imminent injury that would cause Ameripro irreparable injury. In fact, shortly after the temporary injunction hearing, Ameripro swore that it was entitled to recover nearly $2 million in damages for breach of the contract. Texas law does not permit a temporary injunction to enforce a contract where the applicant for the injunction has an adequate remedy at law to recover contractual damages. There simply is no imminent injury. And, there is no irreparable harm that was facing Ameripro. Ameripro failed to sustain its burden of establishing imminent and irreparable injury which would necessitate the entry of a temporary injunction. Moreover, the temporary injunction has no nexus to any imminent or irreparable injury and was not necessary to prohibit Ameripro from suffering and irreparable injury.

The temporary injunction order does not comply with the requirements of Rule 683 because it does not explain why the injunction is necessary in order to prohibit imminent and irreparable injury to Ameripro. The temporary injunction

18

order makes merely conclusions regarding the applicable legal standard without providing a reasoning or justification for the injunctive relief and why the injunctive relief is necessary to prevent irreparable injury. Therefore, the temporary injunction order is void.

The district court did not follow the language of the contract and applicable law and restrained Appellants from soliciting publicly known residential builders and developers. The names and contact information of the publicly known residential builders and developers is not a trade secret because the information is readily available in the public and can be obtained by doing a simple Google search. The contract fails to define the term "customer" but at the temporary injunction hearing Ameripro's president admitted that Ameripro provides loans to residential borrowers and that the residential borrowers are the customers of the Ameripro. He also admitted that Ameripro has no contracts, agreements or business relationships with residential homebuilders and developers. They are not "customers" of Ameripro and, consequently, the district court abused its discretion in restraining Appellants from soliciting the homebuilders.

The temporary injunction order is overbroad and there is no nexus between the restrictions in the temporary injunction order and the need to protect Ameripro from imminent and irreparable injury. The temporary injunction order erroneously fails to limit the restrictions on solicitation to one (1) year after the termination of

19

the employment contracts, and compelled Appellants to turn over forensic images of their electronic devices and to cease and desist from using their electronic devices including cell phones, hard drives and laptops which they had used in their ordinary and daily business practices. There is no justification for this compelling order and there is no nexus between this provision of the temporary injunction order and any imminent or irreparable injury.

## STANDARD OF REVIEW

The standard of review for the grant or denial of a temporary injunction is abuse of discretion. *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 716 (Tex. App.—Corpus Christi 2001, no pet.) (*citing, Walling*, 863 S.W.2d at 58; *Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 468 (Tex. App.—Corpus Christi 2000, pet. dism'd., w.o.j.)). However, a trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). There is no particular deference to legal conclusions of the trial court and a de novo standard of review applies when the issue turns on a pure question of law. *Zamora*, 13 S.W.3d at 468; *see State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). "[A] trial court abuses its discretion by entering an overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal

20

rights." *Harbor Perfusion*, 45 S.W.3d at 717, (citing *Fairfield Estates L.P. v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.); *The Republican Party of Texas v. Dietz*, 940 S.W.2d 86, 93 (Tex. 1997); *Villalobos v. Holguin*, 146 Tex. 474, 208 S.W.2d 871, 875 (Tex. 1948); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 583 Tex. App.—San Antonio 1998, no writ)). For reasons argued herein, the temporary injunction granted by the district court is overly broad, not based upon the evidentiary record and an abuse of discretion by the district court and, consequently, the temporary injunction should be dissolved. A district court abuses its discretion if it misapplies the law to the established facts of the case, *Law v. William Marsh Rice Univ.*, 123 S.W.3d 786, 792 (Tex. App.--Houston [14th Dist.] 2003, pet. denied), or if it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or if *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

## ARGUMENT AND AUTHORITIES

### I.

**THE TEMPORARY INJUNCTION ORDER IS VOID BECAUSE IT DOES NOT COMPLY WITH THE REQUIREMENTS OF RULE 683 AND THERE IS NO EVIDENCE IN THE RECORD TO SUPPORT THE ELEMENTS NECESSARY TO OBTAIN A TEMPORARY INJUNCTION.**

The temporary injunction order is void because it does not comply with the strict requirements of Rule 683 of the Texas Rules of Civil Procedure. Rule 683

21

provides that every order granting an injunction must "set forth the reasons for its issuance" and "be specific in its terms." TEX. R. CIV. P. 683. That is, the order must provide a "detailed explanation of the reason for the injunction's issuance." *Adust Video v. Nueces County*, 996 S.W.2d 245, 249 (Tex. App.--Corpus Christi 1999, no pet.). This requirement is mandatory and must be strictly followed. *Qwest Comms. v. AT&T Corp,* 24 S.W3d 334, 337 (Tex. 2000); *InterFirst Bank San Felipe, N.A. v. Paz Const. Co.*, 715 S.W.2d 640, 641 (Tex. 1986); *Monsanto Co. v. Davis*, 25 S.W.3d 773, 788 (Tex. App.--Waco 2000, pet. denied); *Big D Props., Inc. v. Foster*, 2 S.W.3d 21, 22-23 (Tex. App.--Fort Worth 1999, no pet.). If an order fails to comply with these requirements, it is void and should be dissolved. *Qwest Comms.,* 24 S.W3d at 337; *InterFirst Bank*, 715 S.W.2d at 641; *Monsanto Co.*, 25 S.W.3d at 788.

When a temporary injunction is based in part on a showing that the applicant would suffer irreparable harm if the injunction is not issued, Rule 683 requires the order to state precisely *why* the applicant would suffer irreparable harm. *See, State v Cook United, Inc.* 464 S.W.2d 105,106 (Tex. 1971); *Monsanto Co.*, 25 S.W.3d at 788 (finding a temporary injunction order to be void under Rule 683 because it stated only that plaintiffs "will suffer probable injury in the event that such writ of temporary injunction is not issued"); *Byrd Ranch, Inc. v. Interwest Sav. Assoc.*, 717 S.W.2d 452, 453-55 (Tex. App.--Fort Worth 1986, no writ) (same where order

22

stated only that plaintiff "will suffer irreparable harm for which it has no adequate remedy at law"); *Univ. Interscholastic League v. Torres*, 616 S.W.2d 355, 358 (Tex. Civ. App.--San Antonio 1981, no writ) ("Even though there were allegations in the appellee's petition for injunction which may have justified the issuance of the writ, the mere recital of 'no adequate remedy at law' and 'irreparable harm' in the order lacks the specificity required by Rule 683."); *Gen. Homes, Inc. v. Wingate Civic Assoc.*, 616 S.W.2d 351, 353 (Tex. Civ. App.--Houston [14th Dist.] 1981, no writ) (finding that a temporary injunction order did not satisfy Rule 683 "because it only states the trial court's conclusion that immediate and irreparable harm will result if the injunction is not granted, with no specific reasons supporting the conclusion"); *Stoner v. Thompson*, 553 S.W.2d 150, 151 (Tex. Civ. App.--Houston [1st Dist.] 1977, writ ref'd n.r.e.) (finding a temporary injunction order insufficient under Rule 683 and noting that "[t]he conclusion [in the order] that the situation is harmful [to the plaintiff] is not a reason why injury will be suffered if the interlocutory relief is not ordered"); *see also Cornelison v. Offshore Entm't Corp.*, No. 13-02-00452-CV, 2002 Tex. App. LEXIS 8618, at *4-5 (Tex. App.--Corpus Christi Dec. 5, 2002, no pet.) (not designated for publication) (finding a temporary injunction order void under Rule 683 where order stated only that "[t]he Court finds that immediate and irreparable injury, loss or damage as alleged will result to plaintiff unless Defendant is forthwith restrained as requested"); and

23

*Intercontinental Terminals Co. v. Vopak N. Am., Inc,* 354 S.W.3d 887, 899 (Tex. App. -- Houston [1st Dist.] 2011, no pet. ) ("Rule 683 mandates that a trial court order granting a temporary injunction must explain in the order its reasons for believing that the applicant has shown it will suffer injury if interlocutory relief is not granted."). The temporary injunction order in this case does not explain in the order the reasons the district court believes that Ameripro will suffer irreparable injury if a temporary injunction is not granted and, thus, the temporary injunction order is void because it does not comply with the strict and mandatory requirements of Rule 683.

Rule 683 requires that the injunction order state the reasons why an injury is imminent and irreparable and why an adequate remedy at law does not exist with detail. The Rule requires that the order state specifically why the injury is imminent and what injury will be suffered by the applicant if the injunctive relief is not granted. *Cook United,* 464 S.W.2d at 106: *Kotz v. Imperial Capital Bank,* 319 S.W.3d 54,56 ( Tex. App. -- San Antonio 2010, no pet.); *International Bhd. of Elec. Workers Local Un. v Becon Constr. Co*., 104 S.W.3d 239, 243 (Tex. App. -- Beaumont 2003, no pet.); *Fasken v. Darby*, 901 S.W.2d 591, 593 (Tex. App. -- El Paso 1995, no writ); and, *Mareno v. Baker Tools, Inc.* 808 S.W.2d 208, 210 (Tex. App. -- Houston [1st Dist.] 1991, no writ). A temporary injunction "that fails to identify the harm that will be suffered if it does not issue must be declared void

and be dissolved. This rule operates to invalidate an injunction even when the complaining party fails to bring the error to the trial court's attention." *Fasken*, 901 S.W.2d at 593.

Here, the temporary injunction order makes mere conclusions and does not provide any explanation or description of why the extraordinary remedy of a temporary injunction is needed in order to prevent imminent injury to Ameripro. The temporary injunction order merely concludes that "Ameripro has met its burden to establish a probable right of recovery and likelihood of success on the merits"; but the temporary injunction order does not comply with the requirements of the Rule 683 by providing the grounds or explaining why the alleged injury to Ameripro is imminent, or irreparable, or why an adequate remedy at law does not exist for damages. The temporary injunction order merely concludes that "Ameripro will suffer a probable, imminent and irreparable injury" but provides no explanation of why the injury is imminent or, further why the injury is irreparable. The order merely concludes that "Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief" but does not provide the necessary description or grounds supporting why Ameripro does not have a remedy for breach of contract in damages.

Nowhere in the temporary injunction order is there any description or explanation of why any injury to Ameripro is imminent. There is also no

explanation or description in the temporary injunction order relating to any "customers" of Ameripro that Appellants unlawfully solicited.  And, there is no explanation in the temporary injunction order regarding any solicitation of "Brohn Homes, Seaholm Residences or Clark Wilson Builders." On its face, the temporary injunction order fails to comply with the requirements of Rule 683 and, as a result, is void and should be dissolved.

The temporary injunction applicant carries the burden to establish all of the necessary elements that would entitle the applicant to a temporary injunction. At the temporary injunction hearing, the applicant, Ameripro, must introduce competent evidence to support all of the necessary elements required to secure a temporary injunction including an injury that is imminent and a lack of any other legal remedy. *Letson v. Barnes*, 979 S.W.2d 414, 417 (Tex. App. -- Amarillo 1998, pet. denied).  There is no evidence in the record of this appeal that would support any conclusion that Ameripro does not have an adequate remedy at law in damages for the alleged breach of the contract by Nasserfar, Task and Gosney.  There is no evidence in the record that Ameripro cannot recover damages and no evidence that Ameripro made any effort to attempt to calculate its contract damages. Furthermore, there is no evidence in the record of any "imminent injury" to Ameripro caused by Appellants' possession of alleged confidential information of Ameripro prior to the temporary injunction hearing.  In fact, the undisputed

evidence is that all confidential information of Ameripro -- both paper and electronic -- was returned to Ameripro prior to the temporary injunction hearing (RR at Vol. 4 Applicant's Exhibit 4; RR at Vol. 3 at 122, L21--123, L5; Plaintiffs' Exhibit 34 at RR Vol.4; RR at Vol 3 at 73 L18-- 78, L1 and 85, L6 -86, L23.), and, consequently, there is no basis for any injunction related to the alleged confidential information of Ameripro. Furthermore, there is no evidence in the record that Appellants solicited any "customers" of Ameripro except those "customers" of Appellants that existed prior to the time that they were employed by Ameripro in which they are permitted to solicit under the express wording of the employment contracts. In other words, there is no basis and no evidence in the record of any solicitation of "customers" that would violate any contract. And, in addition, there is simply no evidence in the record that this temporary injunction was necessary because of an imminent injury to Ameripro. Consequently, based on the failure of the temporary injunction order to comply with Rule 683 and the failure of Ameripro to carry its burden of presenting competent evidence supporting the elements necessary for a temporary injunction, the temporary injunction in this case is void and should be immediately dissolved.

## II.

**THE DISTRICT COURT ERRED IN THE TEMPORARY INJUNCTION ORDER IN APPLYING THE NON-SOLICITATION PROVISIONS OF THE CONTRACTS TO REAL ESTATE HOMEBUILDERS AND CONDOMINIUM DEVELOPERS, REAL ESTATE SALES AGENTS, AND**

**OTHER REAL ESTATE PROFESSIONALS INVOLVED IN THE REAL ESTATE INDUSTRY BECAUSE THEY ARE NOT "CUSTOMERS" OF AMERIPRO UNDER THE PLAIN READING OF THE CONTRACTS.**

The contracts only prohibit the solicitation of "any customer" of Ameripro for a period of one (1) year following the termination of Nasserfar's and Task's employment with Ameripro. Several paragraphs in several employment agreements provide generally the same verbiage as follows:

"5.(e) For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity do any of the following:

(i)     solicit from any *customer,* payor or supplier doing business with the company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such *customer,* payor or supplier:

. . .

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) *shall not apply to any customer of Employee that existed prior to employment* with the Company, provided the *customer and their loan* is not being serviced by the Company." (Emphasis added).

( App.6; RR Vol. 4 at Applicant's Exhibit 14). The employment agreements were drafted by Ameripro. (RR at Vol. 3 at 70, L15-25).

The employment agreements on their face do not define the terms "customer" and Ameripro confessed that there are no definitions of the terms in the agreements (RR at Vol. 3 at 71, L1-11) But the exception to the prohibition on solicitation applies to "any customer of Employee that existed prior to employment

28

with the Company, provided the *customer and their loan* is not being serviced by the Company." (Emphasis added)  Ameripro is in the business of loaning money to customers to purchase residential real estate. (RR Vol. 2 at 109-111; 115, L9-21). This paragraph of the employment agreement clearly defines the term "customer" to refer to residential loan borrowers, not homebuilders or residential developers. The district court erred as a matter of law in concluding that the term "customer" applies to residential homebuilders, residential condominium developers, and other real estate professionals such as real estate sales agents, and in granting a temporary injunction prohibiting solicitation of "Brohn Homes, Seaholm Residences and Clark Wilson Builders" (*See*, App. 1 at 4).  This construction of the employment agreement by the district court is contrary to the language and intent of the agreement. The district court's construction of the employment agreement to define the term "customer" to include residential homebuilders, residential condominium developers, and other real estate sales professionals such as real estate agents creates a latent ambiguity in the agreement.  It was not the intent of the agreement.  The intent of the agreement was to define the term "customer" to mean only residential loan borrowers since Michael Nasserfar and Michael Task are licensed residential mortgage loan officers and Ameripro is in the business of loaning money to borrowers to enable them to purchase residential real estate.  Any other construction of these terms in the employment agreement is

ambiguous and the ambiguity must be construed against the drafter of the agreement -- Ameripro. *Levine v. Bayne, Snell & Krause, Ltd.,* 40 S.W.3d 92, 95 (Tex. 2001); *State & Cty. Mut. fire Ins. v. Macias*, 83 S.W.3d 304, 307 (Tex. App.-- Corpus Christi, 2002).

A latent ambiguity in a contract occurs when a contract is unambiguous on its face, but an ambiguity arises due to some collateral matter when the contract is applied to the particular subject matter. *Progressive Cty. Mut. Ins. v. Kelley*, 284 S.W.805, 807 (Tex. 2009); and, *Farmers Ins. Exch. v. Leonard,* 125 S.W. 85, 65 (Tex. App. -- Austin 2003, pet. denied). The district court's construction of the employment contract term "customer" to include residential homebuilders, residential condominium developers, and other real estate sales professionals such as real estate agents is not only erroneous but such construction creates a latent ambiguity and, as such, cannot be the basis upon which a temporary injunction can be sustained. *Gallagher Headquarters Ranch Dev., Ltd v. City of San Antonio*, 303 S.W,3d 700, 702 (Tex. 2010).

Alternatively, the term "customer" is referred to in both Section 5(e)(i) and 5(e)(ii) of the employment agreement; but, it is also referred to in the paragraph of the agreement which excludes the non-solicitation prohibition as to "any customer of Employee that existed prior to employment with the Company."  Therefore, if the term "customer" is to be construed as including residential homebuilders,

30

residential condominium developers, and other real estate sales professionals such as real estate agents, then the non-solicitation prohibition does not apply to any residential homebuilders, residential condominium developers, and other real estate sales professionals such as real estate agents that Michael Nasserfar or Michael Task did business with prior to their employment with Ameripro. This is the clear reading on the agreement; however, the temporary injunction order fails to include a finding that these "customers" can be solicited because the contracts exempt these customers from the solicitation restrictions    However, this construction of the employment agreement is not necessary if the agreement is correctly interpreted to mean that the term "customer" refers to borrowers and does not include any residential homebuilders, residential condominium developers, and other real estate sales professionals such as real estate agents. The intent of the agreement was only to limit the solicitation to residential loan borrowers of Ameripro unless Michael Nasserfar or Michael Task were the loan officers for the residential loan borrowers prior to their employment with Ameripro -- an instance in the industry known as a refinance. No evidence establishes that neither Michael Nasserfar nor Michael Task ever solicited loans from any residential loan borrowers of Ameripro and, thus, if a proper construction of the employment contract is utilized, there is no legal basis for a temporary injunction prohibiting the solicitation of "Brohn Homes, Seaholm Residences, and Clark Wilson

31

Builders" (see, Temporary Injunction Order, App. 1; CR 223-227 at 3-4) since Nasserfar and Task are in complete compliance with all of their lawful obligations under the contracts as properly construed.

A "customer" is generally defined as "one who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business." BLACK'S LAW DICTIONARY 348 (5th ed. 1979). The preferred definition of "customer" by Webster's New International Dictionary is "one who regularly or repeatedly makes purchases of, or has business dealings with a tradesman or business house; one who customarily has dealings with a business establishment." Ameripro confessed at the temporary injunction hearing that it does not have any direct business dealings with and does not loan money to residential homebuilders, residential real estate agents or residential developers. ( RR at Vol. 2 at 109-111). There are no Texas cases which define a "customer" as one who refers a borrower to a lender or mortgage company. There is no Texas common-law or statutory law that would define a mortgage company's "customer" as anyone other than the "borrower" of money from the mortgage company and there is no statutory or common law in Texas that would define a mortgage company's customer as a residential real estate homebuilder, residential condominium builder, licensed real estate agent or sales agent, or any other professional involved in the real estate industry. It is clear that the term "customer" in the employment agreements was a

32

reference to borrowers who borrow money from Ameripro -- a company that is in the business of lending money for the purchase of residential real estate. Id. Ameripro's contention that residential homebuilders, condominium developers, licensed real estate sales agents or other professionals in the real estate industry are its "customers" is without merit, and the district court's construction of the employment agreements to bar solicitation of residential real estate homebuilders, residential condominium builders, residential real estate agents or other professionals involved in the real estate industry is erroneous as a matter of law. Consequently, the portion of the temporary injunction which prohibits the solicitation of "Brohn Homes, Seaholm Residences, and Clark Wilson Builders" (see, Temporary Injunction Order, App.1; CR 223-227) is legally erroneous and this portion of the temporary injunction should be dissolved because the non-solicitation provisions apply only to residential loan borrowers, not builders.

## III.

**THE DISTRICT COURT ERRED IN CONCLUDING THAT RESIDENTIAL HOME AND CONDOMINIUM BUILDER, AND REAL ESTATE SALES AGENT CONTACT INFORMATION IS A TRADE SECRET BECAUSE SUCH INFORMATION IS PUBLIC INFORMATION AND CAN NEVER BE DETERMINED TO BE A TRADE SECRET, AND IS NOT THE CONFIDENTIAL AND PROPRIETARY INFORMATION OF AMERIPRO**

The district court's finding and conclusion that residential home and condominium builder, and licensed real estate sales agent contact information is a

33

confidential and proprietary trade secret belonging only to Ameripro is erroneous as a matter of law. The contact information of residential home and condominium builder, and licensed real estate sales agent is not a secret and is not property of or a trade secret or confidential and proprietary information belonging exclusively to Ameripro. The contact information of residential home and condominium builders, and real estate sales agents is generally known and is widely and readily ascertainable by proper means through the public domain. (RR at Vol 4 Plaintiffs' Exhibits 52-64; RR at Vol. 3 123-126). The contact information of residential home and condominium builders, and real estate sales agents is easily obtainable from the websites sponsored and authored by the residential home and condominium builders, and real estate sales agents, their public advertising, their marketing brochures, their business cards, Google searches, Bing searches, trade Association journals, publications and website searches, public offices where they conduct business, and other publicly available information. *Id.* It is no secret and it is not confidential and proprietary information belonging to Ameripro. And because it is no secret, and particularly no secret limited to Ameripro, the district court's conclusion in the temporary injunction order regarding trade secrets is erroneous.

To establish that the contact information of residential home and condominium builders, and real estate sales agents is Ameripro's confidential and

proprietary trade secret, Ameripro must prove that (1) it has taken reasonable efforts to keep the information secret, and (2) that the information has actual or potential independent economic value to third parties because it is generally unknown and not readily ascertainable by proper means. Tex. Civ. Rem. Code §134A.002(6) (emphasis added); *Twister B.V. v. Newton Research Partners*, 364 S.W.3d 428, 437 (Tex. App. -- Dallas, no pet.). To be protected the confidential and proprietary information trade secret must be substantially secret and unknown to the public or not ascertainable by the public using proper means. *Wissman v. Boucher*, 240 S.W.2d 278, 280 (Tex. 1951).

The word "secret" means that the proprietary information is not generally known or readily available to the public and, conversely, information that is generally known in the industry, readily accessible by independent investigation, or publicly disclosed is not a secret and is not confidential or proprietary information belonging only to Ameripro. *Interox Am. v. PPG Indus.,* 736 F.2d 194, 201-02 (5th Cir. 1984); *Sands v. Estate of Buys*, 160 S.W.3d 684, 690-91 (Tex. App. -- Fort Worth 2005, no pet.) (identities of corporation's clients could easily be acquired by others); *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 586 (Tex. App. -- San Antonio 1996, no writ) (plaintiff's customer list could be compiled by calling physicians and hospital administrators and asking for the name of their supplier).

Information is "generally unknown" if individuals who would derive an economic benefit from the information are unaware of the information or cannot ascertain the information through proper means -- such as public websites, Yellow Pages, and advertising materials. *See,* UNIFORM TRADE SECRETS ACT ("UTSA") §1 cmt. Ameripro failed to carry its burden at the temporary injunction hearing of proving that the alleged confidential and proprietary trade secret information is not readily ascertainable because it is not available in trade journals, reference books, published materials, advertising materials or websites. *See,* Tex. Civ. Prac. & Rem. Code §134A.002(6)(A) ("CPRC"). In 2013, Texas adopted the Texas Uniform Trade Secrets Act ("TUTSA") codified at Civ. Prac. & Rem. Code §134A.001 *et. seq.* To meet its burden, Ameripro must prove that the alleged confidential and proprietary trade secret information could not have been ascertained by independent development, independent research, and not by any other means that would be proper. *See,* CPRC §134A.002(4). Prior to the adoption of the TUTSA, Texas common-law similarly required that the alleged proprietary information be secret. The proprietary information must have a modicum of originality to separate it from every day knowledge. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470,476 (1974), and information that can be accumulated from the public domain does not qualify as proprietary and confidential trade secret information. *Brandon v. Copper,* 591 S.W.2d 553, 556 (Tex. App. -- Amarillo

36

1979, writ ref'd n.r.e.). Likewise, general skill, knowledge and experience, abstract ideas, methodologies and practices and procedures required by law do not qualify as proprietary confidential trade secrets. *Numed, Inc. v. McNutt*, 724 S.2d 432, 434 (Tex. App. -- Fort Worth 1987, no writ).

The information that Ameripro contends is a proprietary and confidential trade secret must not be information generally known or readily available to the public, and Ameripro did not meet its burden to prove that the information was not generally known or readily available to the public at the temporary injunction hearing. *Reliant Hosp. Partners v. Cornerstone Healthcare Grp. Holdings, Inc.*, 374 S.W.3d 488, 499 (Tex. App. -- Dallas 2012, pet. denied); and, *Allan J. Richardson & Assocs v. Andrews,* 718 S.W.2d 833, 837 (Tex. App. -- Houston [14th Dist.] 1986, no writ). So, for example, information that is generally known in a particular industry, readily ascertainable by inspection or independent investigation, or publicly disclosed is not considered a confidential and proprietary trade secret. *Interox Am. v. PPG Indus.*, 736 S.W.194, 201-02 (5th Cir. 1984); *Sands v. Estate of Buys*, 160 S.W.3d 684, 690-91 (Tex. App. --Fort Worth 2005, no pet.) (identities of corporation's clients could easily be acquired by others and, thus, is not confidential and proprietary trade secret information); and, *Wissman v. Boucher*, 240 S.W.2d 278, 281 (Tex. 1951) (general knowledge available to the public does not qualify as a confidential and proprietary trade secret).

In addition, Ameripro failed at the temporary injunction hearing to address several of the factors as set forth in the Restatement (3d) of Unfair Competition §39 reporter's note cmt. d. First, is the information known outside Ameripro's business? The court should assess the extent to which the alleged confidential and proprietary trade secret is information that is outside of the Ameripro's business, and is information only known to the Ameripro. The court should consider the extent to which the alleged confidential and proprietary trade secret information is generally known in the residential real estate market in Austin and the surrounding communities. *Lamons Metal Gasket Co. v. Traylor,* 361 S.W.2d 211, 213 (Tex. App. -- Houston 1962, writ ref'd n.r.e.) (Machines were generally known to the basket and metal industry and were not a trade secret). Specifically, customer lists that contain information readily discoverable by independent means would not qualify as a protectable confidential proprietary trade secret. *Numed, Inc. v. McNutt*, 724 S.2d 432, 435 (Tex. App. -- Fort Worth 1987, no writ); (customer lists could be compiled by calling physicians and hospital administrators and asking for the name of their supplier and, thus, does not qualify); *SCM Corp. v. Triplett Co.,* 399 S.W.2d 583, 586 (Tex. App. -- San Antonio 1966, no writ) (the customer lists could be ascertained by anyone and, thus, is not confidential and proprietary trade secret information).

Second, what is the level of difficulty to duplicate the information? The court should assess the ease or difficulty with which others could properly acquire or duplicate the information. *In re Union Pac. R.R.*, 294 S.W.3d 589, 592 (Tex. 2009); and *In re Bass,* 113 S.W.3d 735, 742 (Tex. 2003). These factors weigh heavily in rejecting Ameripro's contention that the contact information of real estate homebuilders and other professionals in the real estate business is a confidential and proprietary trade secret belonging only to Ameripro, and Ameripro failed to prove at the temporary injunction hearing that such information is a trade secret. The information clearly is not confidential, not proprietary and not secret. Because of Ameripro's failure to present or offer evidence or to rebut the public nature of this information, the District Court erred in concluding that there was any trade secret status to the contact information of real estate homebuilders and other professionals in the real estate business and, consequently, trade secrets is an improper basis for granting the temporary injunction.

## IV.

**THE DISTRICT COURT ERRED IN GRANTING THE TEMPORARY INJUNCTION BECAUSE AMERIPRO FAILED TO PROVE PROBABLE, IMMINENT AND IRREPARABLE INJURY CAUSED BY THE PREVIOUS POSSESSION OF CONFIDENTIAL INFORMATION OF AMERIPRO.**

Where is the probable, imminent and irreparable injury to Ameripro from Appellants' alleged previous possession of alleged confidential information? No injury or harm was established by Ameripro at the temporary injunction hearing,

and certainly no imminent injury. There is no irreparable injury existing in the record to support the temporary injunction clauses related to the alleged confidential information or alleged trade secrets. Ameripro failed to prove probable and imminent irreparable injury caused by the previous possession by Appellants of Ameripro's alleged confidential information. It is improper for the district court to assume irreparable injury when there is no proof of misuse of confidential information by Appellants. *W.R. Grace & Co. v. Henson*, 2007 Tex. App. LEXIS 6771, 2007 WL 2389547, at *3 (Tex. App.—Corpus Christi Aug. 23, 2007, no pet.). The obligation not to use confidential information also does not bar a former employee from using the general knowledge, skill, and experience that the employee acquired during the employment to compete with the former employer. *Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 443 (S.D. Tex. 2008); *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 425 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Here, there is no reason to infer that Appellants did or would use Ameripro's confidential information because at the time of the temporary injunction hearing Appellants did not have any confidential information in their possession (*see*, RR at Vol. 3 at 122, L21-123,L5; Plaintiffs' Exhibit 34at RR Vol.4; RR at Vol.3 at 73 L18-78, L1 nad 85, L6-- 86, L23) and do not need such information in their current positions given their extensive industry knowledge. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 469 (5th

Cir. 2003) (declining to infer that former employee would probably use the information).

The purpose of injunctive relief is to halt wrongful acts that are threatened or in the course of accomplishment, *rather than to grant relief against past actionable wrongs* or to prevent commission of wrongs not *imminently threatened. See Tex. Health Care Info. Council v. Seton Health Plan, Inc.,* 94 S.W.3d 841, 853 (Tex. App.--Austin 2002, pet. denied). Although an injunction is a preventive device, injunctive relief is improper when the party seeking the injunction has mere fear or apprehension of the possibility of injury. *Harbor Perfusion, Inc. v. Floyd,* 45 S.W.3d 713, 716 (Tex. App.--Corpus Christi 2001, no pet.)

No legal presumption of use of confidential information exists under Texas law. Texas courts have declined to apply the inevitable disclosure doctrine when the former employee does not have possession of confidential information or has not used any such alleged confidential information with his current employer, *M-I, L.L.C. v. Stelly*, 2009 U.S. Dist. LEXIS 65866, 2009 WL 2355498, at * 7 (S.D. Tex. Jul. 30, 2009); *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 242 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Ameripro offered no evidence of any past improper *use* of any alleged confidential information by Appellants, and, as a matter of law, there can be no future improper use of confidential information since the record establishes, without debate, that

Appellants no longer possess any confidential information of Ameripro. (RR at Vol. 3 at 122, L21-123,L5; Plaintiffs' Exhibit 34at RR Vol.4; RR at Vol.3 at 73 L18-78, L1 nad 85, L6-- 86, L23). Ameripro cannot rely upon the "inevitable disclosure doctrine" to support its burden to prove irreparable harm caused by the Appellants previous possession of alleged confidential information. There is no evidence of irreparable harm, or any injury at all, suffered in the past or in the future by the Appellants previous possession of alleged confidential information of Ameripro and certainly no injury that is imminent. Therefore, the district court erred in granting the temporary injunction because there is no probable and imminent irreparable injury to Ameripro resulting from Appellants previous possession of alleged confidential information.

Despite the employment contracts and Texas statutes, Ameripro is still required to prove imminent and irreparable injury in the interim if a temporary injunction is not entered. America failed to prove any imminent injury and certainly no irreparable harm. In 2012, the Dallas Court of Appeals held that employment contracts and statutes regarding non-compete and non-solicitation covenants do not replace the common law requirement for injunctive relief that an applicant show imminent and irreparable injury to obtain a temporary injunction. *Primary Health Physicians, P.A. v. Sarver*, 390 S.W.3d 662, 664-65 (Tex. App.— Dallas 2012, no pet.). The *Sarver* court then joined its sister courts of appeals in

holding that employment contracts and statutes do not preempt the requirements for obtaining temporary injunctive relief**.** *Id.* at 665 (citing *EMSL Analytical, Inc. v. Younker*, 154 S.W.3d 693, 695 (Tex. App.—Houston [14th Dist.] 2004, no pet.); and *NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 867-68 (Tex. App.—Beaumont 2003, no pet.)). The *Sarver* court agreed with the reasoning of these cases that employment contracts in Texas statutes do "not supplant the common law requirements for a pretrial temporary injunction." *Id.* Since *Sarver* issued in 2012, other Texas courts of appeals have agreed that evidence of a probable**,** imminent, and irreparable injury in the interim is a necessary element for a temporary injunction. *See Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 Tex. App. LEXIS 3398, 2014 WL 1257278, at *7 (Tex. App.—Fort Worth Mar. 27, 2014, no pet.) (mem. op.) (section 15.52 does not apply to temporary injunctions); *Down Time-South Texas, LLC v. Elps*, 13-13-00495-CV, 2014 Tex. App. LEXIS 3047, 2014 WL 1464320, at *7 (Tex. App.—Corpus Christi-Edinburg Mar. 20, 2014, no pet.) (mem. op.) (requiring proof of injury). Therefore, an applicant seeking a temporary injunction must show a probable, imminent, and irreparable injury in the interim before trial to sustain its burden to be entitled to a temporary injunction. Ameripro failed to do so.

There is no evidence in the record of any probable, imminent and irreparable injury that Ameripro would suffer if a temporary injunction was not entered. In

43

fact, the record establishes, without rebuttal or conflict, that all of the confidential information alleged by Ameripro was returned to Ameripro prior to the temporary injunction hearing and no paper or electronic copies of any confidential information was retained by Appellants. (RR at Vol. 3 at 122, L21-123,L5; Plaintiffs' Exhibit 34at RR Vol.4; RR at Vol.3 at 73 L18-78, L1 nad 85, L6-- 86, L23). Since the record conclusively establishes that Appellants, at the time of the temporary injunction hearing, did not possess any confidential information of Ameripro, Ameripro has failed to meet its burden to establish a probable, imminent and irreparable injury in the interim caused by the alleged confidential information, and the district court abused its discretion in entering a temporary injunction regarding electronic files, electronic media, and confidential information.

## V.

**THE DISTRICT COURT ERRED IN GRANTING THE TEMPORARY INJUNCTION BECAUSE AMERIPRO HAS AN ADEQUATE REMEDY AT LAW FOR CONTRACTUAL DAMAGES AND THERE IS NO IRREPARABLE INJURY SUFFICIENT TO JUSTIFY THE TEMPORARY INJUNCTION.**

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford,* 84 S.W.3d 198, 204 (Tex. 2002), *citing, Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); and *Electronic Data Sys. Corp. v. Powell*, 508 S.W.2d 137, 139 (Tex. Civ. App.-Dallas 1974, no writ). The Texas Supreme Court emphasized that "[a] temporary

44

injunction is an extraordinary remedy and does not issue as a matter of right", *citing Walling*, 863 S.W.2d at 57 and that "[t]o obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru,* 84 S.W.3d at 204, *citing, Walling*, 863 S.W.2d at 57; and, *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). The probable injury element requires a showing that the harm is imminent, the injury would be irreparable, and that the plaintiff has no other adequate legal remedy. *Zamora*, 13 S.W.3d at 468.

An irreparable injury exists if the party injured cannot sufficiently be compensated in damages or the amount of damages is immeasurable by pecuniary standards. *Id.* (citing *Canteen Corp. v. Republic of Tex. Props., Inc.,* 773 S.W.2d 398, 401 (Tex. App.--Dallas 1989, no writ)). The contract provisions at issue here "will not be enforced by an injunction where the party seeking the injunction has failed to show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy." *Reach Group, L.L.C. v. Angelina Group,* 173 S.W.3d 834, 837-38 (Tex. App.--Houston [14th Dist.] 2005, no pet.).

Although an injunction is a preventive device, injunctive relief is improper where the party seeking the injunction has mere fear or apprehension of the possibility of injury. *Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d

45

246, 248 (Tex. 1983). A prerequisite for injunctive relief is actual injury, the threat of imminent harm, or another's demonstrable intent to do that for which injunctive relief is sought. *Tri-State Pipe and Equip., Inc. v. S. Cnty. Mut. Ins. Co*., 8 S.W.3d 394, 401 (Tex. App.—Texarkana 1999, no pet.). An injunction will not issue if damages are sufficient to compensate the applicant for any wrong committed by the respondent and if the damages are subject to measurement by an ascertainable pecuniary standard. *Tom James Co. v. Mendrop,* 819 S.W.2d 251, 253 (Tex. App.-- Fort Worth 1991, no writ), and *Minexa Ariz., Inc. v. Staubach,* 667 S.W.2d 563, 567 (Tex. App.-- Dallas 1984, no writ). The party requesting the injunction has the burden of negating the existence of adequate legal remedies. *Minexa Ariz., Inc.,* 667 S.W.2d at 567; and *Cardinal Health*, 106 S.W.3d at 235.  The burden is on the applicant (Ameripro) to prove that its damages cannot be calculated, not on the non-movant (Appellants) to *disprove* that notion. *See Reach Group, L.L.C*., 173 S.W.3d at 838.  Ameripro failed to carry that burden because it produced no evidence, either express or implicit, that its damages are simply too speculative to be calculated and, after the temporary injunction hearing swore that it had nearly $2 million in damages (CR Supp. 2 filed August 31 2015 at 17) and, additionally, that it was entitled to disgorgement damages and a reasonable royalty from Appellants. (See, App. 3,4 and 5 at 3-6,16-17: CR Supp. 2 filed August 31, 2015 at 3-6, 16-17).

Ameripro failed to establish or offer any evidence that Appellants intended to or were violating any provision of the contract and, specifically, there is no evidence that Appellants had possession of any of the alleged confidential and proprietary files (paper or electronic) of Ameripro at the time of the temporary injunction hearing. In fact, the evidence establishes, without rebuttal from Ameripro, that all of the electronic files had been deleted from all electronic devices of the Appellants prior to the temporary injunction hearing (RR at Vol. 3 at 73 L18-78, L1 and 85, L6 -- 86, L23 -- testimony of Lee Whitfield) and, thus, there is no basis for the temporary injunction clauses with respect to the paper or electronic alleged confidential and proprietary records and files of Ameripro. In addition, Ameripro failed to establish that Ameripro had a probable, imminent and irreparable injury in the interim that could not be compensated by damages and, thus, the temporary injunction was improperly granted by the district court.

A district court abuses its discretion in granting a temporary injunction unless "it is clearly established by the facts that one seeking such relief is threatened with an actual irreparable injury if the injunction is not granted." *Markel v. World Flight, Inc.*, 938 S.W.2d 74, 80 (Tex. App.—San Antonio 1996, no pet.) (quoting *Dallas Gen. Drivers v. Wamix, Inc.*, 156 Tex. 408, 295 S.W.2d 873, 879 (Tex. 1956)). And evidence of fear, apprehension, and possibilities is not sufficient to establish any injury, let alone irreparable injury. *Id.* at 79-80. To demonstrate

probable injury or harm, an applicant must show an injury for which there can be no real legal measure of damages or none that can be determined with a sufficient degree of certainty, *i.e.*, a non-compensable injury. *Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 925-26 (Tex. App.—Dallas 2006, no pet.).

The party seeking injunctive relief carries the burden to demonstrate an irreparable injury. *See Reach Group, L.L.C. v. Angelina Group*, 173 S.W.3d 834, 838 (Tex. App.--Houston [14th Dist.] 2005, no pet.). An injury is considered irreparable if the party cannot be adequately compensated in damages, or if those damages are incapable of calculation. *Butnaru*, 84 S.W.3d at 204; *Reach Group, L.L.C.*, 173 S.W.3d at 838. Generally, however, courts do not enforce contractual rights by injunction, because an applicant who may recover breach-of-contract damages can rarely establish an irreparable injury and accompanying inadequate legal remedy. *Butnaru*, 84 S.W.3d at 211; *Reach Group, L.L.C.*, 173 S.W.3d at 838.

It is improper for a district court to enforce contractual rights by injunction "because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract or available." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002), *citing, Canteen Corp. v. Republic of Tex. Props., Inc.* 773 S.W.2d 398, 401 (Tex. App. -- Dallas, 1989, no writ), and *Chevron U.S.A. , Inc. v Stoker*, 666 S.W. 2d 379, 382 (Tex. App. Eastland 1984,

48

writ dism'd). The district court erred in enforcing a contract between the parties when the legal remedy of damages was available to Ameripro.

Under common law, the applicant seeking injunctive relief must demonstrate four elements to be entitled to an injunction: (1) the existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law. *Devon Energy production company, L.P. v. McCarver,* ____S.W.3d ___, 2015 Tex App. LEXIS 8241, (Tex, App. -- Waco, August 6, 2015, no pet.), *citing, Noell v. City of Carrollton*, 431 S.W.3d 682, 712 (Tex. App.—Dallas 2014, pet. denied); *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.); *Priest v. Tex. Animal Health Comm'n*, 780 S.W.2d 874, 875 (Tex. App.—Dallas 1989, no writ).

It is no excuse that §65.001 of the Texas civil practice and remedies code does not set forth in these elements specifically since the principles governing courts of equity govern injunction proceedings under §65.001. *See,* §65.001 ("The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law."). And, Rule 693 of the Texas Rules of Civil Procedure provides that "[t]he principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with these rules or the provisions of the statutes." *See,* TRCP 693.

49

In *Town of Palm Valley Texas v. Johnson,* 87 S.W.3d 110, (Tex. 2001), the Texas Supreme Court rejected the opinion of the Court of Appeals that an injunction may be granted without a showing of irreparable harm". The court held that the requirement of equity of showing irreparable harm and a lack of an adequate legal remedy are prerequisites to obtaining injunctive relief. *Town of Palm Valley Texas, supra,* 87 S.W.3d at 111. "For the same reasons as we explained in *Powers,* the statute does not permit injunctive relief without a showing of irreparable harm otherwise required by equity." *Town of Palm Valley Texas, supra,* 87 S.W.3d at 111. The Waco Court of Appeals, as recently as August 6, 2015, has affirmed that the Texas Supreme Court "does not permit injunctive relief without a showing of irreparable harm or injury as otherwise required by equity." *Devon Energy production company, L.P. supra,* Tex App. LEXIS 8241 *4, *citing, Town of Palm Valley Texas v. Johnson,* 87 S.W.3d 110, 111 (Tex. 2001).

Ameripro failed to establish in the district court, and cannot establish "irreparable injury" which is a necessary element for a temporary injunction because Ameripro has an adequate remedy at law -- namely, damages. As held by the Dallas Court of Appeals, "[i]rreparable injury" is stated to be '"an injury of such nature that the injured party cannot be adequately compensated therefore in damages, or that the damages which result there from cannot be measured by any

50

certain pecuniary standard."' *Canteen Corp. v. Republic of Tex. Props., Inc*. 773 S.W.2d 398, 401 (Tex. App. -- Dallas, 1989, no writ), *citing, Chevron U.S.A. , Inc. v Stoker*, 666 S.W. 2d 379, 382 (Tex. App. Eastland 1984, writ dism'd), and *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567 (Tex. App. -- Dallas 1984, no writ). Because Ameripro has an adequate damage remedy, the temporary injunction was improper and the district court abused its discretion in granting the temporary injunction.

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain that pecuniary standard." *Devon Energy, supra,* Tex App. LEXIS 8241 *4, *citing, Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002); *Canteen Corp. v. Republic of Tex. Props., Inc*., 773 S.W.2d 398, 401 (Tex. App.—Dallas 1989, no writ).

. Ameripro, the applicant, must establish that there is no adequate remedy at law for the damages Ameripro seeks. *Devon Energy, supra,* Tex App. LEXIS 8241 *4, *citing, Millwee-Jackson Joint Venture v. DART*, 350 S.W.3d 772, 782 (Tex. App.—Dallas 2011, no pet.); and *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 235 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In *Butnaru,* the Texas Supreme Court held that the applicant for the injunction must establish "in the trial court, in addition to the other temporary-

injunction elements, and an inadequate legal remedy." *Butnaru,* 84 S.W.3d at 204, 210.  Even in the context of an employment contract not to solicit, the applicant for the injunction, Ameripro, must still meet its burden of establishing that it has no adequate remedy at law and that it cannot calculate or establish damages resulting from the alleged unlawful breach of the contract not to solicit customers "In the context of a covenant not to compete, a covenant will not be enforced by an injunction where the party seeking the injunction has failed to show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy." *The Reach Group, LLC v. Angelina Group,* 173 S.W.3d 834, 836-38 (Tex. App. -- Houston [14th Dist.] 2005, no pet.), *citing, Tom James Co. v. Mendrop,* 819 S.W.2d 251, 253 (Tex. App.--Fort Worth 1991, no writ). "Courts generally will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available." *The Reach Group, LLC,* 173 S.W.3d at 838, *citing*, *Butnaru*, 84 S.W.3d at 211. ("An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.") *Butnaru*, 84 S.W.3d at 204; and *see Cardinal Health Staffing Network, Inc v. Bowen*, 106 S.W.3d 230, 235 (Tex. App.--Houston [1st Dist.] 2003, no pet.)(quoting *Butnaru*, 84 S.W.3d at 204); *Mendrop*, 819 S.W.2d at 253 ("An injunction will not issue if damages are sufficient to

compensate the plaintiff for any wrong committed by the defendant and if the damages are subject to measurement by an ascertainable pecuniary standard."). And Ameripro, the injunction applicant, has the burden to establish that there is no adequate remedy at law for damages. *The Reach Group, LLC,* 173 S.W.3d at 838, *citing, Cardinal Health*, 106 S.W.3d at 235.

In *W. R. Grace & Co. v. Henson,* 2007 Tex. App. LEXIS 6771 (Tex. App. -- Corpus Christie 2007, no pet.), the employee resigned his position with the employer and accepted a job with one of the employer's competitors. He testified that he intended to solicit business from customers that he had serviced when working for the employer, but that he would not disclose any information received while working for the employer. The employer contended that it would suffer irreparable injury absent an injunction. However, the appellate court noted that the employer did not: (1) present any evidence of wrongful acts that were imminently threatened or in the course of accomplishment, (2) claim that it had lost any business, or (3) prove that the employee *used* any confidential information to solicit business for his new employer. The employer provided no evidence regarding harm or injuries that could not be remedied through an award of monetary damages. The Court of Appeals affirmed the district court's denial of the requested temporary injunction because there was no imminent harm and the

53

applicant for the injunction failed to prove that it's injuries could not be compensated through the award of monetary damages.

Here, Ameripro failed to prove that it has no adequate remedy at law if the temporary injunction is not granted. After the temporary injunction was granted, Ameripro swore that it had suffered approximately $2 million in damages. But, at the temporary injunction hearing, Ameripro failed to prove that it cannot recover its contractual damage claims. The district court erred in granting the temporary injunction because there was no proof of an imminent and irreparable injury. Ameripro can proceed with its contractual damages claims; but the temporary injunction should be dissolved.

## VI.

**THE DISTRICT COURT ABUSED ITS DISCRETION AND ENTERED AN OVERBROAD TEMPORARY INJUNCTION IN WHICH THERE IS NO NEXUS BETWEEN THE ENJOINED CONDUCT AND ANY IMMINENT AND IRREPARABLE INJURY TO AMERIPRO.**

A district court abuses its discretion when it misapplies the law to established facts or when it concludes that a temporary injunction should be granted and such conclusion is not reasonably supported by the evidence. *State v. Southwestern Bell Tel Co.*, 526 S.W.2d 526, 528 (Tex. 1975). The entry of a temporary injunction that enjoins lawful as well as unlawful acts is overbroad and constitutes abuse of discretion. *RCI Entm't (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 603 (Tex. App. -- San Antonio 2012, no pet.); and,

*Computek Computer & Office Sups. v. Walton,* 156 S.W.3d 221 (Tex. App. --

Dallas 2005, no pet.).

A temporary injunction must enjoin only those acts that are necessary to protect the applicant from imminent and irreparable injury and must not enjoin acts that are unnecessary to protect the applicant during the interim before trial from imminent and irreparable injury. "[A] trial court abuses its discretion by entering an overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights." *Harbor Perfusion*, 45 S.W.3d at 717, (citing *Fairfield Estates L.P. v. Griffin*, 986 S.W.2d 719, 723 (Tex. App.—Eastland 1999, no pet.); *The Republican Party of Texas v. Dietz*, 940 S.W.2d 86, 93 (Tex. 1997); *Villalobos v. Holguin*, 146 Tex. 474, 208 S.W.2d 871, 875 (Tex. 1948); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 583 Tex. App.—San Antonio 1998, no writ)). A temporary injunction order that goes further than necessary to protect the applicant from imminent irreparable injury or that does not comply with applicable law is overbroad and an abuse of discretion. *Matlock v. Data Processing Security*, Inc., 618 S.W.327, 329 (Tex. 1981).

The temporary injunction order entered by the district court is overbroad and is an abuse of discretion by the court. Clause (i) of the temporary injunction order requires Appellants "to provide" "forensic images of all original source media that

55

contains or did contain Ameripro files or information (including but not limited to flash drives, disks, USB storage devices, external storage devices, hard drives, cell phones and laptops) (hereinafter collectively the "Media") in the possession, custody or control of Nasserfar, Task, and Gosnay." (App. 1 at 3) This provision is overbroad and unnecessary to preserve the status quo until trial. The temporary injunction order does not set forth an explanation of why Ameripro will be imminently and irreparably injured if the forensic images are not turned over to Ameripro, and there is no evidence of imminent or irreparable injury that will occur to Ameripro if the forensic images are not turned over.

In the same clause (i) of the temporary injunction order, the district court ordered that "[t]he Media [including hard drives, cell phones and laptops of Nasserfar, Task and Gosnay which they use every day in their business] from which the forensic images are made will be preserved and held by" Appellants' counsel as "attorneys eyes only." In essence, the district court ordered that the hard drives, cell phones and laptop computers of Nasserfar, Task and Gosnay which they use in their daily business practices had to be relinquished by them, turned over to their attorney and held by the attorney without access by Nasserfar, Task and Gosnay. This provision of the temporary injunction order is unreasonable and overbroad and an abuse of discretion. The temporary injunction order does not set forth an explanation of why Ameripro will be imminently and irreparably injured if

56

Nasserfar, Task and Gosnay do not relinquish their hard drives, cell phones and computers, and there is no evidence of imminent or irreparable injury that will occur to Ameripro if Nasserfar, Task and Gosnay do not relinquish their hard drives, cell phones and computers. Ameripro sought this provision of the order to punish Nasserfar, Task and Gosney for resigning their at will employment with Ameripro. This provision of the order bears no resemblance to any need for protection for Ameripro, is overbroad and an abuse of discretion.

Clause (iii) of the temporary restraining order unreasonably restrains "Oak Mortgage, [and] employees of Oak Mortgage" from "directly or indirectly, soliciting business from Brohn Homes, Seaholm Residences and Clark Wilson Builders." There is no contract or fiduciary relationship between Oak Mortgage and Ameripro and, thus, no legal justification for enjoining all loan officers and employees of Oak Mortgage from soliciting business from publicly known homebuilders. The temporary injunction order does not set forth an explanation of why Ameripro will be imminently and irreparably injured if loan officers and employees of Oak Mortgage -- other than Nasserrfar, Task and Gosnay -- solicit business from publicly known homebuilders -- such as Brohn Homes, Seaholm Residences, and Clark Wilson Builders -- and there is no evidence of imminent or irreparable injury that will occur to Ameripro if such actions are not enjoined.

Clause (iii) of the temporary restraining order is also unreasonable and overbroad because it does not restrict the prohibition on solicitation to the one (1) year term as set forth in the employment agreements. (App. 6; RR Vol 4 Plaintiffs' Exhibit 3). The restriction on solicitation, if properly applied and applicable at all, is limited to one year from the date that Nasserfar, Task and Gosnay terminated their employment relationship with Ameripro. *Id.* this portion of the temporary injunction order is too broad and, if applicable at all, must be limited to one (1) year from the date of the termination of the employment relationship which occurred on January 16, 2015.

## PRAYER

For these reasons, Appellants pray that the court dissolve the temporary injunction.

Respectfully submitted,

/s/ Charles Bundren
**WM. CHARLES BUNDREN & ASSOCIATES**
**LAW GROUP, PLLC**
Wm. Charles Bundren, Esq.
Attorney-in Charge
State Bar No. 03343200
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034
(214) 808-3555     Telephone
(972) 624-5340     Facsimile
e-mail:     charles@bundrenlaw.net
**ATTORNEY FOR APPELLANTS**

# CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of September, 2015, all counsel of record were served with a copy of this document by serving the following:

Susan Burton, Esq.
State Bar No.      03479350
GRAVES DOUGHTERY HEARON & MOODY
P.C.
401 Congress., Suite 2200
Austin, Texas 78701
Telephone:  (512) 480-5600
Telecopier:  (512) 480-5862 (facsimile)
E-mail:      sburton@gdhm.com
**ATTORNEY FOR APPELLEE:**

__X__by the electronic filing manager pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

____ by certified mail return receipt requested deposited with the United States Postal Service on the date indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

__X__ by email at the email address indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

____ by commercial delivery service deposited with _____ on the date indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

and/or

____ by fax at the fax number indicated above pursuant to.
TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

/s/ Charles Bundren
Wm. Charles Bundren, Esq.

**ATTORNEY FOR:**
**APPELLANTS**

**CERTIFICATE OF COMPLIANCE**

I certify that this document was produced on a computer using Microsoft Word and contains 10,967 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas rule of appellate procedure 9.4(i)(1).

/s/ Charles Bundren

**WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC**

Wm. Charles Bundren, Esq.
Attorney-in Charge
State Bar No. 03343200
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034
(214) 808-3555     Telephone
(972) 624-5340     Facsimile
e-mail:        charles@bundrenlaw.net
**ATTORNEY FOR APPELLANTS**

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

Wm. Charles Bundren, Esq.
Attorney-in-Charge
State Bar No. 03343200
2591 Dallas Parkway
Suite 300
Frisco, Texas 75034
Telephone:214.808.3555

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 17th day of September, 2015, all counsel of record were served with a copy of this document by serving the following:

Susan Burton, Esq.
State Bar No.       03479350
GRAVES DOUGHTERY HEARON & MOODY
P.C.
401 Congress., Suite 2200
Austin, Texas 78701
Telephone:  (512) 480-5600
Telecopier:  (512) 480-5862 (facsimile)
E-mail:        sburton@gdhm.com
**ATTORNEY FOR APPELLEE:**

__X__ by the electronic filing manager pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

_____ by certified mail return receipt requested deposited with the United States Postal Service on the date indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

__X__ by email at the email address indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

_____ by commercial delivery service deposited with _____ on the date indicated above pursuant to TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

and/or

_____ by fax at the fax number indicated above pursuant to.
TRAP 6.3, 9.2 (c)(2), 9.5 (a), 9.5 (b) (1), 9.5(c) (4)and 9.5(e),

/s/ Charles Bundren
Wm. Charles Bundren, Esq.

**ATTORNEY FOR:**
**APPELLANTS**

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

# EXHIBIT 1

**Filed in The District Court
of Travis County, Texas**

JUN 1 6 2015

At_____ 10:50 ҍ.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC., | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, MICHAEL | § | |
| E. TASK, and TYCORD R. GOSNAY, | § | |
| | § | |
| **Plaintiffs / Counter-Defendants,** | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRO FUNDING, INC., | § | |
| | § | |
| **Defendant / Counter-Plaintiff.** | § | 345th JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION ORDER

Ameripro Funding, Inc.'s ("Ameripro") Application for Temporary Injunction, set forth in Defendant and Counter-Plaintiff Ameripro Funding, Inc.'s Counterclaim and Sworn Application for Temporary Injunction and Permanent Injunction, came on for hearing before the Court on May 26 and May 27, 2015. Based on the pleadings, the evidence submitted, and the argument of counsel, the Court finds that Ameripro is entitled to entry of a temporary injunction against Plaintiffs and Counter-Defendants Michael H. Nasserfar ("Nasserfar"), Michael E. Task ("Task"), Tycord R. Gosnay ("Gosnay"), and Oak Mortgage Group, Inc. ("Oak Mortgage") as set forth below.

The Court finds that, based upon the evidence, Ameripro has met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious interference with contract, and breach of contract, in that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not





limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contact information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter "Ameripro Information").

The Court further finds, based upon the evidence, that Ameripro has met its burden to establish that Ameripro will suffer a probable, imminent, and irreparable injury until trial on the merits, absent entry of a temporary injunction, in that Ameripro has shown that the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify, a future award of damages would not fully or adequately compensate Ameripro, Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief, and even to the extent that a legal remedy might be available, its redress will be limited and inadequate. The Court further finds that the balancing of the equities as between Ameripro and Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage favors the issuance of this temporary injunction, and that this temporary injunction is necessary to preserve the status quo between the parties pending trial on the merits.

IT IS THEREFORE ORDERED that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage, employees of Oak Mortgage, and other entities acting or purporting to act in participation or concert with them, are commanded forthwith to:

(i)     within three (3) days of this Order, provide to Roy Rector of R3 Digital Discovery (Ameripro's forensic computer expert) forensic images of all original source media that contains or did contain Ameripro files or information (including but

2

224

not limited to flash drives, disks, USB storage devices, external storage devices, hard drives, cell phones, and laptops) (hereinafter collectively the "Media") in the possession, custody, or control of Nasserfar, Task, and Gosnay (including in the possession, custody, or control of their attorneys and/or Lee Whitfield of Digital Discovery), including all bit by bit forensic copies or images, however and whenever made, including but not limited to, all such forensic images stored in any of the following formats: E01, L01, dd, s01, ad1 and/or gho. The forensic images of the Media may be reviewed and analyzed by Roy Rector, and by outside counsel of Ameripro at Graves Dougherty Hearon & Moody ("Graves Dougherty") as Attorneys' Eyes Only under the Agreed Protective Order, and Graves Dougherty may show forensic images to in-house counsel for Ameripro so long as the images relate to Ameripro. The Media from which the forensic images are made will be preserved and held by Counter-Defendants' attorney, Charles Bundren, as Attorneys' Eyes Only under the Agreed Protective Order. If the parties' counsel can agree upon which information contained in the Media belongs to the respective parties, without Court intervention, then the parties are authorized to return the other party's information to it or him. Ameripro will provide to Mr. Bundren forensic images of the three laptops that Counter-Defendants Nasserfar, Task, and Gosnay returned to Ameripro on January 15-16, 2015 (it was stated on the record that those forensic images were provided to Mr. Bundren on May 28, 2015 at the hearing).

(ii)    desist and refrain from, directly or indirectly, using any of the Ameripro Information, including but not limited to any of the Ameripro Information

3

225

contained on the Media, and from copying, purging, modifying, or destroying any Ameripro Information (except to make the forensic images for Roy Rector as set forth above in this Order).

(iii)    desist and refrain from, directly or indirectly, soliciting business from Brohn Homes, Seaholm Residences, and Clark Wilson Builders.

IT IS FURTHER ORDERED that Ameripro remove any reference to Michael Nasserfar (e.g., videos, likenesses) from the Ameripro website.

IT IS FURTHER ORDERED that the Parties mediate this case no later than sixty (60) days from the date of this Order. Such mediation shall take place in Austin, Travis County, Texas and shall be conducted by a licensed attorney agreed upon by the Parties. Costs of the mediation shall be shared equally by Counter-Defendants and Ameripro.

IT IS FURTHER ORDERED that this matter is set for trial on the merits on February 22, 2016, in the Travis County Courthouse, 1000 Guadalupe Street, Austin, Travis County, Texas 78701.

In accordance with Rule 684 of the Texas Rules of Civil Procedure, the Clerk shall issue such temporary injunction order upon Ameripro filing with the Court a bond executed by it and adequate sureties in the amount of $10,00.00, payable to Counter-Defendants, approved and conditioned as the law requires and such bond shall remain on file with the Court, as bond for this Temporary Injunction Order. The Clerk of the Court shall forthwith issue a temporary injunction in conformity with the law and the terms of this order.

SIGNED this 15 day of June , 2015 at 3: 15 a.m. (p.m.).

HON. GISELA D. TRIANA
JUDGE PRESIDING

4

226

APPROVED:

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress, Suite 2200
Austin, Texas 78701
(512) 480-5764/Fax (512) 536-9908

By: _____

Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com

ATTORNEYS FOR DEFENDANT
AMERIPRO FUNDING, INC.


APPROVED AS TO FORM:

WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
(214) 808-3555/Fax (972) 624-5340

By: _____

Wm. Charles Bundren
State Bar No. 03343200
Charles@bundrenlaw.net

ATTORNEYS FOR PLAINTIFFS OAK MORTGAGE GROUP, INC.,
MICHAEL H. NASSERFAR, MICHAEL E. TASK AND TYCORD R. GOSNAY

5

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

# EXHIBIT 2

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC. | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, | § | |
| MICHAEL E. TASK | § | |
| and, | § | |
| TYCORD R. GOSNAY, | § | |
| , | § | 345th JUDICIAL DISTRICT |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| AMERIPRO FUNDING, INC., | § | TRAVIS COUNTY, TEXAS |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' AMENDED NOTICE OF ACCELERATED APPEAL

TO THE HONORABLE COURT:

1.    OAK MORTGAGE GROUP, INC. Michael H. Nasserfar, Michael E. Task and Ty R. Gosnay (all hereinafter referred to collectively as "Plaintiffs") desire to appeal from the Temporary Injunction Order signed by The Honorable Gisela D. Triana, Judge Presiding, in the above referenced civil action on June 15, 2015.

2.    OAK MORTGAGE GROUP, INC. Michael H. Nasserfar, Michael E. Task and Ty R. Gosnay appeal to the Third Court of Appeals, Austin, Texas.

3.     The appeal of this case is an accelerated appeal because it is an appeal

of a Temporary Injunction Order pursuant to the Texas Civil Practice and Remedies

Code §51.104(a)(4).

Respectfully submitted,

By: /s/ Charles Bundren

**WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC**

Wm. Charles Bundren, Esq.
Attorney-in Charge
State Bar No. 03343200
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034
(214) 808-3555     Telephone
(972) 624-5340     Facsimile
e-mail:     charles@bundrenlaw.net
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 6th day of July, 2015, all counsel of record were served with a copy of this document in accordance with Rule 21a of the Texas Rules of Civil Procedure by serving the following:

Susan Burton, Esq.
State Bar No.     03479350
GRAVES DOUGHTERY HEARON & MOODY P.C.
401 Congress., Suite 2200
Austin, Texas 78701
Telephone:  (512) 480-5600
Telecopier:  (512) 480-5862 (facsimile)
E-mail:     sburton@gdhm.com
**ATTORNEY FOR DEFENDANT:**

__X__ by the electronic filing manager pursuant to TRCP 21a(a)(1),

_____ by certified mail return receipt requested deposited with the United States Postal Service on the date indicated above pursuant to TRCP 21a(a)(2),

__X__ by email at the email address indicated above pursuant to TRCP 21a(a)(2),

_____ by commercial delivery service deposited with _____ on the date indicated above pursuant to TRCP 21a(a)(2), and/or

_____ by fax at the fax number indicated above pursuant to TRCP 21a(a)(2).

/s/ Charles Bundren
Wm. Charles Bundren, Esq.
**ATTORNEY FOR: PLAINTIFFS**

---

CASE NO. 03-15-00416-CV

---

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

---

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

---

**APPELLANTS' APPENDIX**

---

# EXHIBIT 3

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC., | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, MICHAEL | § | |
| E. TASK, and TYCORD R. GOSNAY, | § | |
| | § | |
| **Plaintiffs / Counter-Defendants,** | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRO FUNDING, INC., | § | |
| | § | |
| **Defendant / Counter-Plaintiff.** | § | 345th JUDICIAL DISTRICT |

## COUNTER-PLAINTIFF AMERIPRO FUNDING, INC.'S FIRST AMENDED COUNTERCLAIM AND SWORN APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTION, AND AMENDED ANSWER

TO THE HONORABLE JUDGE OF SAID COURT:

AMERIPRO FUNDING, INC. ("Ameripro") respectfully files this its First Amended Counterclaim and Sworn Application for Temporary and Permanent Injunction, complaining of Counter-Defendants Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay ("Individual Counter-Defendants") and Oak Mortgage Group, Inc. ("Oak Mortgage"), and Amended Answer.

This Court entered a Temporary Restraining Order on May 11, 2015 (the "TRO"), and a Temporary Injunction on June 16, 2015 (the "Temporary Injunction"), based on Counter-Defendants' theft of Ameripro's confidential information, violations of contractual non-solicitation provisions, and other misconduct as described in those orders and detailed below. Ameripro requests that the Court issue permanent injunctive relief to restrain Counter-Defendants from engaging in similar misconduct, in addition to disgorgement and other relief set forth herein. Ameripro would respectfully show the Court the following.

## A. Introduction: Counter-Defendants' breach of fiduciary duty, misappropriation and conversion, and breach of contractual ownership and non-solicitation provisions.

1.  Ameripro is an Austin-based residential mortgage lender. The Individual Counter-Defendants are former employees who worked at Ameripro's branch office in Lakeway,

3

Texas. Nasserfar served as Branch Manager for the Lakeway branch. Task served as Sales Manager and co-managed the branch. Gosnay was a loan officer and agent of Ameripro. Each of the Individual Counter-Defendants owed formal fiduciary duties to Ameripro during his employment with the company.

2.     On January 15-16, 2015, the Individual Counter-Defendants abruptly resigned from Ameripro without prior oral or written notice. The following Monday, they opened a new branch office for Ameripro's competitor, Oak Mortgage, two streets away.

3.     Ameripro subsequently discovered that the Individual Counter-Defendants had been secretly transmitting copies of its confidential records to Oak Mortgage, beginning *over two months* before they resigned. Oak Mortgage scanned and downloaded copies of Ameripro reports onto its own computer network. Under contract, common law, and statute, all such records were the exclusive property of Ameripro, and the Individual Counter-Defendants were barred from taking or disclosing that information, let alone to a competitor.

4.     Over one month before they resigned, the Individual Counter-Defendants secretly reached an agreement under which Oak Mortgage would pay their legal expenses "in the event a law suit is filed" against them by Ameripro. The Individual Counter-Defendants continued working as fiduciaries to Ameripro, however, and used their position of trust with Ameripro to funnel confidential information to their future employer. By the time they resigned from Ameripro, the Individual Counter-Defendants had assembled and taken *thousands* of Ameripro financial spreadsheets, internal reports, and borrower data (which they loaded onto thumb drives and external storage devices), as well as a bankers box full of Ameripro's internal monthly general ledgers, loan profitability reports, pro formas, statements of income, federally-protected lists of Ameripro borrowers, and other confidential property of Ameripro. The Individual Counter-Defendants deleted hundreds of files and e-mails from Ameripro computers, including

2

approximately 911 customer files which Task deleted from an Ameripro-issued laptop.

5. The Individual Counter-Defendants also began working in concert with Oak Mortgage to solicit customers and divert business away from Ameripro, again while they were still employed and under fiduciary obligations to Ameripro. Five weeks before the Individual Counter-Defendants resigned from Ameripro, Oak Mortgage e-mailed Nasserfar and Task that "You can maintain and solicit to your book of business, and your builder/realtor relationships. You can maintain and solicit to your past customer database." In direct violation of their fiduciary obligations, the Individual Counter-Defendants proceeded to solicit business secretly on behalf of Oak Mortgage, even while they continued their employment with Ameripro.

6. For example, Nasserfar e-mailed Oak Mortgage personnel several weeks before his resignation from Ameripro, to report on his progress in "dropping in on all builder contacts." During Nasserfar's employment with Ameripro, Oak Mortgage sent him "scripts" to use in contacting "All previous clients & database," "Borrowers in Pipeline," and "Realtors in Pipeline." Gosnay forwarded an internal Ameripro compilation of customer contacts and closing preferences to his personal gmail account, for later use at Oak Mortgage. Still other texts and e-mails show that the Individual Counter-Defendants were secretly communicating with Ameripro customers about their plans to open a competing branch office with Oak Mortgage, even while still employed with Ameripro.

7. Counter-Defendants' conduct violated multiple duties and prohibitions imposed on them by contract, statute, and common law. The fact that the Individual Counter-Defendants began disclosing confidential information to a competitor and soliciting on its behalf even *before* they resigned is particularly unconscionable in light of the fiduciary obligations they still owed to Ameripro. Oak Mortgage not only aided and abetted those breaches of fiduciary duty, but specifically pressed the Individual Counter-Defendants to supply it with copies of internal

3

confidential data, and provided scripts and other assistance to help Ameripro's fiduciaries divert customers and business opportunities to Oak Mortgage.[1] The Individual Counter-Defendants' fiduciary duties, independent of the contractual non-solicitation and non-disclosure clauses they signed, barred them from engaging in such conduct.

8. The information which Counter-Defendants stole provided a detailed blueprint of the business operations of Ameripro's Lakeway office, which enabled Counter-Defendants to open a new competing branch in a single business day, less than one-quarter mile away. Leaving aside the confidential nature of its information, Ameripro invested considerable time and expense in developing the multitude of detailed financial records, spreadsheets, data compilations, and proprietary forms. By unlawfully taking all of that work product, Counter-Defendants not only misappropriated Ameripro's property, but also Ameripro's investment of time and money in creating it. By acting in flagrant disregard of their fiduciary duties over a period of several months, Counter-Defendants succeeded in destroying the business operations at Ameripro's Lakeway branch, and usurping it for themselves.

9. As a consequence of Counter-Defendants' multiple statutory, common law, and contractual violations, Ameripro seeks actual and punitive damages against Counter-Defendants (including the remedy of disgorgement from all Counter-Defendants),[2] and permanent injunctive relief, as detailed below.

---

[1] *Fidelity Nat. Title Ins. Co. v. Heart of Tex. Title Co.*, 2000 WL 13037 *6 (Tex. App.–Austin Jan. 6, 2000, pet. denied) (not design. publ.) (company engaged in fraud and "participated in or conspired to commit a breach of fiduciary duty" when it "actively encouraged Margos to recruit her co-workers while she was still employed" by a different entity).

[2] *In re Longview Energy Co.*, _ S.W.3d _, 2015 WL 2148353 *5 (Tex. 2015) ("Disgorgement is an equitable forfeiture" applicable if a fiduciary agent competes with the principal, or usurps an opportunity, or diverts an opportunity from the principal, or breaches the "relationship of trust." "The remedy discourages disloyalty and strengthens fiduciary relationships by 'strip[ping] the defendant of a wrongful gain.'"); *ERI Consult. Engrs., Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) (same, and even if a fiduciary did not obtain a benefit, he "may be required to forfeit the right to compensation" for his work); Restatement (Third) of Restitution and Unjust Enrichment §§ 40, 43 (conversion, breach of duty).

4

**B.    Background facts in support of Ameripro's equitable and legal claims, and answer.**

10.    Ameripro is a residential mortgage lending company. By the nature of its lending business, Ameripro receives loan applications, social security numbers, credit reports, tax records, asset descriptions, and other private information of consumers.

*Individual Counter-Defendants' access*
*to Ameripro's confidential information*

11.    Ameripro and its employees are required by law to protect the confidentiality of such consumer information under the Gramm-Leach-Bliley Act of 1999, Regulation P, and other applicable federal and State regulations which guard the privacy of consumers.[3]

12.    For example, under Regulation P, any "list, description, or other grouping" of consumers derived in whole or in part from nonpublic sources (such as borrower lists that Ameripro compiles from its loan records or computer files) is federally protected information and may not be disclosed, even if the same list *could* have been derived from publicly available information.    In the course of their employment with Ameripro, the Individual Counter-Defendants served as loan originators for Ameripro, and were given access to mortgage applications, consumer credit scores, loan documentation, lists of Ameripro borrowers and their loan numbers, and other consumer information maintained on Ameripro's network which is confidential by statute.

13.    Counter-Defendants were also given access to Ameripro's confidential and proprietary information, including monthly general ledgers, profitability reports, and pro formas. The detailed financial and customer information in Ameripro's internal reports is not generally known to its competitors, and gives Ameripro a competitive advantage in the marketplace.

---

[3] Chapter 94 of the Gramm-Leach-Bliley Act of 1999 ("Privacy – Disclosure of Nonpublic Personal Information") is codified in part at 15 U.S.C. § 6801. *et seq.* Regulation P is codified at 12 C.F.R. § 1016 (Dec. 21, 2011), *et seq.*

5

Disclosure of that data to a competitor, such as Oak Mortgage, would enable it to assess the economic viability of opening an office in the same locale, and to replicate Ameripro's business operations and jumpstart a competing branch. That is in fact what Counter-Defendants did.

*Under both contract and common law, Ameripro*
*is the exclusive owner of such information*

14. In sworn testimony, Counter-Defendants admitted that the records they took from Ameripro were confidential, that they had not obtained those records from any public source, and that they instead downloaded or printed them from Ameripro's password-protected computers.

15. Each of the Individual Counter-Defendants signed multiple contracts with Ameripro, however, in which they agreed that Ameripro is the sole owner of all such property. Attached as Exhibit A is a list of excerpts from a portion of the contracts that the Individual Counter-Defendants signed with Ameripro, in which they contractually agreed:

    (a) that Ameripro is the exclusive owner of all information to which they were given access during their employment or which they themselves created,

    (b) that all of their work product falls within the "work made for hire" doctrine and is owned exclusively by Ameripro,

    (c) that in the event Ameripro is not already deemed the sole owner of all such information, the Individual Counter-Defendants contractually assign to Ameripro any and all right, title, and interest they may have in any of the information, again vesting exclusive ownership in Ameripro, and

    (d) that they will not disclose that information or use it for any purpose other than performing their duties at Ameripro, and upon the termination of their employment the Individual Counter-Defendants would return all copies of that information to Ameripro, and would not retain, use, or disclose any copies or extracts for any purpose.

6

8

16. The Individual Counter-Defendants also contractually agreed that "all leads and loans in process are Company's property," that they will not "take any action to divert such loans to a competitor or away from Company," and that upon termination they would provide a "written account of any and all open leads, business prospects, and/or loans in process as of the date" of his termination.

17. The contracts which the Individual Counter-Defendants signed supplement the protections that Ameripro has in its business information under common law. Even in the absence of an enforceable contractual restriction, the Individual Counter-Defendants and those acting in concert with them are barred under Texas common law "from using for [their] own advantage, and to the detriment of [their] former employer, confidential information or trade secrets acquired by or imparted" to them in the course of their employment.[4]

18. Likewise, even if any portions of Ameripro's confidential reports could potentially have been derived from researching public records, Counter-Defendants were barred from taking a shortcut and copying *Ameripro's* compilations of that data, under both common law and the terms of their contracts. At common law, "The question is not 'how *could* he have secured the knowledge?' but 'How *did* he?'"[5] Here the Individual Counter-Defendants admitted that the information they took from Ameripro could not be found publicly, and that they copied it from Ameripro's protected computer network rather than from any public source.

*Individual Counter-Defendants also entered
into enforceable non-solicitation agreements*

19. The Individual Counter-Defendants' contracts with Ameripro also contain statutorily enforceable provisions which bar them from soliciting Ameripro customers and

---

[4] *See, e.g., Hill v. McLane Co., Inc.,* 2011 WL 56061 at *2 (Tex. App.–Austin 2011, no pet.) (not design. publ.).

[5] *Id.*

7

employees after their termination from the company.[6] Those provisions are independent of common law safeguards which bar employees (and certainly fiduciaries) from soliciting for a competitor during employment.[7] Nasserfar's and Task's employment agreements provide:

"For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following: (i) solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier; (ii) solicit from any known customer, payor or supplier of the Company business of the same or a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination; (iii) recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto, or (iv) otherwise knowingly interfere with the business of the Company."

The only exception to the contractual non-solicitation provision was for a person who had already been a "customer" of the employees prior to his employment with Ameripro (even then, in light of their common law fiduciary duties, they could not solicit any such preexisting customers on behalf of themselves or for a competitor while they were still employed with Ameripro).

20.     On social media, Nasserfar represented to the public that Ameripro's customers include "3 Texas based builders" for whom Ameripro was the lender (and for whom Nasserfar

---

[6] The non-solicitation clauses are also enforceable under Tex. Bus. & Comm. Code § 15.50, *et seq.* The employment agreements promised access to confidential information. Once these employees were given such access (including confidential customer files and Ameripro financial records), they became bound by their reciprocal promise not to use or disclose such information. That satisfied the "otherwise enforceable agreement" provisions under Section 15.50. Excerpts of those reciprocal agreements are quoted in Exhibit A to this pleading. The Texas Supreme Court expressly held that "clients' names, billing information, and pertinent tax and financial information" constitutes confidential information for purposes of enforcing non-compete provisions under Section 15.50. *Mann Frankfort Stein & Lipp Advisors v. Fielding*, 289 S.W.3d 844, 851 (Tex. 2009) (accounting). That holding applies with greater force here, in light of the federal regulations which make client mortgage information confidential as a matter of statute, in addition to Ameripro's own financial records to which Individual Counter-Defendants also had access.

[7] *Fidelity*, 2000 WL 13037 *6; *ERI*, 318 S.W.3d at 873; *Longview*, 2015 WL 2148353 *5 (Tex. 2015).

8

10

claimed to have built a "builder-centric" model "developed here at Ameripro"), and "builder partners and other referral groups" whom he stated had a "seamless & successful" mortgage relationship with Ameripro. Likewise, Task admitted under oath that the non-solicitation provisions of their contracts barred them from soliciting from Ameripro's builder and realtor referral sources,[8] and publicly represented that multiple developers were "clients" of Ameripro.

21. Similarly, Gosnay's "Employment, Confidential Information and Invention Assignment Agreement" with Ameripro provides the following non-solicitation clause:

> "*Interference.* I agree that during the course of my employment and for a period of 18 months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, at the option either of the Company or myself, with or without notice, I will not, either directly or indirectly, interfere with the Company's relationships with any customers or clients of the Company whom I served or otherwise had direct contact with during the course of my employment. In the event that I violate my obligations under this paragraph, I agree that the 18-month time period will be extended by a period of time equal to that period beginning when I began violating my obligations under this paragraph and ending when the activities constituting such a violation came to an end."

Similar to Ameripro's contracts with Nasserfar and Task, Gosnay's contract also prohibited him from soliciting any employee of Ameripro for 18 months after his employment terminated.

*Counter-Defendants' theft of Ameripro's confidential information commenced months before the employees resigned*

22. Counter-Defendants knew that their contracts with Ameripro barred them from using, disclosing, or retaining copies of Ameripro's confidential records, and from assisting a competitor while still employed with Ameripro. When Gosnay was offered a job in February 2014, Nasserfar even called special attention to those provisions of his contract, writing:

> "Employee Confidentiality and Assignment of Inventions Agreement. As with all Company employees, you will be required as a condition of your employment with the Company, to sign the enclosed standard Employee Confidentiality and

---

[8] Transcript of the May 11, 2015 hearing on Ameripro's TRO application, at 49-50. The same testimony was introduced into evidence at the May 26-27, 2015 hearing on Ameripro's Temporary Injunction application.

9

<u>Assignment of Inventions Agreement</u>."

Nasserfar also advised Gosnay in writing:

> "In addition, while you render services with the Company, <u>you will not assist any person or entity in competition with the Company</u>, in preparing to compete with the Company or in hiring any employees or consultants of the Company."

23.     Less than one year after Nasserfar wrote those words, all three Individual Counter-Defendants consciously violated those provisions of their contracts and their fiduciary obligations. Oak Mortgage actively encouraged and participated in those breaches of duty.

24.     Oak Mortgage e-mailed Nasserfar on October 30, 2014, asking him to provide Oak with documents showing the "current year's sales production (units & volume)" and the "previous year's sales production (units & volume)" for Ameripro's Lakeway branch. Nasserfar the same day e-mailed those totals for both years to Oak Mortgage, beginning a stream of confidential information that he relayed to Ameripro's competitor over the next 2½ months.

25.     Nasserfar understood that his secret communication of confidential information with Oak Mortgage subjected him to liability, and understood that his contracts with Ameripro barred him from soliciting from referral sources. As part of the same October 30 e-mail exchange, Nasserfar gave Oak Mortgage a list of his "Concerns," which included "Lose Centerra builder account. Lose Brohn account. Lose some PLR realtors. Lawsuit. Non compete clause. Old client list with no contact to." Nasserfar also listed "Ramp up time" as one of his concerns. Normally, setting up a new branch office would take several weeks (and typically months) to accomplish. Over 2½ months before Nasserfar resigned from Ameripro, he and Oak Mortgage were already discussing the ramp-up time to set up a competing office. Counter-Defendants, however, ended up skipping the normal ramp-up time by simply copying and downloading *Ameripro's* ledgers, reports, client lists, and even its proprietary templates and forms.

10

26. On November 12, 2014, for example, Oak Mortgage's senior vice president e-mailed Nasserfar that "I will need some more information from you," and asked Nasserfar to provide multiple categories of internal Ameripro documents by that weekend. The items Oak Mortgage insisted upon included Ameripro's "Year to Date P&L and Last Year's P&L," Ameripro's "Product Mix" with a breakdown of units and volume for each type of loan product, other Ameripro staff member's "Compensation" (even if Nasserfar did not anticipate trying to solicit them to leave), and Ameripro "Pricing" for three "scenarios/deals" that Nasserfar was working on at the time so that Oak Mortgage "can compare it to our pricing." Counter-Defendants sought that information for Ameripro's Lakeway branch in particular, as they went forward with their plans to set up a competing office in the same location.

27. The following Monday, November 17, 2014, Nasserfar gave Oak Mortgage a copy of Ameripro's internal loan profitability report at a meeting in Dallas. That report not only supplied Oak Mortgage with confidential itemized fees and profits for Ameripro's office for the preceding year, but also a year-to-date list of *all* of the names of borrowers and account numbers for that branch.[9] Oak Mortgage's CEO scanned a copy of the report onto his computer the same day. The Individual Counter-Defendants also provided Oak Mortgage with an electronic copy of an Ameripro loan profitability report, which Oak Mortgage's senior vice president loaded onto his computer as well.

28. Oak Mortgage gave Nasserfar a job description which stated that one of his duties at Oak Mortgage would be to "[e]stablish" and manage the budget for Oak Mortgage's new Lakeway branch. The Individual Counter-Defendants admitted in testimony that they supplied

---

[9] The loan profitability report was compiled from nonpublic loan files. That by itself would bar disclosure under Regulation P, even if borrower names could have been obtained by searching deed records. Moreover, even if Nasserfar had compiled a list from public sources (he admitted he did not), Regulation P also barred him from disclosing it "in a manner that indicates that any of the individuals on the list is a consumer of a financial institution," such as Ameripro. The nonpublic information in the report, such as fees paid by the individual consumers, also barred its disclosure to Oak Mortgage.

11

Oak Mortgage with copies of every monthly general ledger report for 2014, giving a blueprint of every budget item for Ameripro's Lakeway branch for the entire year, including itemized expenses and credits. Like the other confidential information they took, that data was not available from any public source, and instead was printed from Ameripro's computer network. The Individual Counter-Defendants continued funneling information to Ameripro's competitor over the following months, including a list of borrowers whose loans were still pending.

29. In the days immediately before they resigned from Ameripro, Counter-Defendants intensified their thefts of Ameripro confidential information. In order to obtain access to Ameripro's financial information on the Accounting for Mortgage Bankers (AMB) network, a person must use his or her password to log onto Ameripro's computer network, and while logged into that network, use a second password to log onto the AMB network. As a Branch Manager, Nasserfar was the only employee at Ameripro's Lakeway office who had been given a second password to log into the AMB system. The week they resigned, however, Nasserfar and Task jointly printed copies of Ameripro's financial records from AMB, to take with them to their new Oak Mortgage office. They printed and downloaded Ameripro's internal records, including general ledgers, profitability reports, pro formas, borrower records, and statements of income.

30. In addition to taking electronic copies of confidential records on thumb drives and external storage devices, they took a bankers box of Ameripro internal reports and personnel files when they resigned. Task admitted he later gave the bankers box to Gosnay at Oak Mortgage's new offices, for him to scan as well. Among several thousand other Ameripro reports, Nasserfar downloaded copies of loan profitability reports for 2012, 2013, and 2014 from Ameripro's computers, giving details of the fees and associated profits for Ameripro during those years in the same location where Oak Mortgage planned to open a competing office.

31. Some of the most serious examples of Counter-Defendants' thefts include

12

electronic copies of credit reports for Ameripro borrowers (listing the borrowers' social security numbers, bank account numbers, and credit scores), and borrowers' loan applications (listing their social security numbers, employers, income, and other protected consumer information). Counter-Defendants also removed copies of personnel records for *other* Ameripro employees, including salary information. They admitted that they had no excuse for taking such legally protected consumer and personnel records with them upon their termination from Ameripro.

32. At least as early as December 10, 2014, Gosnay likewise began sending copies of proprietary templates and forms from Ameripro's computer network to Gosnay's personal gmail account, to use at Oak Mortgage. In one blatant example, Oak Mortgage forgot to remove Ameripro's address at the bottom of the forms, before using the same template for Oak's new office. By January 13, 2015, just two days before he resigned from the company, Gosnay was still logging onto his computer at Ameripro and transmitting its confidential information to his personal gmail account, including details of Ameripro's client concession fees, builder contacts and cell phone numbers, clients' title company preferences, transaction details, and other compilations contained in Ameripro computer files, and additional proprietary templates and forms that Ameripro developed for its business and maintained on its computers.[10] Gosnay then tried to permanently delete that evidence on Ameripro's computer, including copies of his forwarded e-mails, before returning the laptop to Ameripro.

---

[10] Counter-Defendants have made the irrelevant argument that the *identities* of builders is information that can be publicly obtained. Counter-Defendants' argument fails to insulate them from liability in at least three respects. First, Counter-Defendants took Ameripro's non-public compilation, which in turn included non-public details such as pricing, builder preferences, cell phone numbers, and contact information. Second, even as to any information that could have independently compiled from public records, they chose instead to log onto Ameripro computers and take *Ameripro's compilations*. Their misappropriations sound in both tort and contract. *Bancservices Group, Inc. v. Strunk & Assoc.*, 2005 WL 2674985 *3 (Tex. App. - Houston [14th Dist.] 2005, pet. denied) (not design. publ.) (mere fact that a person supposedly could obtain the same information through legitimate means does not deprive its owner of recourse "from those who would secure possession of it by unfair means," including taking from a computer to use in a competing business). Third, the non-solicitation provisions of their contracts bar them from soliciting those customers, regardless whether they use confidential information in doing so.

13

33. As Nasserfar previously wrote Gosnay, during the Individual Counter-Defendants' tenure with Ameripro they were not permitted to assist anyone "in competition with the Company," or "in preparing to compete with the Company." In addition to transmitting confidential information to Oak Mortgage, however, the Individual Counter-Defendants began soliciting business on Oak Mortgage's behalf even while they were *still employed* at Ameripro.

34. Over one month before the Individual Counter-Defendants resigned from Ameripro, Oak Mortgage advised the Ameripro employees that they *can* "solicit to your book of business, and your builder/realtor relationships," and that they that they *can* "solicit to your past customer database." As a further encouragement for the Individual Counter-Defendants to begin acting against their principal, the following day Oak Mortgage agreed to indemnify the employees if they were later sued by Ameripro. One week later, Nasserfar compiled and e-mailed Task a list of contact names for several of Ameripro's primary builder clients, including Centerra Homes and Brohn Homes, and a few days later, reported to Oak Mortgage that he was driving 200 miles and "dropping in on all builder contacts." (Nasserfar reported that progress to Ameripro's competitor, not to his employer Ameripro.)

35. By January 6, 2015, Oak Mortgage had sent Nasserfar scripts to use for "Borrowers in Pipeline," "Realtors in Pipeline," and "All previous clients & database," including the advantages of his moving to Oak Mortgage — again while Nasserfar was still employed at Ameripro.[11] Nasserfar also advised existing Ameripro customers of their plans to open a new

---

[11] Counter-Defendants argued at the Temporary Injunction hearing that "customer" as used in the non-solicitation clauses of their contracts is limited to "borrowers." In testimony, however, they had previously admitted that "customer" as used in the contracts include the builders which formed the core of Ameripro's business for that branch, and made similar admissions in social media and in e-mails, including in Nasserfar's e-mail list of "Concerns" quoted above. The Court rejected Counter-Defendants' overly narrow definition. Even under *Counter-Defendants'* definition, however, their conduct shows that

14

Oak Mortgage office, and exchanged texts with builder personnel about standing down until his resignation notice was received. (As discussed below, Task destroyed his text communications, erasing evidence of similar communications he had with Ameripro customers.)

36. While they were still employed in management positions for Ameripro, Nasserfar and Task also set up meetings with builder customers and business prospects on behalf of Oak Mortgage. While still Ameripro employees, they even began scheduling meetings to occur *after* they resigned, again for the benefit of Oak Mortgage.

37. Even if no contractual non-solicitation existed at all, Counter-Defendants' conduct in secretly soliciting Ameripro customers — during a time when they were still serving in fiduciary roles for Ameripro — is a plain violation of Texas common law. Their theft of Ameripro's confidential information also assisted them in soliciting Ameripro clients, enabling them to open a competing office in just one business day, instead of the months it would normally take to ramp up an office and begin operations. Although the Individual Counter-Defendants were contractually required to give Ameripro a "written account of any and all open leads, business prospects, and/or loans in process as of the date" of his termination, they also breached that provision and failed to provide any such list. After they resigned, they refused to return calls from Ameripro or otherwise cooperate about upcoming closings, disrupting the closings that were still in progress and injuring Ameripro's goodwill and builder relationships.

*Counter-Defendants' destruction of files and*
*evidence, including after issuance of the TRO*

38. Counter-Defendants also engaged in destruction of Ameripro files and evidence.

they made no pretense of trying to comply with the contracts or common law. Oak Mortgage sent Nasserfar scripts to use for "Borrowers" in pipeline, and advised that the employees could solicit to their "book of business" and "past customer database" – all of which would be barred even under their definition. Moreover, regardless of the contractual definition, no employee (let alone a fiduciary) is permitted to solicit on behalf of a competitor while still working for his employer.

15

The same day that Nasserfar resigned on January 16, 2015, he logged into Ameripro's computer network and began systematically deleting files, including *almost 120 contacts* in the Outlook Contacts folder he had maintained at Ameripro. Nasserfar took additional steps to try to purge the files from Ameripro's computer system altogether, by selecting the option to "permanently delete" those files from the "Deleted Items" folder. Task deleted 62 folders (containing *911 customer files*) from a laptop that Ameripro had issued to him, before returning it to the company. Gosnay attempted to permanently destroy all of the evidence that he had been forwarding Ameripro documents to his personal gmail account.

39. At least as early as December 11, 2014, Counter-Defendants knew of the potential lawsuit with Ameripro, as exemplified by the indemnity that Oak Mortgage had previously given the Individual Counter-Defendants while they were still fiduciaries of Ameripro. Remnants of text messages produced by Oak Mortgage show that Task had texted with his co-conspirators over the following month, including on the subject of contacting people whom he admitted he was not allowed to solicit. Nevertheless, Task manually destroyed *every* text message that he had exchanged during his employment with the other Counter-Defendants and with Ameripro customers.

40. At the hearing on Ameripro's request for TRO on May 11, 2015, Ameripro brought Task's destruction of text messages to the Court's attention. In addition to ordering Counter-Defendants to return all of Ameripro's information in whatever medium they possessed and/or took such information, the Court specifically instructed Counter-Defendants "not to destroy anything, period," and later in the hearing repeated "do not destroy anything." Counter-Defendants represented in open court that "in the meantime, nothing is going to be destroyed." The hard drive they supplied in response to the TRO, however, showed that Counter-Defendants subsequently destroyed over 150 files, after the TRO issued, and sought to wipe out the evidence

16

of that conduct in the unallocated space of the hard drive. Forensic analysis of the hard drive shows that unallocated folders have been cleaned and zeroed out: in other words, leaving aside any destruction of information that might be shown in the *original* media, confidential documents which they had copied onto the hard drive copy were deleted after the TRO actually issued. In the process of destroying such evidence, however, Counter-Defendants overlooked or were unaware of a Master File Table on the same hard drive, which recorded their destruction of evidence after the TRO issued.[12]

41. This Court has inherent authority to punish such destruction of evidence even if no TRO had been entered against Counter-Defendants. The fact that Counter-Defendants destroyed additional evidence after this Court entered the TRO, however, is contempt of court, particularly in light of this Court's express command to Counter-Defendants at the TRO hearing to desist from destroying anything "period."

*Upon their resignations from Ameripro, the Individual*
*Counter-Defendants' actions have been as agents for Oak Mortgage*

42. Upon their resignations from Ameripro, the Individual Counter-Defendants all became agents of Oak Mortgage. As of January 19, 2015, Nasserfar was the Vice President of Austin and Branch Manager for Oak Mortgage. Task was its new Austin Area Sales Manager, and Gosnay was its Mortgage Loan Officer at the new Lakeway office.

43. As agents of Oak Mortgage, they kept the reams of confidential information they took from Ameripro, ranging from general ledgers to borrower credit reports, and in violation of the non-solicitation provisions of their contracts, continued soliciting from Ameripro customers. Counter-Defendants' conduct has been a continuing violation of statute, common law, and

---

[12] The Table shows that 140 file folders were deleted after May 14, 2015 at 1:52 p.m., from the "COC-002" folder (Michael Task's thumb drive), and that another 12 files were deleted on May 19, 2015, at 1:46 p.m., via the recycle bin of "COC-001" (Michael Nasserfar's thumb drive), all after the TRO issued.

17

contract. The *entirety* of Oak Mortgage's competing Lakeway office personnel, as listed on its website, were in continuous possession of Ameripro's confidential information in the several months before this Court issued a Temporary Injunction against them, and are presumed under Texas law to have used all such data.

C.     **Application for permanent injunctive relief (and for continued enforcement of the Court's June 16, 2015 Temporary Injunction against Counter-Defendants).**

44.     Ameripro incorporates by reference all factual allegations stated hereinabove. Counter-Defendants, together with Counter-Defendants' agents, representatives, new employer(s), servants, employees, independent contractors, attorneys, and those persons or entities in active concert or participation with them, are collectively referred to as the "Restrained Parties."

45.     Based on their conduct recited above, Counter-Defendants have taken confidential and proprietary information belonging to Ameripro (including Ameripro's internal financial reports, borrower credit reports and loan applications, pricing information, client and referral supplier lists, concession fees, builder contacts and cell phone numbers, clients' business preferences, transaction details, proprietary templates, loan set-up sheets, document forms, correspondence, and other Ameripro compilations of information and forms that Ameripro developed for its business), and have also attempted to permanently destroy copies of Ameripro files, all in violation of Texas common law and the Individual Counter-Defendants' written employment contracts. Counter-Defendants' conduct is causing, and unless enjoined will continue to cause, irreparable harm to Ameripro.

46.     Based on Counter-Defendants' conduct and misappropriation of information, Ameripro has suffered, and unless Counter-Defendants and those acting in concert with them are immediately enjoined from engaging in the following actions, Ameripro reasonably fears it is likely to continue suffering imminent and irreparable harm, loss, and damage through Counter-

18

Defendants' use of Ameripro's confidential and proprietary information in competition against Ameripro (including Ameripro's customer and referral suppliers), loss of customers and customer goodwill through Counter-Defendants' solicitation for a competitor, permanent loss of customers and referral suppliers, and permanent damage to Ameripro's goodwill and business reputation. Disclosure of the above confidential and proprietary information to Ameripro's competitor Oak Mortgage, in addition to constituting misappropriation and conversion of Ameripro's property, would give Counter-Defendants an unfair competitive advantage over Ameripro. The only adequate, effective, and complete relief to Ameripro is to restrain Counter-Defendants from further engaging in the following proscribed activities as set forth below.

47. Counter-Defendants' conduct described above also constitutes misappropriation of confidential and proprietary information, conversion, breach of fiduciary duty, and breach of contract, and as indicated in this counterclaim and sworn application, Ameripro has shown a probable right of recovery and likelihood of success on the merits.

48. Pursuant to Tex. R. Civ. P. 680, *et seq.*, and Tex. Civ. Prac. & Rem. Code § 65.001, *et seq.*, and in order to preserve the status quo during the pendency of this action, Ameripro therefore requests the Court's continued enforcement of the Temporary Injunction issued in this cause, as well as issuance of a permanent injunction, ordering and immediately enjoining Counter-Defendants and the other Restrained Parties to do each of the following:

   i)    ordering Counter-Defendants and the other Restrained Parties to immediately return to Ameripro all documents and information they removed from Ameripro (including but not limited to any information that was contained on Ameripro computers or in Ameripro files, Ameripro's pricing information, client and referral supplier lists, concession fees, builder contacts and cell phone numbers, clients' business preferences, transaction details, proprietary templates, loan set-

19

up sheets, document forms, correspondence, and other Ameripro compilations of information and forms that Ameripro developed for its business), and other duplications of information located at Ameripro or on Ameripro computers, e-mails, original files or documents, printouts, photocopies, electronically stored documents, and other information taken from Ameripro, including any information which identifies or pertains to customers and referral suppliers (and contacts with each) with whom Ameripro did business during the term of the Individual Counter-Defendants' employment at Ameripro;

ii) enjoining Counter-Defendants and the other Restrained Parties from continuing to withhold from Ameripro documents and information they removed from Ameripro (including but not limited to information that was contained on Ameripro computers or in Ameripro files, Ameripro's pricing information, client and referral supplier lists, concession fees, builder contacts and cell phone numbers, clients' business preferences, transaction details, proprietary templates, loan set-up sheets, document forms, correspondence, and other Ameripro compilations of information and forms that Ameripro developed for its business), and other duplications of information located at Ameripro or on Ameripro computers, e-mails, original files or documents, printouts, photocopies, electronically stored documents, and other information taken from Ameripro, including any information which identifies or pertains to customers and referral suppliers (and contacts with each) with whom Ameripro did business during the term of the Individual Counter-Defendants' employment at Ameripro;

iii) enjoining Counter-Defendants and the other Restrained Parties from soliciting from customers (including in particular Brohn Homes, Centerra Homes, Clark

20

Wilson Builders, and Seaholm Residences), and referral suppliers with whom Ameripro did business during the term of the Individual Counter-Defendants' employment at Ameripro;

iv)    enjoining Counter-Defendants and the Restrained Parties from destroying any documents and information they removed from Ameripro until such time that all such information has been returned to Ameripro (including but not limited to information that was contained on Ameripro computers or in Ameripro files, Ameripro's pricing information, client and referral supplier lists, concession fees, builder contacts and cell phone numbers, clients' business preferences, transaction details, proprietary templates, loan set-up sheets, document forms, correspondence, and other Ameripro compilations of information and forms that Ameripro developed for its business), and other duplications of information located at Ameripro or on Ameripro computers, e-mails, original files or documents, printouts, photocopies, electronically stored documents, and other information taken from Ameripro, including any information which identifies or pertains to customers and referral suppliers (and contacts with each) with whom Ameripro did business during the term of the Individual Counter-Defendants' employment at Ameripro;

v)    enjoining Counter-Defendants and the other Restrained Parties from using (including from using in connection with Oak Mortgage's business), or from transferring or conveying to any third party, or from accessing or granting access to, any of the documents and information they removed from or transmitted outside of Ameripro, except to transfer such information to Ameripro (including but not limited to information that was contained on Ameripro computers or in

21

Ameripro files, Ameripro's pricing information, client and referral supplier lists, concession fees, builder contacts and cell phone numbers, clients' business preferences, transaction details, proprietary templates, loan set-up sheets, document forms, correspondence, and other Ameripro compilations of information and forms that Ameripro developed for its business), and other duplications of information located at Ameripro or on Ameripro computers, e-mails, original files or documents, printouts, photocopies, electronically stored documents, and other information taken from Ameripro, including any information which identifies or pertains to customers and referral suppliers (and contacts with each) with whom Ameripro did business during the term of the Individual Counter-Defendants' employment at Ameripro.

49. Ameripro is a mortgage company which has served the Central Texas area since 2003, and it depends on the goodwill of its customers and referral suppliers to remain in business. Ameripro has made a significant investment in maintaining good relationships with its customers and referral suppliers, and marketing its services.

50: As required by the Gramm-Leach-Bliley Act and Regulation P, Ameripro maintains a sophisticated computer system and internal safeguards to comply with statutory requirements and other regulations governing confidentiality of loan information, and to ensure that customers receive excellent service and protection of their personal and financial information. Ameripro's safeguards of its confidential and proprietary information include secure-access entry to its premises, log-in requirements to access its computers (including requiring employees first to be registered and accepted through Ameripro's IT department before receiving log-in credentials), additional log-in safeguards for loan officers, and similar security safeguards for federally regulated banks.

22

24

51.     Counter-Defendants' conduct in removing confidential and proprietary information, attempting to solicit from Ameripro's customers and referral suppliers, and the other conduct set forth above will result (and has already resulted) in loss of customers and referral suppliers, loss of goodwill, violation of laws which bar misappropriation of information, and the loss of and permanent injury to the value of Ameripro's confidential information. Ameripro does not have an adequate remedy at law for the same reasons set forth in the preceding paragraphs, including because Counter-Defendants have wrongfully taken confidential information belonging exclusively to Ameripro.

52.     The injury that will result to Ameripro if Counter-Defendants and the other Restrained Parties are not enjoined from the conduct described above would outweigh any injury that continued enforcement of the temporary injunction and issuance of the permanent injunction might cause Counter-Defendants, and would not disserve the public interest. Ameripro has posted the bond set by the Court in connection with the Temporary Injunction, pending trial on the merits and issuance of a permanent injunction, and the writs of Temporary Injunction have been issued and served.

**D.     Breach of fiduciary duty, and knowingly aiding and abetting breach.**

53.     Ameripro incorporates by reference all factual allegations stated hereinabove. Each of the Individual Counter-Defendants served in agency roles on behalf of Ameripro, and consequently owed fiduciary duties to Ameripro as a matter of law. By the nature of their management duties and access to files (and as detailed in their employment agreements) each of them was entrusted with the most highly confidential client information of Ameripro, including internal Ameripro financial reports and financial information and loan documentation of consumer clients, which the Individual Counter-Defendants agreed to keep confidential and to

23

use exclusively for Ameripro's mortgage lending business.[13] Each of them owed a high duty of loyalty, good faith, fair dealing, honest performance, full disclosure, and strict accountability to Ameripro.[14]

54. The Individual Counter-Defendants' conduct as detailed above, including transmittals (while still employed and under agency with Ameripro) of Ameripro's general ledgers, loan profitability reports, sales by unit and volume, pricing information, clients and contact information, templates, and other confidential and proprietary information for purposes of using at Oak Mortgage's competing business, and their attempted permanent destruction of Ameripro computer files which identify customers, are flagrant violations of fiduciary duty. Their active solicitation of Ameripro customers on behalf of a competitor, even while they were still employed by Ameripro, is a flagrant violation of fiduciary duty.[15] While still employed with Ameripro and under agency, the Individual Counter-Defendants were in constant communication with their co-conspirator Oak Mortgage to plan a competing business, using Ameripro confidential information and its existing builder customers.

55. As a consequence of the Individual Counter-Defendants' violations of fiduciary duty, and Oak Mortgage's knowing aiding and abetting those breaches of duty, Counter-Defendants are jointly and severally liable to Ameripro for its actual damages, and punitive damages, for which Ameripro seeks recovery. Counter-Defendants are also liable to Ameripro

---

[13] *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508-09 (Tex. App. – Houston [1st Dist.] 2003, no pet.) (principal and agent is among the formal fiduciary relationships which arise "as a matter of law").

[14] *Vogt v. Warnock*, 107 S.W.3d 778, 782-83 (Tex. App. – El Paso 2003, pet. denied) ("A fiduciary owes her principal a high duty of good faith, fair dealing, honest performance, and strict accountability. ... In discussing the nature of fiduciary relationships, our Supreme Court has stated that the higher standards there imposed should rarely be subject to exceptions ...").

[15] Their conduct also violates their common law duty to refrain from using for their own advantage, and to the detriment of their former employer, confidential information or trade secrets acquired by or imparted to them in their employment. Employees are held to that common law duty even in the absence of a fiduciary relationship. The Individual Counter-Defendants' conduct was particularly inexcusable in that each of them was an employee, agent, *and* fiduciary to Ameripro while he committed those acts.

24

for disgorgement, and in the case of the Individual Counter-Defendants, also liable for forfeiture of compensation (including compensation they received from Ameripro during the period of their breach), for which Ameripro seeks recovery.

**E.    Misappropriation and conversion.**

56.    Ameripro incorporates by reference all factual allegations stated hereinabove. Counter-Defendants' conduct described above constitutes misappropriation and conversion of Ameripro's property.    Even in the absence of written employment agreements with the Individual Counter-Defendants, each of the Counter-Defendants is charged with knowledge that former employees may not use for their own advantage, and to the detriment of their former employer Ameripro, confidential information acquired by or imparted to them in the course of their employment.    Similarly, the employment agreements describe in detail that financial information, client lists, pricing information, client financial information, and other Ameripro documents to which they were given access (or which they themselves created during their employment) are the sole property of Ameripro, and may not be used or disclosed by the Individual Counter-Defendants for any purpose other than Ameripro's business.

57.    At least as early as December 10, 2014, Oak Mortgage had reviewed Nasserfar's and Task's employment agreement with Ameripro, and in addition to the knowledge that Oak Mortgage is presumed to have of Texas common law, knew of the contractual confidentiality provisions.   Ameripro also made Oak Mortgage specifically aware of the Individual Counter-Defendants' employment agreements, to remove any question that its continued retention and use of Ameripro proprietary and confidential information was a violation of law and of the employment agreements.    At the specific request of Oak Mortgage, however, the Individual Counter-Defendants secretly e-mailed and delivered copies of such confidential and proprietary information as described above for use at Oak Mortgage, Ameripro's competitor, and deleted

25

27

Ameripro computer records. Oak Mortgage retained and used copies of those confidential records.

58. As a consequence of their acts of misappropriation and conversion, Counter-Defendants are jointly and severally liable to Ameripro for actual damages, and punitive damages, for which Ameripro seeks recovery.

**F. Breach of contract, and tortious interference with contract.**

59. Ameripro incorporates by reference all factual allegations stated hereinabove. As quoted extensively above, Nasserfar's and Task's "Proprietary Information Agreement," "Confidentiality Agreement," "Non-Disclosure Agreement," and "Employment Agreement," Gosnay's "Employment, Confidential Information and Invention Assignment Agreement" and "Loan Officer Agreement," and the Ameripro employee handbooks with which they contractually agreed to comply, contain extensive provisions which define Ameripro's agreed ownership of financial information, customer information, pricing information, compilations of client files, and other information to which they were given access during their employment with Ameripro, and the Individual Counter-Defendants' contractual obligation not to use or disclose any of that information, and not to solicit from or interfere with Ameripro's customers, suppliers, payors, or employees for one year (Nasserfar and Task) and 18 months (Gosnay).

60. The Individual Counter-Defendants' conduct described above, including their disclosures of confidential information, their misappropriation and conversion of Ameripro's confidential information, their solicitation of its customers, suppliers, payors, and employees, and their intentional attempts to destroy Ameripro computer files, not only sound in tort but also constitute breach of contract. In breach of contract, they also failed to provide a written list of any and all leads, business prospects, and/or loans in process as of the date of his termination, as required by their agreements. On account of these multiple breaches of contract and commission

26

28

of torts, and their failure to remain "available to help with and participate in the closing process" despite Ameripro's attempts to contact them, none of the Individual Counter-Defendants terminated his employment in good standing.[16] Oak Mortgage's active encouragement of those contractual violations constitutes tortious interference with Ameripro's contracts.

61. Counter-Defendants argue that the Individual Counter-Defendants never received access to confidential information at Ameripro. In testimony, however, Counter-Defendants admitted the exact opposite, including the confidential nature of general ledgers, borrower information, and other records they stole. Moreover, as Counter-Defendants acknowledge in their petition, Ameripro is "a mortgage company that originates residential loans in the State of Texas." [Second Amended Petition at ¶ 3.] Each of the Individual Counter-Defendants (who were formerly Ameripro's branch manager, sales manager, and loan officer) routinely had access to such loan files. Ameripro's client loan files consequently are confidential as a matter of law, including under the provisions of the Gramm-Leach-Bliley Act and Regulation P.

62. As a matter of law, such information also satisfies the Texas Supreme Court's *Mann Frankfort* analysis of confidential information that will support the enforcement of non-compete and non-solicitation provisions under Tex. Bus. & Comm. Code § 15.50, *et seq.* Counter-Defendants' argument that they never received confidential information during the course of their employment (and that they cannot be held liable for that reason) is frivolous.

63. Counter-Defendants have also argued that the contracts are unenforceable as "contracts of adhesion," because the contracts were supposedly presented to them on a "take it or

---

[16] In the same paragraph which required the Individual Counter-Defendants to provide a written list of "any and all" leads, prospects, and loans in process, it adds: "Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination." They failed to meet any of those prerequisites, failing to provide the required written list, refusing to be available to help and participate in closings, and violating the confidentiality, ownership, and non-solicitation provisions of their contracts. They refused to respond to Ameripro's multiple attempts to contact them.

27

leave it basis" by Ameripro. That argument not only is factually untrue, but also of no legal consequence. The Texas Supreme Court has specifically held that "an employer may make precisely such a 'take it or leave it' offer to its at-will employees." Even if the employer premises "continued employment on acceptance of new or additional terms," it is entitled to do so, and the contract is not rendered "unconscionable."[17] Indeed, Counter-Defendants have purported to sue under those contracts, even as they simultaneously argue that they are unenforceable. Their attacks on enforcement of the contracts are both factually and legally without merit.

64. As a consequence of the Individual Counter-Defendants' breaches of contract, and Oak Mortgage's tortious interference with those contracts, Counter-Defendants are liable to Ameripro for its actual damages, punitive damages (as to Oak Mortgage), and attorneys' fees (as to the Individual Counter-Defendants), for which Ameripro seeks recovery.

65. In addition, Ameripro is entitled to, and hereby respectfully requests, an equitable extension of the non-solicitation period for a time period equivalent to the duration when Counter-Defendants were in breach. Their breaches commenced at least as early as December 2014, and continued at least through entry of the TRO in this cause on May 11, 2015.[18]

## G. Violation of Tex. Bus. & Com. Code §§ 143.001-02 (Harmful Access by Computer).

66. Ameripro incorporates by reference all factual allegations stated hereinabove. As

[17] *In re Halliburton Co.*, 80 S.W.3d 566 (Tex. 2002). *See also Obra Homes, Inc. v. Gonzalez*, 2010 WL 2224662 *8 (Tex. App. – Corpus Christi 2010, no pet.) (even if an agreement qualifies as a "contract of adhesion" because a party has no bargaining power, that in itself does not render it unconscionable).

[18] *Nationsbuilders Ins. Serv., Inc. v. Houston Int'l Ins. Group, Ltd.*, 2013 WL 3423755 *6 (Tex. App. – Dallas July 3, 2013, no pet.) ("The concept of equitable extension has also been recognized under Texas law," and noting the "remedy of a one-year extension of the restricted period gave [claimant] the benefit of its bargain of a one-year period without appellees preparing to conduct a business in competition"); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003) (court has authority to extend the expiration of non-solicitation clause). Without equitable extension, Ameripro would be deprived of the benefit of its bargain for the time period when Counter-Defendants breached the non-solicitation clauses.

28

a consequence of the conduct described above, Counter-Defendants are also liable to Ameripro under Tex. Civ. Prac. & Rem. Code §§ 143.001-02, for harmful access by computer. Oak Mortgage actively encouraged the Individual Counter-Defendants to supply it with internal confidential records of Ameripro, while they were still employed by Ameripro. The Individual Counter-Defendants complied. In addition to paper copies printed from Ameripro's computers, they transmitted electronic versions of internal Ameripro information while still employed with Ameripro, and after resignation, took and kept copies of such records as agents of Oak Mortgage.

67.     Oak Mortgage had no consent to use of Ameripro computers at all, whether directly or indirectly through the Individual Counter-Defendants. The limited consent that Ameripro had given the Individual Counter-Defendants to use its computers was strictly for the business purposes of Ameripro, and certainly did not extend to them supplying confidential documents that were secretly requested by a competitor. As Task admitted at the Temporary Injunction hearing, the Individual Counter-Defendants printed and downloaded records from Ameripro computers for a purpose other than that for which Ameripro had given consent. As Nasserfar stated when he extended Ameripro's job offer to Gosnay, any activity that would assist "in preparing to compete with the Company" would also certainly be outside the parameters of any authorized use of Ameripro's computers. Similarly, their destruction of files and e-mails from Ameripro-issued laptops was outside any authorized use of the company's computers. They used that stolen information to unfairly compete against Ameripro, including by jumpstarting a competing office in one business day.

68.     Under Section 143.001, a person who is injured, or whose computer has been injured, as a result of intentional or knowing conduct which violates of Chapter 33 of the Penal Code, may maintain a civil cause of action. Section 33.02 of the Penal Code provides, in turn, that "A person commits an offense if the person knowingly accesses a computer, computer

29

31

network, or computer system without the effective consent of the owner." "Harm" is defined to include not only erasure of information, but also "any other loss, disadvantage, or injury that might reasonably be suffered as a result of the actor's conduct." Section 33.01(12) provides that "Consent is not effective if: … used for a purpose other than that for which consent was given" — the very facts to which Counter-Defendants admitted at the Temporary Injunction hearing. Section 33.01 defines "Access" to include making "use of any resource of a computer, computer network, computer program, or computer system" — the very method by which Counter-Defendants downloaded and printed Ameripro's confidential information. As a consequence of their statutory violations, Counter-Defendants are liable to Ameripro for its actual damages, reasonable attorneys' fees, and costs, for which Ameripro seeks recovery.

**H.     Violation of Tex. Bus. & Com. Code § 134A.001, *et seq.* (Texas Uniform Trade Secrets Act).**

69.     Ameripro incorporates by reference all factual allegations stated hereinabove.  As a consequence of their conduct, Counter-Defendants are also liable to Ameripro under Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.*, for violation of the Texas Uniform Trade Secrets Act ("TUTSA").  "Trade secret" under TUTSA is defined to be "information" (specifically including "financial data," or a "list of actual or potential customers or suppliers") that derives actual or potential independent economic value from not being generally known or readily ascertainable by "proper means" by other persons who can obtain economic value from its disclosure or use, and that is the subject of reasonable efforts to maintain secrecy.  Under Section 134A.002(3), Counter-Defendants' misappropriation included their "acquisition," their "disclosure," and their "use" of such information, each of which independently gives rise to their liability to Ameripro.

70.     The confidential and proprietary information which Counter-Defendants obtained from Ameripro, as described above, constitute trade secrets under that statutory definition.  Each of the Individual Counter-Defendants admitted that the reports they copied and downloaded from

30

Ameripro were not derived from public sources, and could not be found publicly. Ameripro's monthly general ledgers, loan profitability reports, pro formas, statements of income, lists of borrowers and their account numbers at Ameripro, and other data were accessible only from Ameripro's secure offices and password-protected computer network, and was not information generally known to the public. The very fact that Oak Mortgage actively sought copies of that data, and secretly obtained copies from the Individual Counter-Defendants, is an acknowledgement that the information was of economic value, including for Oak Mortgage's analysis of the economic viability of opening a new office in the same Lakeway location and unusual expenses associated with that location.

71.     The general ledgers and other detailed data also enriched Counter-Defendants by enabling them to jumpstart a new office in one business day – piggybacking on Ameripro's investment of time and resources to develop such information – instead of the usual ramp-up time of several months. When they downloaded Ameripro forms, Counter-Defendants even forgot to remove Ameripro's address, before using the same documents for Oak Mortgage.

72.     Counter-Defendants improperly duplicated Ameripro's Lakeway office, from its budget information to its templates and forms, and reopened the office under its own banner. In the process, they destroyed Ameripro's Lakeway office, and unjustly appropriated Ameripro's labor and Ameripro's business for themselves. As a consequence of their conduct described above, Counter-Defendants are liable for damages for Ameripro's loss of business, damages measured by Counter-Defendants' unjust enrichment, exemplary damages as a consequence of Counter-Defendants' willful and malicious misappropriation, and injunctive relief, for which Ameripro seeks recovery.

**I.      Civil conspiracy.**

73.     Ameripro incorporates by reference all factual allegations stated hereinabove. As

31

33

detailed above, the Counter-Defendants coordinated their efforts in committing the violations of common law, contract, and statute. The Individual Counter-Defendants all abruptly resigned on January 15-16, 2015, without prior notice to Ameripro, and immediately began working in the same Hill Country Galleria complex for Ameripro's competitor, Oak Mortgage. In the months before their departure from Ameripro, they were in constant communication with Oak Mortgage, and at Oak Mortgage's initiation, were secretly transmitting Ameripro's confidential information to that competitor, including internal financial records, customer information, pricing information, and templates and forms, were secretly deleting Ameripro records from Ameripro's computers, and secretly soliciting Ameripro's customers. After the Individual Counter-Defendants resigned from Ameripro, they continued those violations as agents of Oak Mortgage.

74.    The evidence supports that beginning at least as early as October 2014, Counter-Defendants had a common objective and design to engage in the tortious acts, statutory violations, and breaches of contract described above, and that they each took acts in furtherance of that conspiracy. Each Counter-Defendant is jointly and severally liable for the actions of each other Counter-Defendant, in connection with each cause of action asserted by Ameripro above.

**J.    Spoliation of evidence.**

75.    Ameripro incorporates by reference all factual allegations stated hereinabove. Counter-Defendants' intentional destruction of text messages and e-mails (after Oak Mortgage agreed to indemnify them for a future lawsuit with Ameripro), their destruction of computer files and folders (including destruction of over 150 files and cleaning out the unallocated space even after this Court issued a TRO and commanded them to desist such destruction), and their other intentional and negligent acts to destroy relevant information as described above, constitute spoliation of evidence. Counter-Defendants had a duty to preserve all such evidence, commencing at least as early as December 11, 2014 when Oak Mortgage agreed to indemnify

32

34

them in litigation against Ameripro. They certainly had such a duty on May 11, 2015, when the Court ordered them not to destroy "anything, period." In each instance, they nevertheless continued to willfully and negligently destroy documents.

76.     Ameripro respectfully requests that a spoliation instruction be given to the jury, instructing the jury that such evidence had it been produced would have been unfavorable to Counter-Defendants, in addition to any other instructions or action by the Court to appropriately address Counter-Defendants' intentional and negligent destruction of relevant information.

**K.     Rule 47 statement.**

77.     Pursuant to Tex. R. Civ. P. 47, Ameripro seeks monetary relief over $200,000 but not more than $1,000,000, and non-monetary relief (including injunctive relief as set forth hereinabove). The damages sought by Ameripro are within the jurisdictional limits of the Court.

78.     Ameripro reserves the right to amend its statement of monetary relief sought, following discovery into the extent of Counter-Defendants' tortious, contractual, and statutory violations, as well as to reflect the attorneys' fees that Ameripro has incurred.

**L.     Ameripro's Amended Answer.**

79.     In answer to "Plaintiffs' Second Amended Original Petition," Ameripro incorporates by reference all factual allegations stated hereinabove, and further pleads the following by way of general denial and affirmative defense.

*General denial*

80.     Pursuant to Tex. R. Civ. P. 92, Ameripro generally denies each and every, all and singular, the allegations contained in "Plaintiffs' Second Amended Original Petition." Ameripro demands strict proof of their allegations by a preponderance of the evidence.

*Invalid bases for anti-suit
injunction, and mootness*

81.     Subject to and without waiving the generality of the foregoing, Counter-

33

Defendants' amended requests for injunctive relief fail as a matter of law. Counter-Defendants requested that Ameripro be enjoined from "filing any legal action against Plaintiffs," and from "asserting or alleging" claims (including to enjoin Ameripro from alleging that "any confidential and proprietary information is provided" to its employees). However, those requests fail to satisfy any of *Golden Rule*'s extraordinary predicates for an appropriate anti-suit injunction. As a matter of law, they should be summarily denied.[19]

82.    Counter-Defendants' request for anti-suit injunction should also be denied as moot. Ameripro's claims have *already* been filed. The Court has *already* ruled that "Ameripro has met its burden to establish that it has a probable right of recovery and likelihood of success on the merits," and issued a Temporary Injunction in connection with the very claims they seek to enjoin. In short, their requests for injunctive relief are both meritless and pointless.[20]

*Violations of Rule 13 and*
*Sections 9.001-9.012*

83.    For the same reasons stated above, Counter-Defendants' unsworn request for injunctive relief, and their allegation that Ameripro has committed "antitrust" violations, are groundless and brought in bad faith, have no basis in law or fact, and are not warranted by a good faith argument for the extension, modification, or reversal of existing law. Their amended petition violates Tex. R. Civ. P. 13 and Tex. Civ. Prac. & Rem. Code §§ 9.001-9.012.

84.    Counter-Defendants do not even pretend to comply with *Golden Rule* requirements in seeking their injunction. Likewise, their attempt to cast Ameripro's filing of its lawsuit as an "antitrust" violation is not only factually and legally baseless, but also is barred by the absolute judicial privilege, which does not permit them to maintain a cause of action based

---

[19] *Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 651 (Tex. 1996) (per curiam).

[20] Counter-Defendants' other request for injunctive relief, relating to ownership and control of a website and alleged templates, has also already been rejected by the Court, both on the record and in the June 16, 2015 "Order Denying Plaintiffs'/Counter-Defendants' Application for Temporary Restraining Order."

34

on Ameripro's prosecution of its claims or on statements made in Ameripro's pleadings.[21]

85.     Counter-Defendants have also alleged in bad faith that the Individual Counter-Defendants were never given access to any confidential information at Ameripro, and that Ameripro's contracts are consequently unenforceable. Counter-Defendants made *opposite* admissions in their prior sworn testimony, and among other confidential records, admitted they had ongoing access to loan applications for Ameripro borrowers.[22] They also had access to Ameripro's internal financial reports, such as general ledgers (which Counter-Defendants again admitted are confidential). Their assertion of demonstrably false statements, which contradict their prior sworn testimony, is both groundless and in bad faith.

86.     Pursuant to Tex. R. Civ. P. 13 and Tex. Civ. Prac. & Rem. Code §§ 9.001 - 9.012, Ameripro respectfully moves the Court, after reasonable notice to the parties, to order Counter-Defendants to pay the incurred expenses of Ameripro in opposing the frivolous claims (including attorneys' fees, any witness fees, fees of experts, and deposition expenses), and to strike those allegations from Plaintiffs' Second Amended Original Petition.

*Failure to state a justiciable
claim for declaratory relief*

87.     Similarly, Counter-Defendants' request for declaratory relief should be summarily dismissed as a matter of law, as an improper use of declaratory judgment procedure. Counter-Defendants have requested declaratory relief for their "alledged [sic] tortious interference with

---

[21] *Burger v. Burger*, 2006 WL 495663 *5 n. 25 (Tex. App. – Fort Worth Mar. 2, 2006, no pet.) ("courts have consistently applied the privilege to all types of claims arising out of communications made in the course of judicial proceedings, regardless of the labels placed on them"); *Daystar Res., Inc. v. Collmer*, 176 S.W.3d 24, 27 (Tex. App. – Houston [1ˢᵗ Dist.] 2004, pet. denied) (privilege extends to pleadings).

[22] As discussed above, the Supreme Court held that "clients' names, billing information, and pertinent tax and financial information" is confidential for purposes of enforcing non-compete provisions under Section 15.50. *Mann Frankfort*, 289 S.W.3d at 851. Confidentiality provisions (like those in Ameripro's contracts) are what support the existence of an "otherwise enforceable agreement" under Section 15.50, not defeat it. Moreover, contrary to Counter-Defendants' argument that the contracts are unenforceable, this Court has enforced them twice over, in the TRO and again in the Temporary Injunction.

contractual and business relationships," and have asked the Court to make various declarations relating to "*Defendant's* [Ameripro's] claim" against them. Counter-Defendants' request for a declaration of their non-liability for tortious interference and other causes of action is an improper use of the declaratory judgment procedure, and should be dismissed as a matter of law.

*Nasserfar contractually assigned to Ameripro the website*
*and alleged templates (and denied the latter even existed)*

88.     Counter-Defendants also argue that Nasserfar supposedly authored templates prior to working for Ameripro, and that Ameripro and its employees supposedly began using iterations of those documents after he began working for Ameripro. They contend that Nasserfar still owns those templates.     Nasserfar also claims to own the internet domain name michaelnasserfar.com.

89.     Those arguments are baseless, however, on the face of the contracts that Nasserfar signed with Ameripro: i) Nasserfar contractually conveyed all of his right, title, and interest in the michaelnasserfar.com domain to Ameripro on May 12, 2014; ii) Nasserfar contractually warranted to Ameripro on October 18, 2011, that he did *not* have any intellectual property or other proprietary information of his own when he began working for the company (such as templates); and iii) on four separate occasions, Nasserfar contractually agreed that if any such prior works existed and were used on Ameripro computers, on its premises, or in connection with its business, then he conveyed all right, title, and interest in them to Ameripro. Pursuant to Tex. R. Civ. P. 58, Ameripro adopts herein by reference its "Ameripro Funding, Inc.'s Response to Counter-Defendants' Application for Injunction" filed May 22, 2015, detailing those facts. While Ameripro is the owner and legally entitled to use all such property, Ameripro is not using any templates created by Nasserfar, and has disabled the website link.

90.     In fact, at the May 26-27, 2015 hearing on Ameripro's Temporary Injunction, this Court heard the same arguments by Counter-Defendants, and rejected them. The Court also

36

38

issued an order denying Counter-Defendants' application for restraining order on June 16, 2015.

*Ameripro's lawsuit to enforce its contractual rights*
*cannot support a claim of tortious interference*

91. Counter-Defendants argue that the manner in which Ameripro has sought to enforce its contracts – i.e., Ameripro's filing of its lawsuit against Counter-Defendants – constitutes tortious interference with Counter-Defendants' contracts and business relationships. As a matter of law, Counter-Defendants' claim fails on at least two grounds: i) the absolute judicial privilege bars them from maintaining a cause of action based on Ameripro's prosecution of its claims; ii) their claims are also barred by the privilege of legal justification or excuse, under which Ameripro has a privilege to protect its own colorable rights and seek redress for Counter-Defendants' conduct. In the June 16, 2015 Temporary Injunction, this Court determined that Ameripro "met its burden to establish that it has a probable right of recovery and likelihood of success on the merits" as to all Counter-Defendants. At a minimum, Ameripro has established the existence of colorable rights, and as a matter of law, its suit to enforce those rights is covered by both privileges.

*Compensation claims are barred*

92. The Individual Counter-Defendants' claims for additional compensation from Ameripro are likewise barred on multiple grounds:

> A. The Individual Counter-Defendants' employment agreements with Ameripro included a compensation formula which defined how each of them would be paid. Ameripro paid each of them in accordance with that formula. No additional amounts are due any of the Individual Counter-Defendants under the terms of their contracts with Ameripro. Instead, as detailed above, each of them is accountable to Ameripro for forfeiture and disgorgement of amounts he was paid during the time period he was in breach of his duties to the company.

37

B.    As a consequence of the Individual Counter-Defendants' breaches of contract and fiduciary duty described above (including their admitted failure to provide a written account of open leads, business prospects, and loans in process, their failure to assist in closings that occurred after their terminations, and their misappropriation of confidential records), none of the Individual Counter-Defendants was in "good standing" with Ameripro as of the date of termination. They are not owed any amounts, including any commissions for closings that occurred after they terminated their employment. As a consequence of their breaches of contract and fiduciary duty, they are also barred from seeking enforcement of the contracts against Ameripro, and Ameripro is relieved from any obligation to perform under those breached agreements.

C.    The Individual Counter-Defendants' argument that Ameripro should have renegotiated their contracts (and that they should be paid based on profitability) fails to state any valid cause of action, and is not legally unenforceable. The parties never agreed upon any of the material terms for a *new* employment agreement to take the place of their existing contracts, let alone in any writing signed by both parties. Moreover, Ameripro made clear to the Individual Counter-Defendants that they are barred (as loan originators) from being paid based on profits for their branch, and Ameripro refused to agree to any such provision. As a matter of law, the Individual Counter-Defendants cannot enforce contract terms that never came into existence.[23] Even if the parties were

---

[23] *Kottke v. Scott*, 2011 WL 1467194 *4 (Tex. App. – Austin April 14, 2011, no pet.) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree."). In addition to a merger clause, Ameripro's contracts with the former employees required any future modifications or substitutions be in a writing signed by both parties. *Garner v. Fidelity Bank*, 244 S.W.3d 855, 860 (Tex.

38

to have ever agreed to such a modification (which they did not), it would have violated governing regulations, and hence been illegal, void, and unenforceable.

93.     All of Counter-Defendants' claims against Ameripro are further barred under the doctrines of unclean hands, estoppel, and waiver, including as a consequence of their material breaches of contract, tortious conduct, and statutory violations described in detail above.

**M.     All conditions precedent have been performed or have occurred.**

94.     Ameripro previously gave written notice and demand to each Counter-Defendant to cease and desist the conduct described above, and for Individual Counter-Defendants to comply with their contracts with Ameripro, but to no avail.

95.     All conditions precedent have been performed or have occurred, including all conditions precedent to Ameripro's right to recover from Counter-Defendants.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff Ameripro respectfully prays that the Court continue to enforce the Temporary Injunction dated June 16, 2015 through entry of final judgment, that Counter-Defendants take nothing by their claims, and that upon trial or other disposition, the Court enter final judgment in favor of Ameripro and against Counter-Defendants, jointly and severally, for the following:

(a)     awarding Ameripro permanent injunctive relief against Counter-Defendants, as requested and detailed above;

(b)     awarding Ameripro recovery of its actual damages against Counter-Defendants, including for Counter-Defendants' misappropriation and conversion of Ameripro's confidential and proprietary information, and for their breaches of fiduciary duty, breaches of contract, statutory violations, and Oak Mortgage's aiding and abetting of those breaches, its tortious

App. – Dallas 2008, no pet.) ("A written agreement will be enforced as written and cannot be added to, varied, or contradicted by parol testimony. This is particularly true where the written contract contains a recital that it contains the entire agreement between the parties or a similarly-worded merger provision.").

39

interference with contracts, and its other acts in conspiracy with the other Counter-Defendants;

(c)     awarding Ameripro disgorgement damages against Counter-Defendants (including all amounts by which Counter-Defendants have been unjustly enriched), and ordering forfeiture of compensation that the Individual Counter-Defendants received and/or allegedly earned and ordering repayment of same to Ameripro;

(d)     awarding Ameripro prejudgment interest to the maximum extent permitted by law;

(e)     awarding Ameripro its reasonable attorneys' fees, costs of court, and any other fees and amounts authorized by statute;

(f)     awarding Ameripro postjudgment interest as provided by law; and

(g)     awarding Ameripro such other and further relief, at law or in equity, to which Ameripro may be justly entitled.

Respectfully submitted,

GRAVES DOUGHERTY HEARON & MOODY, P.C.

By:___/s/ Susan P. Burton_____
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com
401 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5600
Facsimile: (512) 480-5862

ATTORNEYS FOR COUNTER-PLAINTIFF
AND DEFENDANT AMERIPRO FUNDING, INC.

40

42

# AFFIDAVIT

STATE OF TEXAS     §

    §

COUNTY OF TRAVIS     §

BEFORE ME, the undersigned authority, on this day personally appeared Chad Overhauser, who after being duly sworn stated under oath the following:

"My name is Chad Overhauser. I am the President and Founder of Ameripro Funding, Inc. ('Ameripro'), the Counter-Plaintiff in this cause. I am duly authorized to make this affidavit on Ameripro's behalf. I am over the age of 21 and have not been convicted of a felony. I am of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein. I have read the above Defendant and Counter-Plaintiff Ameripro Funding, Inc.'s First Amended Counterclaim, and Sworn Application for Temporary Injunction and Permanent Injunction, and Answer. and every factual statement contained therein (excluding only legal conclusions) is within my personal knowledge. and is true and correct."

_____

Chad Overhauser

SIGNED under oath before me by the said Chad Overhauser on this _7_ day of July, 2015.

_____

Notary Public, in and for the State of Texas

My Commission expires ___1/15/19___

SUSAN DURRETT
Notary Public, State of Texas
My Commission Expires
January 15, 2019

41

43

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing pleading was served on all counsel of record on this 8th day of July, 2015.

_/s/ Susan P. Burton_

Susan P. Burton

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

# EXHIBIT 4

8/11/2015 4:51:44 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-000785
Patsy Ybarra

CAUSE NO. D-1-GN-15-000785

| OAK MORTGAGE GROUP, INC., | § | IN THE DISTRICT COURT |
|---|---|---|
| MICHAEL H. NASSERFAR, MICHAEL | § | |
| E. TASK, and TYCORD R. GOSNAY, | § | |
| | § | |
| Plaintiffs / Counter-Defendants, | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| AMERIPRO FUNDING, INC., | § | |
| | § | |
| Defendant / Counter-Plaintiff. | § | 345th JUDICIAL DISTRICT |

## COUNTER-PLAINTIFF AMERIPRO FUNDING, INC.'S
## SUPPLEMENTAL COUNTERCLAIM

TO THE HONORABLE JUDGE OF SAID COURT:

AMERIPRO FUNDING, INC. ("Ameripro") respectfully files this its Supplemental Counterclaim ("Supplemental Counterclaim"), supplementing "Counter-Plaintiff Ameripro Funding, Inc.'s First Amended Counterclaim and Sworn Application for Temporary and Permanent Injunction, and Amended Answer" (the "First Amended Counterclaim") in this cause, complaining of Counter-Defendants Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay ("Individual Counter-Defendants") and Oak Mortgage Group, Inc. ("Oak Mortgage").

As stated in the First Amended Counterclaim, "Ameripro seeks actual and punitive damages against Counter-Defendants (including the remedy of disgorgement from all Counter-Defendants)." In the First Amended Counterclaim, Ameripro has already asserted its right to disgorgement and for unjust enrichment in connection with its claims for conversion and misappropriation, the Individual Counter-Defendants' breaches of fiduciary duty, Oak Mortgage's knowing participation in the Individual Counter-Defendants' breaches of fiduciary duty, and under Tex. Civ. Prac. & Rem. Code § 134A.001, *et seq.* ("TUTSA").

In discovery responses, Counter-Defendants incorrectly suggest that Ameripro's pleading

3

for disgorgement was limited to its breach of fiduciary duty claims, and have refused to produce responsive documents relating to disgorgement. Counter-Defendants have misstated the scope of Ameripro's disgorgement claim in the First Amended Counterclaim, but in order to avoid any question of adequate notice to Counter-Defendants regarding the scope of disgorgement relief which Ameripro seeks to recover from them, Ameripro clarifies as follows:

1.      In addition to all other relief set forth in the First Amended Counterclaim, Ameripro seeks disgorgement damages against all Counter-Defendants. As to Oak Mortgage, Ameripro is entitled to the remedy of disgorgement based on Oak Mortgage's acts of conversion, misappropriation, knowing participation in and aiding and abetting the Individual Counter-Defendants' breaches of fiduciary duty, violations of Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the Individual Counter-Defendants in connection with their breaches of fiduciary duty, conversion, and misappropriation, all such conduct as described in greater detail in the First Amended Counterclaim.

2.      As to the Individual Counter-Defendants, Ameripro is entitled to the remedy of disgorgement based on the Individual Counter-Defendants' acts of conversion, misappropriation, breaches of fiduciary duty, violations of TUTSA, and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same), conversion, and misappropriation, all such conduct as described in greater detail in the First Amended Counterclaim.

3.      As the Texas Supreme Court has noted, the equitable remedy of disgorgement is to "'strip the defendant of a wrongful gain.'"[1] Ameripro seeks disgorgement as to all Counter-

---

[1] *In re Longview Energy Co.*, _ S.W.3d _, 2015 WL 2148353 *5 & n. 34 (Tex. 2015) (quoting with approval Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt A).

2

Defendants for all profits, use value, proceeds, and/or consequential gains that Counter-Defendants obtained through their wrongful conduct, including any benefits they received in the way of profits, savings, and/or avoided expenditures. As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA.

4. This pleading supplements, rather than amends, Ameripro's First Amended Counterclaim. Pursuant to Tex. R. Civ. P. 58, Ameripro adopts and incorporates herein by reference the First Amended Counterclaim in its entirety.

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff Ameripro respectfully

3

prays that the Court enter final judgment in favor of Ameripro and against Counter-Defendants, jointly and severally, for all relief set forth in Ameripro's First Amended Counterclaim and in this supplement thereto (including disgorgement relief against Counter-Defendants, amounts by which Counter-Defendants have been unjustly enriched, and forfeiture of compensation that the Individual Counter-Defendants received and/or allegedly earned and ordering repayment of same to Ameripro). Ameripro further requests such other and further relief, at law or in equity, to which Ameripro may be justly entitled.

Respectfully submitted,

GRAVES DOUGHERTY HEARON & MOODY, P.C.

By: ___*/s/ Susan P. Burton*_____
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com
401 Congress Ave., Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5600
Facsimile: (512) 480-5862

ATTORNEYS FOR COUNTER-PLAINTIFF
AND DEFENDANT AMERIPRO FUNDING, INC.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing pleading was served on all counsel of record on this 11th day of August, 2015.

___*/s/ Susan P. Burton*_____
Susan P. Burton

4

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

# EXHIBIT 5

8/24/2015 8:00:00 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-15-000785
Jonathan Sanders

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC. | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, | § | |
| MICHAEL E. TASK | § | |
| and, | § | |
| TYCORD R. GOSNAY, | § | |
| | § | 345th JUDICIAL DISTRICT |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| AMERIPRO FUNDING, INC., | § | TRAVIS COUNTY, TEXAS |
| | § | |
| Defendant. | § | |

## NOTICE OF DAMAGES CLAIMED BY
## DEFENDANT/COUNTER-PLAINTIFF

TO THE HONORABLE COURT:

Attached hereto as "Exhibit 1" is a true and correct copy of "Defendant/Counter-Plaintiff's Answers And Objections To Plaintiffs'/Counter-Defendants' First Interrogatories" sworn to by Chad Overhauser, President of Ameripro Funding, Inc., Defendant/Counter-Plaintiff, on August 17, 2015.

Respectfully submitted,

By: /s/ Charles Bundren

**WM. CHARLES BUNDREN & ASSOCIATES
LAW GROUP, PLLC**

Wm. Charles Bundren, Esq.

**PLAINTIFFS' NOTICE OF DAMAGES CLAIMED BY DEFENDANT/COUNTER-PLAINTIFF** PAGE 1

7

Attorney-in Charge
State Bar No. 03343200
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034
(214) 808-3555    Telephone
(972) 624-5340    Facsimile
e-mail:       charles@bundrenlaw.net
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 22nd day of August, 2015, all counsel of record were served with a copy of this document in accordance with Rule 21a of the Texas Rules of Civil Procedure by serving the following:

Susan Burton, Esq.
State Bar No.       03479350
GRAVES DOUGHTERY HEARON & MOODY
P.C.
401 Congress., Suite 2200
Austin, Texas 78701
Telephone:  (512) 480-5600
Telecopier:  (512) 480-5862 (facsimile)
E-mail:       sburton@gdhm.com
**ATTORNEY FOR DEFENDANT:**


__X__ by the electronic filing manager pursuant to TRCP 21a(a)(1),

_____ by certified mail return receipt requested deposited with the United States Postal Service on the date indicated above pursuant to TRCP 21a(a)(2),

__X__ by email at the email address indicated above pursuant to TRCP 21a(a)(2),

_____ by commercial delivery service deposited with _____ on the date indicated above pursuant to TRCP 21a(a)(2), and/or

_____ by fax at the fax number indicated above pursuant to TRCP 21a(a)(2).

/s/ Charles Bundren
Wm. Charles Bundren, Esq.
**ATTORNEY FOR: PLAINTIFFS**

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC. | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, | § | |
| MICHAEL E. TASK | § | |
| and, | § | |
| TYCORD R. GOSNAY, | § | |
| ' | § | 345th JUDICIAL DISTRICT |
| Plaintiffs, | § | |
| | § | |
| VS. | § | |
| | § | |
| AMERIPRO FUNDING, INC., | § | TRAVIS COUNTY, TEXAS |
| | § | |
| Defendant. | § | |

## NOTICE OF DAMAGES CLAIMED BY DEFENDANT/COUNTER-PLAINTIFF

# EXHIBIT 1

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC., | § | IN THE DISTRICT COURT |
| MICHAEL H. NASSERFAR, MICHAEL | § | |
| E. TASK, and TYCORD R. GOSNAY, | § | |
| | § | |
| Plaintiffs/Counter-Defendants, | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| V. | § | |
| | § | |
| AMERIPRO FUNDING, INC., | § | |
| | § | |
| Defendant/Counter-Plaintiff. | § | 345th JUDICIAL DISTRICT |

## DEFENDANT/COUNTER-PLAINTIFF'S ANSWERS AND OBJECTIONS TO PLAINTIFFS'/COUNTER-DEFENDANTS' FIRST INTERROGATORIES

TO: Plaintiffs/Counter-Defendants, Oak Mortgage Group, Inc., Michael H. Nasserfar, Michael E. Task and Tycord R. Gosnay, by and through their counsel of record, Wm. Charles Bundren, Esq., WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034.

Defendant/Counter-Plaintiff, Ameripro Funding, Inc. ("Ameripro") submits these its answers and objections to Plaintiffs/Counter-Defendants' ("Counter-Defendants") First Interrogatories.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 480-5738 Telephone
(512) 480-5838 Telecopier

By:   /s/ Susan P. Burton
_____
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com

ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF
AMERIPRO FUNDING, INC.

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on this 17th day of August, 2015, via electronic mail on the following:

Wm. Charles Bundren, Esq.
WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034

/s/ Susan P. Burton
Susan P. Burton

2

12

## OBJECTIONS TO CERTAIN
## INSTRUCTIONS AND DEFINITIONS

Ameripro objects to the "Time Frame" listed at p. 11 of Counter-Defendants' interrogatories (a 4½-year period from January 1, 2011 to the present), on the ground that it is overbroad, harassing, and covers years that are not relevant to any issue in this lawsuit: Gosnay did not begin working for Ameripro until 2014, and he alleges that he was not paid commissions "earned in the month of January 2015." Similarly, Nasserfar and Task only allege they were not paid amounts owed "beginning in the first quarter of 2014." Ameripro's claims relate to Counter-Defendants' tortious conduct and breaches of contract which are believed to have begun no earlier than 2014. In short, Counter-Defendants' 4½-year "Time Frame" from 2011 forward is overbroad, irrelevant, and harassing.

Ameripro further objects to the "Time Frame" extending through the date "the answers to these Interrogatories are made" to the extent that the instruction conflicts with the exemption contained in Tex. R. Civ. P. 193.3(c): Ameripro intends to withhold privileged information that fall within Rule 193.3(c)'s exemption, generated on or after its "Petitioner Ameripro Funding, Inc.'s Verified Rule 202 Petition" was filed in the related proceeding between the same parties relating to the same dispute, and as permitted by Rule 193.3(c), do so without the necessity of complying with Rule 193.3(a) and (b).

Ameripro further objects to the instructions at pp. 2-3 of Counter-Defendants' interrogatories, in which Ameripro is instructed to make detailed explanations regarding each document that had existed in the past 4½ years that is no longer in Ameripro's possession or control or that otherwise is no longer are in existence, and to list each person who might have knowledge regarding same, on the ground that the instructions are unreasonable, overbroad, would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance. Ameripro further objects that those instructions are beyond the scope of Rule 197's requirements.

Ameripro further objects to the instructions at pp. 9-10 of Counter-Defendants' interrogatories, and to the interrogatories which ask Ameripro to list every document that relates to claims in the lawsuit (including multiple categories of detail listed at pp. 9-10) and to list each person who might have knowledge regarding each such individual document, on the ground that the instructions and questions are unreasonable, overbroad, would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance. Ameripro further objects that those instructions are beyond the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial.

Ameripro further objects to Counter-Defendants' eleven pages of instructions and definitions to the extent that they exceed the specific requirements of Rules 192, 193, and 197 of the Texas Rules of Civil Procedure, or the requirements of any other rules pertinent to discovery. Unless otherwise specifically agreed upon by the parties in writing, Ameripro objects to expanding its obligations beyond those exact requirements contained in the Texas Rules of Civil Procedure.

3

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify Defendant's Electronic Information storage devices (hereinafter referred to as "storage devices") which have stored any information or data related to Plaintiffs and other devices which have stored or which are currently storing electronic files and information and ESI which are or have been in the care, custody and control of Defendant since January 1, 2012, the dates the storage devices came into Defendant's custody, the name Defendant uses to describe the storage devices, and the present location of the storage devices, their custodian(s), the characteristics of the information, where the information is stored, backed up, or archived and describe the operating systems or programs used by Defendant to store Electronic Information or ESI, as defined herein.

**ANSWER:**

Counter-Defendants' interrogatories refer to "ESI, as defined herein," but they did not include a definition anywhere in their interrogatories; Ameripro assumes the undefined term "ESI" in this interrogatory was intended to refer to "electronically stored information." Similarly, Counter-Defendants' interrogatories state that the term "Electronic Information" means electronic or magnetic data or information "as defined in" Rule 196.4, but Rule 196.4 does not provide any such definition; Ameripro assumes that the defined term "Electronic Information" has the ordinary meaning of "electronic or magnetic data."

Ameripro objects to Interrogatory No. 1 on the grounds of overbreadth and vagueness, and that responding to the entirety of the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance. Even if the scope of the interrogatory were limited to the Lakeway branch office where Nasserfar, Task, and Gosnay were previously employed, the request to "identify" all of the electronically stored information contained at that branch office would require Ameripro to itemize dozens of Gigabytes of data. Moreover, Ameripro has already produced non-privileged responsive documents, as described below, and the burden of itemizing those documents would be no greater for Counter-Defendants than it would be for Ameripro.[1]

In addition to the undue burden of providing any such listing, the request to identify electronic information "related to Plaintiffs" (without limiting it to any claims or defenses made in and relevant to the lawsuit), is overbroad, vague, and calls for information exceeding the scope of permissible discovery under Tex. R. Civ. P. 192.3(a). Ameripro also objects to the request for "characteristics of the information" as vague and unintelligible.

---

[1] The electronic information which Ameripro has already produced, as well as the 26,000+ documents that Counter-Defendants have supplied in response to the Temporary Injunction Order, by themselves, are among the documents "related to" the three individual Counter-Defendants: the Court's Temporary Injunction Order found that Counter-Defendants misappropriated that information "belonging to Ameripro," that Counter-Defendants wrongfully took it "from Ameripro's computer network" and premises, and that they "attempted to permanently destroy Ameripro documents and files."

4

Subject to and without waiving the foregoing objections, at the May 27, 2015 hearing on Ameripro's application for Temporary Injunction, Ameripro gave opposing counsel a thumb drive which contains forensic images of the electronic and magnetic data stored on the Ameripro laptops that had been issued to Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay (the "Individual Counter-Defendants"), and opposing counsel acknowledged his receipt of that disk on the record at the hearing; that information is incorporated herein by reference pursuant to Tex. R. Civ. P. 58 and 197.2(c). In addition, those laptops (and their serial and model numbers), are identified in deposition Exhibits 25, 80, 153, 157, and 158 in this lawsuit. As stated in James Anagnos' and Roy Rector's deposition testimony in this cause, and in Mr. Rector's testimony at the Temporary Injunction hearing, the three laptops were delivered by Mr. Anagnos to Ameripro's computer forensic expert Roy Rector. Pursuant to Tex. R. Civ. P. 58, 193.5, and 197.2(c), Mr. Anagnos' and Mr. Rector's identity, the details of the delivery of that information, the dates when the delivery was made, and other requested information are set forth in detail in those deposition transcripts and exhibits, in Ameripro's responses to requests for disclosure, and in Mr. Rector's expert files which have been produced in this cause (including APF0028145-28171, APF0028181-28255, and APF0028259-283). In addition, Ameripro has already produced to Counter-Defendants in discovery copies of the electronic information and electronically stored information "related to" the Counter-Defendants; in lieu of identifying each of those documents, Ameripro refers Counter-Defendants to Bates numbers APF0000001 through APF0028283 (including expert materials relating to Mr. Rector's work) from Ameripro's document production and supplements thereto, pursuant to Tex. R. Civ. P. 197.2(c). Aside from the three laptops discussed above, the "storage devices" for electronic or magnetic data or information consists of Ameripro's computer network system (to which the Lakeway office was linked) which continues to be located at Ameripro's offices, Ameripro came into possession of that computer network at least as early as 2003 when the company was formed (and in any event before the January 1, 2012 date specified in this interrogatory), and Ameripro has continuously been the custodian of that computer network system. Ameripro does not have a special "name" for its computer network.

**INTERROGATORY NO. 2:** Separately and distinctly, as to Oak Mortgage, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Oak Mortgage, the amount of damages Defendant seeks from Oak Mortgage, the identity of documents or records, separately and distinctly, supporting Defendant's claimed damages for each cause of action or claim, the identity of persons with knowledge of such claimed damages, and the method and means Defendant used to calculate the claimed damages.

## ANSWER:

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden,

5

unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over *26,000* Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's damage claims against Oak Mortgage and the other Counter-Defendants: those 26,000+ spreadsheets are part of the confidential information "belonging to Ameripro" which the Court stated in the Temporary Injunction Order were wrongfully "taken from Ameripro's computer network and premises."

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, as described in Ameripro's pending Second Motion to Compel Production of Documents. Part of Ameripro's damages claims against all Counter-Defendants consist of disgorgement remedies. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Oak Mortgage, Ameripro seeks disgorgement based on Oak Mortgage's conversion, misappropriation, knowing participation in and aiding and abetting the Individual Counter-Defendants' breaches of fiduciary duty, recovery for unjust enrichment as statutorily allowed under Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the Individual Counter-Defendants in connection with their breaches of fiduciary duty and acts of conversion and misappropriation.

Disgorgement damages (including unjust enrichment) against Oak Mortgage are based on the income that it and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, and the other benefits that Oak Mortgage derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Oak Mortgage and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of

6

a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. To date, however, Counter-Defendants have refused to produce that information in response to Ameripro's second set of requests for production, as needed for Ameripro's calculation. Ameripro reserves the right to supplement with its calculation of disgorgement damage amounts, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Actual damages*. Ameripro also seeks actual damages against all Counter-Defendants, jointly and severally. As to Oak Mortgage, Ameripro seeks actual damages based on Oak Mortgage's knowing participation in and aiding and abetting of the Individual Counter-Defendants' breaches of fiduciary duty, misappropriation, conversion, tortious interference with contract, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and its conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Oak Mortgage's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

*Reasonable royalty*. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA, Tex. Civ. Prac. & Rem. Code § 134A.004(a). Pursuant to that section, Ameripro will also present an alternate damage model measured by imposition of liability for a reasonable royalty against Oak Mortgage and the other Counter-Defendants for their unauthorized use or disclosure of Ameripro's trade secret information (as defined in that statute). Ameripro reserves the right to supplement this portion of its answer with its calculation, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Attorneys' fees and costs*. Ameripro seeks to recover its reasonable and necessary attorneys' fees from all Counter-Defendants, including Oak Mortgage. Ameripro's fee recovery against Oak Mortgage is based on Ameripro's claims under Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.005. Ameripro's calculation of reasonable and necessary fees is based on the factors set forth in Texas Disciplinary Rule of Professional Conduct 1.04 and the *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812, 818-19 (Tex. 1997) line of decisions. Because of the interrelated nature of Ameripro's contract and statutory claims with the other causes of action that Ameripro has asserted, and with the defenses that Plaintiffs/Counter-Defendants have raised, their prosecution entails proof of essentially the

7

same facts, and the discrete legal services that Ameripro's attorneys have performed advance both recoverable and unrecoverable claims and defenses Ameripro asserts in this matter. 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary in connection with Ameripro's contract claims, 95% would have been necessary in connection with Ameripro's TUTSA claims, 95% would have been necessary in connection with Ameripro's Section 143.002 claims (even if Ameripro's attorneys and paralegals had not devoted pretrial and trial work specifically toward claims for which attorneys' fee recovery is not statutorily allowed or to Ameripro's defense of Counter-Defendants' claims), and 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary even if Ameripro did not assert claims for which no fee recovery is permitted. Because of the joint nature of Counter-Defendants' wrongful conduct, 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary as to each Counter-Defendant and on each of the claims for which that Counter-Defendant is statutorily liable for attorneys' fees, even if the other Counter-Defendants (or any of them) were not parties in the lawsuit. Through July 31, 2015, that reasonable and necessary amount totals $200,669. Pursuant to Tex. R. Civ. P. 58 and 193.5(a)(2), Ameripro also adopts by reference its testifying expert designations set out in its responses to requests for disclosure (under Rule 194.2(f) relating to attorneys' fees).

*Exemplary damages.* Ameripro seeks to recover punitive/exemplary damages against all Counter-Defendants, including Oak Mortgage. Ameripro's recovery of punitive/exemplary damages against Oak Mortgage is based on Oak Mortgage's knowing participation in and aiding and abetting of the Individual Counter-Defendants' breaches of fiduciary duty, misappropriation, conversion, tortious interference with contract, and violations of Tex. Civ. Prac. & Rem. Code § 134A.004. Ameripro's punitive/exemplary damages against Oak Mortgage is the greater of i) two times the amount of its economic damages (including disgorgement and actual damages) plus any noneconomic damages found by the jury, or ii) $200,000 (as authorized under Tex. Civ. Prac. & Rem. Code § 41.008), and/or twice the amount of disgorgement and actual damages awarded to Ameripro (as authorized under Tex. Civ. Prac. & Rem. Code § 134A.004).

**INTERROGATORY NO. 3:** Separately and distinctly, as to Michael Nasserfar, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Michael Nasserfar, the amount of damages Defendant seeks from Michael Nasserfar, the identity of documents or records, separately and distinctly, supporting Defendant's claimed damages for each cause of action or claim, the identity of persons with knowledge of such claimed damages, and the method and means Defendant used to calculate the claimed damages.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is

8

18

overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over *26,000* Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's damage claims against Nasserfar and the other Counter-Defendants: those 26,000+ spreadsheets are part of the confidential information "belonging to Ameripro" which the Court stated in the Temporary Injunction Order were wrongfully "taken from Ameripro's computer network and premises."

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, as described in Ameripro's pending Second Motion to Compel Production of Documents. Part of Ameripro's damages claims against all Counter-Defendants consist of disgorgement remedies. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Michael Nasserfar, Ameripro seeks disgorgement based on Nasserfar's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily authorized under Tex. Civ. Prac. & Rem. Code § 134A.004(a), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

Disgorgement damages (including unjust enrichment) against Nasserfar are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Nasserfar during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and

9

commission and knowing participation in breaches of fiduciary duty) enabled Nasserfar and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. For forfeiture damages, that amount consists of $103,120.51, consisting of the income Ameripro paid to Nasserfar from November 1, 2014 through the end of his employment, during the period that Nasserfar was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

For disgorgement of amounts that Counter-Defendants have received for their new Lakeway office since January 16, 2015, Counter-Defendants have refused to produce information in response to Ameripro's second set of requests for production, as needed for Ameripro's calculation. Ameripro reserves the right to supplement with its calculation of disgorgement damage amounts, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Actual damages.* As stated above, Ameripro also seeks actual damages against all Counter-Defendants, jointly and severally. As to Nasserfar, Ameripro seeks actual damages based on Nasserfar's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Nasserfar's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

*Reasonable royalty.* As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA, Tex. Civ. Prac. & Rem. Code § 134A.004(a). Pursuant to that section, Ameripro will also present an alternate damage model measured by imposition of liability for a reasonable royalty against Nasserfar and the other Counter-Defendants for their unauthorized use or disclosure of Ameripro's trade secret information (as defined in that statute). Ameripro reserves the right to supplement this portion of its answer with its calculation, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

10

*Attorneys' fees and costs.* Ameripro seeks to recover its reasonable and necessary attorneys' fees from all Counter-Defendants, including Nasserfar. Ameripro's fee recovery against Oak Mortgage is based on Ameripro's claims under Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.005. Ameripro's calculation of reasonable and necessary fees is based on the factors set forth in Texas Disciplinary Rule of Professional Conduct 1.04 and the *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812, 818-19 (Tex. 1997) line of decisions. Because of the interrelated nature of Ameripro's contract and statutory claims with the other causes of action that Ameripro has asserted, and with the defenses that Plaintiffs/Counter-Defendants have raised, their prosecution entails proof of essentially the same facts, and the discrete legal services that Ameripro's attorneys have performed advance both recoverable and unrecoverable claims and defenses Ameripro asserts in this matter. 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary in connection with Ameripro's contract claims, 95% would have been necessary in connection with Ameripro's TUTSA claims, 95% would have been necessary in connection with Ameripro's Section 143.002 claims (even if Ameripro's attorneys and paralegals had not devoted pretrial and trial work specifically toward claims for which attorneys' fee recovery is not statutorily allowed or to Ameripro's defense of Counter-Defendants' claims), and 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary even if Ameripro did not assert claims for which no fee recovery is permitted. Because of the joint nature of Counter-Defendants' wrongful conduct, 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary as to each Counter-Defendant and on each of the claims for which that Counter-Defendant is statutorily liable for attorneys' fees, even if the other Counter-Defendants (or any of them) were not parties in the lawsuit. Through July 31, 2015, that reasonable and necessary amount totals $200,669. Pursuant to Tex. R. Civ. P. 58 and 193.5(a)(2), Ameripro also adopts by reference its testifying expert designations set out in its responses to requests for disclosure (under Rule 194.2(f) relating to attorneys' fees).

*Exemplary damages.* Ameripro seeks to recover punitive/exemplary damages against all Counter-Defendants, including Nasserfar. Ameripro's recovery of punitive/exemplary damages against Nasserfar is based on his breaches of fiduciary duty, misappropriation, conversion, and violations of Tex. Civ. Prac. & Rem. Code § 134A.004. Ameripro's punitive/exemplary damages against Nasserfar is the greater of i) two times the amount of its economic damages (including disgorgement and actual damages) plus any noneconomic damages found by the jury, or ii) $200,000 (as authorized under Tex. Civ. Prac. & Rem. Code § 41.008), and/or twice the amount of disgorgement and actual damages awarded to Ameripro (as authorized under Tex. Civ. Prac. & Rem. Code § 134A.004).

**INTERROGATORY NO. 4:** Separately and distinctly, as to Michael Task, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Michael Task, the amount of damages Defendant seeks from Michael Task, the identity of documents or records, separately and distinctly, supporting Defendant's claimed damages for each cause of action or claim, the identity of persons with knowledge of such claimed damages, and the method and means Defendant used to calculate the claimed damages.

**ANSWER:**

21

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over *26,000* Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's damage claims against Task and the other Counter-Defendants: those 26,000+ spreadsheets are part of the confidential information "belonging to Ameripro" which the Court stated in the Temporary Injunction Order were wrongfully "taken from Ameripro's computer network and premises."

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, as described in Ameripro's pending Second Motion to Compel Production of Documents. Part of Ameripro's damages claims against all Counter-Defendants consist of disgorgement remedies. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement*. Ameripro seeks disgorgement damages against all Counter-Defendants. As to Michael Task, Ameripro seeks disgorgement based on Task's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily authorized under Tex. Civ. Prac. & Rem. Code § 134A.004(a), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

Disgorgement damages (including unjust enrichment) against Task are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office

12

and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Task during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Task and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. For forfeiture damages, that amount consists of $34,861.73, consisting of the income Ameripro paid to Task from November 1, 2014 through the end of his employment, during the period that Task was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

For disgorgement of amounts that Counter-Defendants have received for their new Lakeway office since January 16, 2015, Counter-Defendants have refused to produce information in response to Ameripro's second set of requests for production, as needed for Ameripro's calculation. Ameripro reserves the right to supplement with its calculation of disgorgement damage amounts, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Actual damages.* As stated above, Ameripro also seeks actual damages against all Counter-Defendants, jointly and severally. As to Task, Ameripro seeks actual damages based on Task's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Task's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

*Reasonable royalty.* As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA, Tex. Civ. Prac. & Rem. Code § 134A.004(a). Pursuant to that section, Ameripro will also present an alternate damage model measured by imposition of liability for a reasonable royalty against Task and the other Counter-Defendants for their

13

unauthorized use or disclosure of Ameripro's trade secret information (as defined in that statute). Ameripro reserves the right to supplement this portion of its answer with its calculation, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Attorneys' fees and costs.* Ameripro seeks to recover its reasonable and necessary attorneys' fees from all Counter-Defendants, including Task. Ameripro's fee recovery against Oak Mortgage is based on Ameripro's claims under Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.005. Ameripro's calculation of reasonable and necessary fees is based on the factors set forth in Texas Disciplinary Rule of Professional Conduct 1.04 and the *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812, 818-19 (Tex. 1997) line of decisions. Because of the interrelated nature of Ameripro's contract and statutory claims with the other causes of action that Ameripro has asserted, and with the defenses that Plaintiffs/Counter-Defendants have raised, their prosecution entails proof of essentially the same facts, and the discrete legal services that Ameripro's attorneys have performed advance both recoverable and unrecoverable claims and defenses Ameripro asserts in this matter. 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary in connection with Ameripro's contract claims, 95% would have been necessary in connection with Ameripro's TUTSA claims, 95% would have been necessary in connection with Ameripro's Section 143.002 claims (even if Ameripro's attorneys and paralegals had not devoted pretrial and trial work specifically toward claims for which attorneys' fee recovery is not statutorily allowed or to Ameripro's defense of Counter-Defendants' claims), and 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary even if Ameripro did not assert claims for which no fee recovery is permitted. Because of the joint nature of Counter-Defendants' wrongful conduct, 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary as to each Counter-Defendant and on each of the claims for which that Counter-Defendant is statutorily liable for attorneys' fees, even if the other Counter-Defendants (or any of them) were not parties in the lawsuit. Through July 31, 2015, that reasonable and necessary amount totals $200,669. Pursuant to Tex. R. Civ. P. 58 and 193.5(a)(2), Ameripro also adopts by reference its testifying expert designations set out in its responses to requests for disclosure (under Rule 194.2(f) relating to attorneys' fees).

*Exemplary damages.* Ameripro seeks to recover punitive/exemplary damages against all Counter-Defendants, including Task. Ameripro's recovery of punitive/exemplary damages against Task is based on his breaches of fiduciary duty, misappropriation, conversion, and violations of Tex. Civ. Prac. & Rem. Code § 134A.004. Ameripro's punitive/exemplary damages against Task is the greater of i) two times the amount of its economic damages (including disgorgement and actual damages) plus any noneconomic damages found by the jury, or ii) $200,000 (as authorized under Tex. Civ. Prac. & Rem. Code § 41.008), and/or twice the amount of disgorgement and actual damages awarded to Ameripro (as authorized under Tex. Civ. Prac. & Rem. Code § 134A.004).

**INTERROGATORY NO. 5:** Separately and distinctly, as to Ty Gosnay, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Ty Gosnay, the amount of damages Defendant seeks from Ty Gosnay, the identity of documents or records, separately and distinctly, supporting Defendant's claimed damages for each cause of

14

24

action or claim, the identity of persons with knowledge of such claimed damages, and the method and means Defendant used to calculate the claimed damages.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over *26,000* Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's damage claims against Gosnay and the other Counter-Defendants: those 26,000+ spreadsheets are part of the confidential information "belonging to Ameripro" which the Court stated in the Temporary Injunction Order were wrongfully "taken from Ameripro's computer network and premises."

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, as described in Ameripro's pending Second Motion to Compel Production of Documents. Part of Ameripro's damages claims against all Counter-Defendants consist of disgorgement remedies. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Tycord Gosnay, Ameripro seeks disgorgement based on Gosnay's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily authorized under Tex. Civ. Prac. & Rem. Code § 134A.004(a), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

15

Disgorgement damages (including unjust enrichment) against Gosnay are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Gosnay during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Gosnay and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. For forfeiture damages, that amount consists of $21,709.73, consisting of the income Ameripro paid to Gosnay from November 1, 2014 through the end of his employment, during the period that Gosnay was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

For disgorgement of amounts that Counter-Defendants have received for their new Lakeway office since January 16, 2015, Counter-Defendants have refused to produce information in response to Ameripro's second set of requests for production, as needed for Ameripro's calculation. Ameripro reserves the right to supplement with its calculation of disgorgement damage amounts, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Actual damages.* As stated above, Ameripro also seeks actual damages against all Counter-Defendants, jointly and severally. As to Gosnay, Ameripro seeks actual damages based on Gosnay's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Gosnay's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

16

*Reasonable royalty*. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA, Tex. Civ. Prac. & Rem. Code § 134A.004(a). Pursuant to that section, Ameripro will also present an alternate damage model measured by imposition of liability for a reasonable royalty against Gosnay and the other Counter-Defendants for their unauthorized use or disclosure of Ameripro's trade secret information (as defined in that statute). Ameripro reserves the right to supplement this portion of its answer with its calculation, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Attorneys' fees and costs*. Ameripro seeks to recover its reasonable and necessary attorneys' fees from all Counter-Defendants, including Gosnay. Ameripro's fee recovery against Oak Mortgage is based on Ameripro's claims under Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.005. Ameripro's calculation of reasonable and necessary fees is based on the factors set forth in Texas Disciplinary Rule of Professional Conduct 1.04 and the *Arthur Andersen & Co. v. Perry Equipment Co.*, 945 S.W.2d 812, 818-19 (Tex. 1997) line of decisions. Because of the interrelated nature of Ameripro's contract and statutory claims with the other causes of action that Ameripro has asserted, and with the defenses that Plaintiffs/Counter-Defendants have raised, their prosecution entails proof of essentially the same facts, and the discrete legal services that Ameripro's attorneys have performed advance both recoverable and unrecoverable claims and defenses Ameripro asserts in this matter. 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary in connection with Ameripro's contract claims, 95% would have been necessary in connection with Ameripro's TUTSA claims, 95% would have been necessary in connection with Ameripro's Section 143.002 claims (even if Ameripro's attorneys and paralegals had not devoted pretrial and trial work specifically toward claims for which attorneys' fee recovery is not statutorily allowed or to Ameripro's defense of Counter-Defendants' claims), and 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary even if Ameripro did not assert claims for which no fee recovery is permitted. Because of the joint nature of Counter-Defendants' wrongful conduct, 95% of the legal services Ameripro's attorneys and paralegals performed would have been necessary as to each Counter-Defendant and on each of the claims for which that Counter-Defendant is statutorily liable for attorneys' fees, even if the other Counter-Defendants (or any of them) were not parties in the lawsuit. Through July 31, 2015, that reasonable and necessary amount totals $200,669. Pursuant to Tex. R. Civ. P. 58 and 193.5(a)(2), Ameripro also adopts by reference its testifying expert designations set out in its responses to requests for disclosure (under Rule 194.2(f) relating to attorneys' fees).

*Exemplary damages*. Ameripro seeks to recover punitive/exemplary damages against all Counter-Defendants, including Gosnay. Ameripro's recovery of punitive/exemplary damages against Gosnay is based on his breaches of fiduciary duty, misappropriation, conversion, and violations of Tex. Civ. Prac. & Rem. Code § 134A.004. Ameripro's punitive/exemplary damages against Gosnay is the greater of i) two times the amount of its economic damages (including disgorgement and actual damages) plus any noneconomic damages found by the jury, or ii) $200,000 (as authorized under Tex. Civ. Prac. & Rem. Code § 41.008), and/or twice the amount of disgorgement and actual damages awarded to Ameripro (as authorized under Tex. Civ. Prac. & Rem. Code § 134A.004).

17

**INTERROGATORY NO. 6:** Identify all persons (including the last known contact information) employed at any time within the applicable dates, by Defendant in its IT or technology division or department and any other employee who had responsibility for maintaining, reviewing, or assisting in the maintenance and review of any electronically stored information of Defendant, Defendant's electronic data, computers, database, hard drives, or other electronic information.

**ANSWER:**

Ameripro objects to Interrogatory No. 6 on the ground that the open-ended request for the identity of every employee who worked in Ameripro's IT or technology department or division is overbroad, and is not reasonably limited to persons with knowledge of any relevant facts. Subject to and without waiving the foregoing objections, the persons who were responsible for maintaining Ameripro's electronically stored information, data, computers, and other electronic information from January 1, 2011 to the present are Jeremy Robichau, IT Lead, and James Anagnos, Director - Information Technology, Tenura Holdings, Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701. (512) 480-5738.

**INTERROGATORY NO. 7:** Identify all persons that reviewed, copied, revised or made changes to, or installed operating systems on, or deleted any electronic files or electronically stored information from any electronic devices that were in the possession, custody or control of Michael Nasserfar, Michael Task or Ty Gosnay at any time during their employment with Defendant, and any and all persons who deleted any information from the laptop computer or other electronic storage devices of Michael Nasserfar, Michael Task or Ty Gosnay, and any and all persons who installed new operating systems on any computer or electronic device previously in the possession of Michael Nasserfar, Michael Task or Ty Gosnay during their employment with Defendant, and, separately and distinctly, identify the dates of such actions, the electronic devices involved, and the identity, separately and distinctly, of the person or persons who engage in such activities, and identify the electronic files or electronically stored information that was deleted from the computers or electronically stored devices in the possession, custody or control of Michael Nasserfar, Michael Task or Ty Gosnay at any time.

**ANSWER:**

On January 26, 2015, as part of a routine update for company laptops a new operating system was loaded onto the laptop that Nasserfar had used during his employment. Pursuant to Tex. R. Civ. P. 58 and 197.2(c), Ameripro adopts and incorporates herein by reference the May 1, 2015 deposition testimony of its expert, Roy Rector, testifying on that subject. Updates would have been installed by Tenura IT Support (either Norm Booher or Colin Stewart), and Ameripro is unaware which updated this particular laptop.

18

28

However, the forensic images that Counter-Defendants have subsequently provided, including forensic images from Nasserfar thumb drives and other electronic devices that the Temporary Injunction Order commanded Counter-Defendants to return to Ameripro, show that Nasserfar did remove confidential records from Ameripro's computer network system, and kept possession of that Ameripro property for several months after his employment with Ameripro ended.

**INTERROGATORY NO. 8:** Identify all files reviewed by Defendant or any of its consultants from the forensic images of any and all electronic devices of Plaintiffs.

### ANSWER:

Pursuant to Tex. R. Civ. P. 192.5 and 193.3(a) & (c), Ameripro withholds from this answer the identity of any of the files that Ameripro's counsel or their staff have reviewed from those forensic images, based on the attorney work-product privilege. Counter-Defendants provided the forensic images of their electronic devices after the Court issued its rulings at the May 26-27, 2015 Temporary Injunction hearing — i.e., well after litigation was not only anticipated, but actually on file. Ameripro will also withhold the identity of any forensic images which relate to Ameripro which the undersigned counsel show to any Ameripro in-house attorneys (as permitted under the Temporary Injunction Order), based on the attorney work-product and attorney-client privileges.

Ameripro also objects to the interrogatory on the grounds of overbreadth, and that responding to the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and that it exceeds the scope of Rule 197's requirements. For example, the review that has occurred to date has shown that there are over 26,000 Ameripro spreadsheets on one Nasserfar thumb drive alone, which Nasserfar improperly took from Ameripro: leaving aside that the specific identity of files reviewed by Ameripro attorneys is privileged information, itemizing those thousands of documents would also be unduly burdensome and expensive and is calculated solely to harass.

Subject to and without waiving the foregoing, Ameripro's testifying expert, Roy Rector, reviewed all of the files from forensic images that Counter-Defendants delivered on June 3, 2015. As stated at the Temporary Injunction hearing, a purpose of his expert review was to ensure that the format of those images complied with the technical format and metadata requirements that the Court imposed on Counter-Defendants in its injunction against them, as opposed to review of the substantive content.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory No. 1 above.

**INTERROGATORY NO. 9:** Identify all files duplicated or copied either electronically or in paper by Defendant or any of its consultants from the forensic images of any and all electronic devices of Plaintiffs.

19

**ANSWER:**

Pursuant to Tex. R. Civ. P. 192.5 and 193.3(a) & (c), Ameripro withholds from this answer the identity of any of the files that Ameripro's counsel or their staff have copied or duplicated from forensic images, based on the attorney work-product privilege. Counter-Defendants provided the forensic images of their electronic devices after the Court issued its rulings at the May 26-27, 2015 Temporary Injunction hearing — i.e., well after litigation was not only anticipated, but actually on file.

Ameripro also objects to identifying each copy or duplication it makes of any images, on the ground that the request on its face would invade the attorney work-product and attorney-client privileges, and would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and that it exceeds the scope of Rule 197's requirements (for example, the request would have Ameripro identify each time it makes a copy of a document to use as an exhibit).

Subject to and without waiving the foregoing, Ameripro's testifying expert, Roy Rector, made a forensic copy of the external hard drive that Counter-Defendants delivered on June 3, 2015, for purposes of reviewing whether the format of the forensic images complied with the technical format and metadata requirements that the Court imposed on Counter-Defendants.

**INTERROGATORY NO. 10:** Identify all person or persons who have reviewed or have been provided with electronic or paper files from the forensic images of any and all electronic devices of Plaintiffs, and as to each person, separately and distinctly, identify the person or persons and the files provided to such person or reviewed by such person or persons.

**ANSWER:**

Pursuant to Tex. R. Civ. P. 192.5 and 193.3(a) & (c), Ameripro withholds from this answer the identity of Ameripro's attorneys or their staff who have reviewed or been provided copies of any files from forensic images, based on the attorney work-product privilege. Counter-Defendants provided the forensic images of their electronic devices after the Court issued its rulings at the May 26-27, 2015 Temporary Injunction hearing — i.e., well after litigation was not only anticipated, but actually on file. Ameripro will also withhold the identity of any forensic images which relate to Ameripro which the undersigned counsel show to any Ameripro in-house attorneys (as permitted under the Temporary Injunction Order), based on the attorney work-product and attorney-client privileges.

Ameripro also objects to the interrogatory on the grounds of overbreadth, and that responding to the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and that it exceeds the scope of Rule 197's requirements. There are over 26,000 Ameripro spreadsheets on one Nasserfar thumb drive alone, and identifying each file that has been "provided" to or "reviewed" by Ameripro attorneys or its consultants would be unduly burdensome and calculated solely to harass.

20

30

Subject to and without waiving the foregoing, on or about June 3, 2015, Counter-Defendants themselves provided Ameripro's testifying expert, Roy Rector, with *all* of the files that were contained on the thumb drive delivered on June 3, 2015. Pursuant to Tex. R. Civ. P. 197.2(c), Ameripro refers Counter-Defendants to the contents of that thumb drive they provided. Again, that thumb drive contained over 26,000 documents, and the burden of itemizing those contents would be substantially the same for Counter-Defendants as it would be for Ameripro.

**INTERROGATORY NO. 11:** Separately and distinctly, as to Oak Mortgage, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Oak Mortgage, the amount, if any, of economic loss, damage, specific lost sales transactions and lost profits, if any, Defendant allegedly suffered as a result of any actions of Oak Mortgage, the identity of all documents or records, separately and distinctly, supporting or forming the bases of such of Defendant's claimed economic loss, specific lost sales transactions and lost profits, if any, for each cause of action or claim asserted by Defendant against Oak Mortgage, and the identity of all persons with knowledge of such claimed economic loss specific, lost sales transactions and lost profits, if any, allegedly suffered by Defendant and the method and means Defendant used to calculate the claimed economic, loss specific lost sales transactions and lost profits, if any.

### ANSWER:

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of all documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over 26,000 Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's economic loss claims against Oak Mortgage and the other Counter-Defendants.

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, which is part of Ameripro's loss claims. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on

21

the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Oak Mortgage, Ameripro seeks disgorgement based on Oak Mortgage's conversion, misappropriation, knowing participation in and aiding and abetting the Individual Counter-Defendants' breaches of fiduciary duty, recovery for unjust enrichment as statutorily allowed under Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the Individual Counter-Defendants in connection with their breaches of fiduciary duty and acts of conversion.

Disgorgement damages (including unjust enrichment) against Oak Mortgage are based on the income that it and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, and the other benefits that Oak Mortgage derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Oak Mortgage and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. To date, however, Counter-Defendants have refused to produce that information in response to Ameripro's second set of requests for production, as needed for Ameripro's calculation. Ameripro reserves the right to supplement with its calculation of disgorgement damage amounts, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

*Actual damages.* Ameripro also seeks actual damages against all Counter-Defendants. As to Oak Mortgage, Ameripro seeks actual damages based on Oak Mortgage's knowing participation in and aiding and abetting of the Individual Counter-Defendants' breaches of fiduciary duty, misappropriation, conversion, tortious interference with contract, violations of

22

Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and its conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Oak Mortgage's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

*Reasonable royalty*. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA, Tex. Civ. Prac. & Rem. Code § 134A.004(a). Pursuant to that section, Ameripro will also present an alternate damage model measured by imposition of liability for a reasonable royalty against Oak Mortgage and the other Counter-Defendants for their unauthorized use or disclosure of Ameripro's trade secret information (as defined in that statute). Ameripro reserves the right to supplement this portion of its answer with its calculation, once Counter-Defendants comply with discovery by producing documents responsive to Ameripro's second set of requests for production.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory No. 2 above.

**INTERROGATORY NO. 12:** Separately and distinctly, as to Michael Nasserfar, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Michael Nasserfar, the amount, if any, of economic loss, damage, specific lost sales transactions and lost profits, if any, Defendant allegedly suffered as a result of any actions of Michael Nasserfar, the identity of all documents or records, separately and distinctly, supporting or forming the bases of such of Defendant's claimed economic loss, specific lost sales transactions and lost profits, if any for each cause of action or claim asserted by Defendant against Michael Nasserfar, and the identity of all persons with knowledge of such claimed economic loss specific, lost sales transactions and lost profits, if any, allegedly suffered by Defendant and the method and means Defendant used to calculate the claimed economic, loss specific lost sales transactions and lost profits, if any.

### ANSWER:

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of all documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the

23

scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over 26,000 Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's economic loss claims against Nasserfar and the other Counter-Defendants.

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, which is part of Ameripro's economic claims. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Nasserfar, Ameripro seeks disgorgement based on Nasserfar's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily allowed under Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

Disgorgement damages (including unjust enrichment) against Nasserfar are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Nasserfar during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Nasserfar and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense

24

of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA. For forfeiture damages, that amount consists of $103,120.51, consisting of the income Ameripro paid to Nasserfar from November 1, 2014 through the end of his employment, during the period that Nasserfar was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

*Actual damages.* Ameripro also seeks actual damages against all Counter-Defendants. As to Nasserfar, Ameripro seeks actual damages based on Nasserfar's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Nasserfar's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory No. 3 above.

**INTERROGATORY NO. 13:** Separately and distinctly, as to Michael Task, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Michael Task, the amount, if any, of economic loss, damage, specific lost sales transactions and lost profits, if any, Defendant allegedly suffered as a result of any actions of Michael Task, the identity of all documents or records, separately and distinctly, supporting or forming the bases of such of Defendant's claimed economic loss, specific lost sales transactions and lost profits, if any for each cause of action or claim asserted by Defendant against Michael Task, and the identity of all persons with knowledge of such claimed economic loss specific, lost sales transactions and lost profits, if any, allegedly suffered by Defendant and the method and means Defendant used to calculate the claimed economic, loss specific lost sales transactions and lost profits, if any.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

25

35

Ameripro objects to the request to list "the identity of all documents or records, separately, and distinctly," on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over 26,000 Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's economic loss claims against Task and the other Counter-Defendants.

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, which is part of Ameripro's economic claims. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Task, Ameripro seeks disgorgement based on Task's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily allowed under Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

Disgorgement damages (including unjust enrichment) against Task are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Task during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing

26

participation in breaches of fiduciary duty) enabled Task and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA. For forfeiture damages, that amount consists of $34,861.73, consisting of the income Ameripro paid to Task from November 1, 2014 through the end of his employment, during the period that Task was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

*Actual damages.* Ameripro also seeks actual damages against all Counter-Defendants. As to Task, Ameripro seeks actual damages based on Task's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Task's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory No. 4 above.

**INTERROGATORY NO. 14:** Separately and distinctly, as to Ty Gosnay, state, separately and distinctly, as to each claim or cause of action asserted as a cross-claim by Defendant against Ty Gosnay, the amount, if any, of economic loss, damage, specific lost sales transactions and lost profits, if any, Defendant allegedly suffered as a result of any actions of Ty Gosnay, the identity of all documents or records, separately and distinctly, supporting or forming the bases of such of Defendant's claimed economic loss, specific lost sales transactions and lost profits, if any for each cause of action or claim asserted by Defendant against Ty Gosnay, and the identity of all persons with knowledge of such claimed economic loss specific, lost sales transactions and lost profits, if any, allegedly suffered by Defendant and the method and means Defendant used to calculate the claimed economic, loss specific lost sales transactions and lost profits, if any.

**ANSWER:**

27

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to list "the identity of all documents or records, separately, and distinctly." on the ground that the requested itemization exceeds 26,000 documents, is overbroad, and providing that identification would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. The Temporary Injunction Order which the Court issued against Counter-Defendants commanded them to provide Ameripro's expert with forensic images of all original source media which contain or did contain "Ameripro files or information." The thumb drive of images that Counter-Defendants have supplied in response to the Temporary Injunction, alone, contains over 26,000 Ameripro confidential spreadsheets, including lists of Ameripro borrowers and Ameripro's internal financial records. They are among the thousands of stolen documents which support *each* of Ameripro's economic loss claims against Gosnay and the other Counter-Defendants.

Ameripro further objects to the interrogatory as harassing, in that Counter-Defendants have refused to produce documents that Ameripro would use in calculating Ameripro's disgorgement damages, which is part of Ameripro's economic claims. The Court's Temporary Injunction found that Ameripro has a "probable right of recovery and likelihood of success on the merits of its claims." Despite that fact, Counter-Defendants have refused to produce documents responsive to Ameripro's Second Set of Requests for Production, which would enable Ameripro to calculate its disgorgement damages claims. Ameripro will provide that disgorgement calculation when Counter-Defendants produce the source documents responsive to Ameripro's second set of requests for production.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

*Disgorgement.* Ameripro seeks disgorgement damages against all Counter-Defendants. As to Gosnay, Ameripro seeks disgorgement based on Gosnay's conversion, misappropriation, breaches of fiduciary duty, recovery for unjust enrichment as statutorily allowed under Tex. Civ. Prac. & Rem. Code § 134A.004(a) (the Texas Uniform Trade Secrets Act or "TUTSA"), and conspiracy with the other Counter-Defendants in connection with their breaches of fiduciary duty (and knowing participation in and aiding and abetting of same) and acts of conversion.

Disgorgement damages (including unjust enrichment) against Gosnay are based on the income that he and the other Counter-Defendants have received for their new Lakeway office since January 16, 2015, the other benefits that they derived from having access to Ameripro's confidential information (including being able to gauge the viability of opening a Lakeway office and in shortening the normal time it would take to open a new branch), and for forfeiture of amounts that Ameripro paid to Gosnay during the time period he was breaching his fiduciary duties and was engaged in conversion and violations of Section 134A.001, *et seq.* (which began

28

at least as early as October 30, 2014). As shown as the hearing on Ameripro's Temporary Injunction application and in depositions in this cause, Counter-Defendants' commission of the conduct set out in the First Amended Counterclaim (including their conversion and misappropriation of Ameripro's internal financial data and customer information, and commission and knowing participation in breaches of fiduciary duty) enabled Gosnay and the other Counter-Defendants to assess the financial viability of opening a branch office in that same locale as Ameripro, to jumpstart the opening of a competing branch office in shortened time and commensurate cost savings, to unfairly compete for Ameripro's customers, to avoid the expense of generating forms and templates and compiling spreadsheets and contact list information, to compare internal Ameripro pricing information in setting their own pricing, to wrongfully obtain the value of using Ameripro's confidential and proprietary information without authorization, and to effectively duplicate Ameripro's business, among other wrongful benefits they gained through their conduct. Ameripro is entitled to recover from Counter-Defendants, jointly and severally, disgorgement of the value of those receipts, avoided costs, and other benefits, including but not limited to the value of the above benefits and of their unlicensed use of the property which they took from Ameripro. As set forth in Ameripro's First Amended Petition, Ameripro is also entitled to a reasonable royalty for Counter-Defendants' unauthorized disclosure and/or use of its trade secrets pursuant to TUTSA. For forfeiture damages, that amount consists of $21,709.73, consisting of the income Ameripro paid to Gosnay from November 1, 2014 through the end of his employment, during the period that Gosnay was actively breaching his fiduciary duties, engaged in conversion, in violation of Section 134A.001, *et seq.*, and in breach of his contracts.

*Actual damages*. Ameripro also seeks actual damages against all Counter-Defendants. As to Gosnay, Ameripro seeks actual damages based on Gosnay's breaches of fiduciary duty, misappropriation, conversion, breaches of his contracts, violations of Tex. Civ. Prac. & Rem. Code § 143.002 and Tex. Civ. Prac. & Rem. Code § 134A.004, and his conspiracy with the other Counter-Defendants in the commission of those violations. Those actual damages over a foreseeable twelve-month period include Counter-Defendants' joint and several liability for the destruction of the mortgage practice at Ameripro's Lakeway office, which was proximately caused by Gosnay's (and each of the other Counter-Defendants') commission of each of those violations, in the amount of $1,974,405.77, multiplying Ameripro's average gross margin by the total production volume / loan origination volume for 2014 for the Lakeway branch office.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory No. 5 above.

**INTERROGATORY NO. 15:** Separately and distinctly, state all facts, including dates and actions which Defendant contends constitutes a breach of the Nasserfar Employment Agreement, and the identity of all documents forming the bases of Defendant's contention of a breach and the identity of person or persons who have knowledge of the alleged breach.

### ANSWER:

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(e). Therefore, in the event that Ameripro amends or supplements this answer at a later date,

29

Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to identify "all facts" and "dates" which it contends constitute a breach of Nasserfar's Employment Agreement, on the grounds of overbreadth, and that that responding to the entirety of the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. For example, Nasserfar's Employment Agreement (and other contracts) provided that all of the documents and information that was provided to him during the course of his employment at Ameripro, or that he generated during his employment at Ameripro, is Ameripro's sole property, and further provided that he could not retain, use, or disclose any of that information, let alone to a competitor. Nasserfar's thumb drives, by themselves, show that he took thousands of Ameripro confidential spreadsheets and other documents with him after he resigned from the company, in breach of his Employment Agreement and other contracts. Similarly, all Ameripro documents contained on the thumb drive received on June 3, 2015 from Counter-Defendants (over 26,000 documents) are documents which form the basis for Ameripro's claim against Nasserfar for breach. Similarly, Nasserfar's ongoing communications from October 30, 2014 through January 16, 2015 (while Nasserfar was still employed with Ameripro and serving as its fiduciary) with Ameripro's competitor, Oak Mortgage, about setting up a competing branch violated his contracts. Itemizing all such dates and thousands of documents would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

Pursuant to pursuant to Tex. R. Civ. P. 58, 193.5, and 197.2(c), Ameripro adopts and incorporates by reference into this answer:

1)   the transcripts of the direct examination testimony of Chad Overhauser and Roy Rector, and the cross examinations of Nasserfar and Task, given at the May 26-27, 2015 hearing on Ameripro's application for Temporary Injunction (Ameripro understands that Counter-Defendants have ordered transcripts of that testimony in connection with Counter-Defendants' appeal of the Temporary Injunction entered against them), describing the Ameripro property taken in violation of his contracts (including general ledgers, loan profitability reports, consumer loan applications and files, pro formas, and the categories of information listed in the Temporary Injunction Order which the Court found that Counter-Defendants took from Ameripro), his failure to provide a list of business opportunities and loans in process and to cooperate in closings, and his work for a competitor while still employed and serving as a fiduciary for Ameripro;

2)   Applicant's [Ameripro's] Exhibit Nos. AX 1-24, 27-38; 42-50, 53-70, 75, 78-85, which were admitted into evidence at the May 26-27, 2015 injunction hearing. Those exhibits include the contracts that Nasserfar and the other Individual

30

40

Counter-Defendants signed with Ameripro, examples of the internal confidential records of Ameripro which Counter-Defendants misappropriated, and e-mails and text messages among Counter-Defendants and with Ameripro customers (including builder customers) in which Ameripro's confidential information taken, disclosed, and used, and during which the Individual Counter-Defendants began assisting Ameripro's competitor Oak Mortgage in competing with Ameripro even while the Individual Counter-Defendants were still under fiduciary obligations with Ameripro (that same conduct also violated the Individual Counter-Defendants' contracts);

3) The forensic images that Counter-Defendants provided to Ameripro (received on or about June 3, 2015), pursuant to the June 16, 2015 Temporary Injunction Order, of thousands of Ameripro confidential spreadsheets, loan applications and credit reports of consumers who submitted applications to Ameripro, and other records that Counter-Defendants took, disclosed, and used in violation of statute, common law, and the Individual Counter-Defendants' contracts.

As stated by the Court in the Temporary Injunction Order, "based upon the evidence" at that May 26-27 hearing (including the evidence listed in items 1 and 2 immediately above), the Court found that Ameripro "met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious interference with contract, and breach of contract" and that Counter-Defendants "have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contract information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter 'Ameripro Information')." That property contractually belonged to Ameripro, and Counter-Defendants' taking, disclosure, and use of that information was without authorization.

Moreover, assuming that Counter-Defendants complied with the Temporary Injunction Order in good faith, the forensic images that Counter-Defendants provided to Ameripro on or about June 3, 2015, were supposed to be media which "contains or did contain Ameripro files or information" — none of which Nasserfar should have had in his possession after January 16, 2015, had he been in compliance with his Employment Agreement. Therefore, all such Ameripro files and information that Nasserfar and his co-conspirators provided on June 3, 2015, are among the documents which support Ameripro's claims for breach of Nasserfar's Employment Agreement.

Persons with knowledge of Nasserfar's breach include Chad Overhauser, President, Ameripro Funding, Inc., 8300 N. Mopac Expressway, Suite 120, Austin, Texas 78759 c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738; James Anagnos, Director, Information Technology, Tenura Holdings,

31

Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738, and (as shown by admissions against interest at the Temporary Injunction hearing and in depositions) Michael H. Nasserfar, Vice President, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Michael E. Task, Austin Area Sales Manager, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Tycord R. Gosnay, Residential Mortgage Loan Originator, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; James Holden Thomas, Chief Executive Officer, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338.

**INTERROGATORY NO. 16:** Separately and distinctly, state all facts, including dates and actions which Defendant contends constitutes a breach of the Task Employment Agreement, and the identity of all documents forming the bases of Defendant's contention of a breach and the identity of person or persons who have knowledge of the alleged breach.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(c). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to identify "all facts" and "dates" which it contends constitute a breach of Task's Employment Agreement, on the grounds of overbreadth, and that that responding to the entirety of the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. For example, Task's Employment Agreement (and other contracts) provided that all of the documents and information that was provided to him during the course of his employment at Ameripro, or that he generated during his employment at Ameripro, is Ameripro's sole property, and further provided that he could not retain, use, or disclose any of that information, let alone to a competitor. The box of confidential Ameripro records Task took to his home, by themselves, show that he took Ameripro consumer information and confidential financial documents with him after he resigned from the company, in breach of his Employment Agreement and other contracts. Similarly, all Ameripro documents contained on the thumb drive received on June 3, 2015 from Counter-Defendants (over 26,000 documents) are documents which form the basis for Ameripro's claim against Task for breach. Similarly, Task's ongoing communications with Ameripro's competitor, Oak Mortgage (while Task was still employed with Ameripro and serving as its fiduciary), about setting up a

32

competing branch violated his contracts. Itemizing all such dates and thousands of documents would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

Pursuant to pursuant to Tex. R. Civ. P. 58, 193.5, and 197.2(c), Ameripro adopts and incorporates by reference into this answer:

1) the transcripts of the direct examination testimony of Chad Overhauser and Roy Rector, and the cross examinations of Nasserfar and Task, given at the May 26-27, 2015 hearing on Ameripro's application for Temporary Injunction (Ameripro understands that Counter-Defendants have ordered transcripts of that testimony in connection with Counter-Defendants' appeal of the Temporary Injunction entered against them), describing the Ameripro property taken in violation of his contracts (including general ledgers, loan profitability reports, consumer loan applications and files, pro formas, and the categories of information listed in the Temporary Injunction Order which the Court found that Counter-Defendants took from Ameripro), his failure to provide a list of business opportunities and loans in process and to cooperate in closings, and his work for a competitor while still employed and serving as a fiduciary for Ameripro;

2) Applicant's [Ameripro's] Exhibit Nos. AX 1-24, 27-38; 42-50, 53-70, 75, 78-85, which were admitted into evidence at the May 26-27, 2015 injunction hearing. Those exhibits include the contracts that Task and the other Individual Counter-Defendants signed with Ameripro, examples of the internal confidential records of Ameripro which Counter-Defendants misappropriated, and e-mails and text messages among Counter-Defendants and with Ameripro customers (including builder customers) in which Ameripro's confidential information taken, disclosed, and used, and during which the Individual Counter-Defendants began assisting Ameripro's competitor Oak Mortgage in competing with Ameripro even while the Individual Counter-Defendants were still under fiduciary obligations with Ameripro (that same conduct also violated the Individual Counter-Defendants' contracts);

3) The forensic images that Counter-Defendants provided to Ameripro (received on or about June 3, 2015), pursuant to the June 16, 2015 Temporary Injunction Order, of thousands of Ameripro confidential spreadsheets, loan applications and credit reports of consumers who submitted applications to Ameripro, and other records that Counter-Defendants took, disclosed, and used in violation of statute, common law, and the Individual Counter-Defendants' contracts.

As stated by the Court in the Temporary Injunction Order, "based upon the evidence" at that May 26-27 hearing (including the evidence listed in items 1 and 2 immediately above), the Court found that Ameripro "met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious

33

interference with contract, and breach of contract" and that Counter-Defendants "have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contract information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter 'Ameripro Information')." That property contractually belonged to Ameripro, and Counter-Defendants' taking, disclosure, and use of that information was without authorization.

Moreover, assuming that Counter-Defendants complied with the Temporary Injunction Order in good faith, the forensic images that Counter-Defendants provided to Ameripro on or about June 3, 2015, were supposed to be media which "contains or did contain Ameripro files or information" — none of which Task should have had in his possession after January 16, 2015, had he been in compliance with his Employment Agreement. Therefore, all such Ameripro files and information that Task and his co-conspirators provided on June 3, 2015, are among the documents which support Ameripro's claims for breach of Task's Employment Agreement.

Persons with knowledge of Task's breach include Chad Overhauser, President, Ameripro Funding, Inc., 8300 N. Mopac Expressway, Suite 120, Austin, Texas 78759 c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738; James Anagnos, Director, Information Technology, Tenura Holdings, Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738, and (as shown by admissions against interest at the Temporary Injunction hearing and in depositions) Michael H. Nasserfar, Vice President, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Michael E. Task, Austin Area Sales Manager, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Tycord R. Gosnay, Residential Mortgage Loan Originator, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; James Holden Thomas, Chief Executive Officer, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338.

**INTERROGATORY NO. 17:** Separately and distinctly, state all facts, including dates and actions which Defendant contends constitutes a breach of the Gosnay Employment Agreement, and the identity of all documents forming the bases of Defendant's contention of a breach and the identity of person or persons who have knowledge of the alleged breach.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(c). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to identify "all facts" and "dates" which it contends constitute a breach of Gosnay's Employment Agreement, on the grounds of overbreadth, and that that responding to the entirety of the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. For example, Gosnay's Employment Agreement (and other contracts) provided that all of the documents and information that was provided to him during the course of his employment at Ameripro, or that he generated during his employment at Ameripro, is Ameripro's sole property, and further provided that he could not retain, use, or disclose any of that information, let alone to a competitor. Gosnay and the other Counter-Defendants even forgot to change Ameripro's address on forms they downloaded from Ameripro's computers, before using them at their new competing business. Similarly, all Ameripro documents contained on the thumb drive received on June 3, 2015 from Counter-Defendants (over 26,000 documents) are documents which form the basis for Ameripro's claim against Gosnay for breach. Similarly, Gosnay's ongoing communications with Ameripro's competitor, Oak Mortgage (while Gosnay was still employed with Ameripro and serving as its fiduciary), about setting up a competing branch violated his contracts. Itemizing all such dates and thousands of documents would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance.

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

Pursuant to pursuant to Tex. R. Civ. P. 58, 193.5, and 197.2(e), Ameripro adopts and incorporates by reference into this answer:

1) the transcripts of the direct examination testimony of Chad Overhauser and Roy Rector, and the cross examinations of Nasserfar and Task, given at the May 26-27, 2015 hearing on Ameripro's application for Temporary Injunction (Ameripro understands that Counter-Defendants have ordered transcripts of that testimony in connection with Counter-Defendants' appeal of the Temporary Injunction entered against them), describing the Ameripro property taken in violation of his contracts (including general ledgers, loan profitability reports, consumer loan applications and files, pro formas, and the categories of information listed in the Temporary Injunction Order which the Court found that Counter-Defendants took from Ameripro), his failure to provide a list of business opportunities and loans in process and to cooperate in closings, and his work for a competitor while still employed and serving as a fiduciary for Ameripro;

2) Applicant's [Ameripro's] Exhibit Nos. AX 1-24, 27-38; 42-50, 53-70, 75, 78-85, which were admitted into evidence at the May 26-27, 2015 injunction hearing.

35

45

Those exhibits include the contracts that Gosnay and the other Individual Counter-Defendants signed with Ameripro, examples of the internal confidential records of Ameripro which Counter-Defendants misappropriated, and e-mails and text messages among Counter-Defendants and with Ameripro customers (including builder customers) in which Ameripro's confidential information taken, disclosed, and used, and during which the Individual Counter-Defendants began assisting Ameripro's competitor Oak Mortgage in competing with Ameripro even while the Individual Counter-Defendants were still under fiduciary obligations with Ameripro (that same conduct also violated the Individual Counter-Defendants' contracts);

3) The forensic images that Counter-Defendants provided to Ameripro (received on or about June 3, 2015), pursuant to the June 16, 2015 Temporary Injunction Order, of thousands of Ameripro confidential spreadsheets, loan applications and credit reports of consumers who submitted applications to Ameripro, and other records that Counter-Defendants took, disclosed, and used in violation of statute, common law, and the Individual Counter-Defendants' contracts.

As stated by the Court in the Temporary Injunction Order, "based upon the evidence" at that May 26-27 hearing (including the evidence listed in items 1 and 2 immediately above), the Court found that Ameripro "met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious interference with contract, and breach of contract" and that Counter-Defendants "have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contract information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter 'Ameripro Information')." That property contractually belonged to Ameripro, and Counter-Defendants' taking, disclosure, and use of that information was without authorization.

Moreover, assuming that Counter-Defendants complied with the Temporary Injunction Order in good faith, the forensic images that Counter-Defendants provided to Ameripro on or about June 3, 2015, were supposed to be media which "contains or did contain Ameripro files or information" — none of which Gosnay should have had in his possession after January 16, 2015, had he been in compliance with his Employment Agreement. Therefore, all such Ameripro files and information that Gosnay and his co-conspirators provided on June 3, 2015, are among the documents which support Ameripro's claims for breach of Gosnay's Employment Agreement.

Persons with knowledge of Gosnay's breach include Chad Overhauser, President, Ameripro Funding, Inc., 8300 N. Mopac Expressway, Suite 120, Austin, Texas 78759 c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738; James Anagnos, Director, Information Technology, Tenura Holdings,

Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738, and (as shown by admissions against interest at the Temporary Injunction hearing and in depositions) Michael H. Nasserfar, Vice President, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Michael E. Task, Austin Area Sales Manager, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Tycord R. Gosnay, Residential Mortgage Loan Originator, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; James Holden Thomas, Chief Executive Officer, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338.

**INTERROGATORY NO. 18:** As to each separate and distinct Plaintiff, describe and state all facts, including dates, the identification of documents and persons with knowledge of such facts and specific actions in which Defendant contends Plaintiffs used any property of Defendant for any purpose, and damages, and methods and means of calculating the damages Defendant contends were caused by such use, and the amount of profits, if any, Defendant contends Plaintiffs obtained or gained by use of such property.

### ANSWER:

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(c) & (d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Ameripro objects to the request to identify "all facts," "dates," and "documents" relating to Ameripro's claim that Counter-Defendants have used Ameripro property, on the grounds of overbreadth, and that that responding to the entirety of the requested information would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance, and on the ground that it exceeds the scope of Rule 197's requirements which allow a party to ask for a description "in general" of the "factual bases for the party's claims or defenses" and not "to marshal all of its available proof" that it intends to offer at trial. As competitors of Ameripro, Counter-Defendants wrongfully had in their possession over 26,000 confidential documents that they secretly took from Ameripro, including general ledgers, pro formas, loan profitability reports, financial spreadsheets, and other internal financial and other proprietary information (including the several categories that the Court listed in the Temporary Injunction Order). As stated by the Court in the Temporary Injunction Order, "based upon the evidence" at that May 26-27 hearing (including the evidence listed in items 1 and 2 below), the Court found that Ameripro "met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims" and that Counter-Defendants "have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability

37

reports, statements of income, customer and referral lists and contract information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter 'Ameripro Information')."

Subject to and without waiving the foregoing objections, Ameripro further answers as follows.

Pursuant to pursuant to Tex. R. Civ. P. 58, 193.5, and 197.2(c), Ameripro adopts and incorporates by reference into this answer:

1) the transcripts of the direct examination testimony of Chad Overhauser and Roy Rector, and the cross examinations of Nasserfar and Task, given at the May 26-27, 2015 hearing on Ameripro's application for Temporary Injunction (Ameripro understands that Counter-Defendants have ordered transcripts of that testimony in connection with Counter-Defendants' appeal of the Temporary Injunction entered against them);

2) Applicant's [Ameripro's] Exhibit Nos. AX 1-24, 27-38; 42-50, 53-70, 75, 78-85 which were admitted into evidence at the May 26-27, 2015 injunction hearing. Those exhibits include examples of Ameripro general ledgers and other internal financial information which Counter-Defendants took for their competing office, Counter-Defendants' communications with each other about obtaining and using Ameripro's internal information, examples of how they planned to use Ameripro's information (e.g., price comparison, determining if there were extraordinary expenses in setting up a competing office in that location), and e-mails and text messages among Counter-Defendants and with Ameripro customers (including builder customers) in which Ameripro's confidential information taken, disclosed, and used, and/or during which the Individual Counter-Defendants began assisting Ameripro's competitor Oak Mortgage in competing with Ameripro even while the Individual Counter-Defendants were still under fiduciary obligations with Ameripro;

3) The forensic images that Counter-Defendants provided to Ameripro (received on or about June 3, 2015), pursuant to the June 16, 2015 Temporary Injunction Order, of thousands of Ameripro confidential spreadsheets, loan applications and credit reports of consumers who submitted applications to Ameripro, and other records that Counter-Defendants took, disclosed, and used in violation of statute, common law, and the Individual Counter-Defendants' contracts.

Assuming that Counter-Defendants complied with the Temporary Injunction Order in good faith, the forensic images that Counter-Defendants provided to Ameripro on or about June 3, 2015, were supposed to be media which "contains or did contain Ameripro files or information" — none of which Counter-Defendants had any right to possess after January 16, 2015 (and which Oak Mortgage never had a right to possess even before that date).

38

48

All of the Ameripro records on that June 3, 2015 thumb drive are information that the Court found were unlawfully "taken from Ameripro's computer network and premises" (as stated in the Temporary Injunction Order), and fall within the legal presumption that Ameripro's competitors (Counter-Defendants) have been using the information they stole from it. All Ameripro documents contained on the thumb drive received on June 3, 2015 from Counter-Defendants (over 26,000 documents) are documents which form the basis for Ameripro's claim against Counter-Defendants for use of its confidential information (as well as for Ameripro's claims that such information was converted, misappropriated, and disclosed), including the identity of each Counter-Defendant who was the custodian of the electronic devices copied on the thumb drive. Counter-Defendants' possession of the documents on the thumb drive, in itself, gives rise to the legal presumption that they used it to Ameripro's detriment.[2] Itemizing all such dates (which is available to Counter-Defendants in the metadata for those 26,000+ documents) and itemizing the 26,000+ documents that Counter-Defendants possessed and used, would likewise subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory Nos. 2-5, and 11-14 above, as they relate to damages, which are also responsive to this interrogatory. Damages relating to Counter-Defendants' misappropriation of Ameripro's confidential records while they were setting up a competing office in the same locale income, in particular, include disgorgement damages. Ameripro will supplement its response to this interrogatory once Counter-Defendants produce records in response to Ameripro's second set of requests for production.

Persons with knowledge of Counter-Defendants' conduct include Chad Overhauser, President, Ameripro Funding, Inc., 8300 N. Mopac Expressway, Suite 120, Austin, Texas 78759 c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738; James Anagnos, Director, Information Technology, Tenura Holdings, Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738, and (as shown by admissions against interest at the Temporary Injunction hearing and in depositions) Michael H. Nasserfar, Vice President, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Michael E. Task, Austin Area Sales Manager, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Tycord R. Gosnay, Residential Mortgage Loan Originator, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; James Holden Thomas, Chief Executive Officer, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338.

---

[2] *See, e.g., Hill v. McLane Co., Inc.*, 2011 WL 56061 *5 (Tex. App. – Austin Jan. 5, 2011, no pet.); *Conley v. DSC Communications Corp.*, 1999 WL 89955 *5 (Tex. App. – Dallas Feb. 24, 1999, no pet.); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 200 (Tex. App. – Fort Worth 2005, no pet.).

39

**INTERROGATORY NO. 19:**  As to each separate and distinct Plaintiff, identify the specific electronic file or paper file Defendant contends each separate Plaintiff used without permission or authorization from Defendant, the date of the use, and the person or persons who have knowledge of such alleged use, and identify and describe all damages or economic loss and the methods and means of calculating all damages or economic loss, separately and distinctly as to each electronic file or paper file and Plaintiff, Defendant contends Defendant suffered as a result of such use.

**ANSWER:**

This interrogatory inquires about matters described in Tex. R. Civ. P. 194.2(e) & (d). Therefore, in the event that Ameripro amends or supplements this answer at a later date, Ameripro asserts its right to exclude its prior answer from evidence or from use in impeachment, pursuant to Tex. R. Civ. P. 197.3.

Pursuant to Tex. R. Civ. P. 197.2, the answer to this interrogatory may be ascertained or derived from the June 3, 2015 thumb drive, and the responsive documents consist of all Ameripro files contained on that thumb drive. Ameripro objects to the request to identify each of the 26,000+ documents on that thumb drive, and each individual date of use (which is available to Counter-Defendants in the metadata for those 26,000+ documents), on the ground that to do so would subject Ameripro to undue burden, unnecessary expense, harassment, and annoyance. The entirety of the Ameripro files contained on the thumb drive that Counter-Defendants gave to Ameripro on June 3, 2015 (as commanded by the Temporary Injunction Order) are documents responsive to this interrogatory, and apply to each of the Counter-Defendants individually:  each of them actively participated in the misappropriating those documents for use in their competing business, were co-conspirators, and are jointly and severally liable for the conduct of each other. Moreover, Counter-Defendants jointly produced those Ameripro confidential documents (which lawfully should not have been in Counter-Defendants' possession), and their joint possession of those records gives rise to the legal presumption that they each used it to Ameripro's detriment.[3]  Counter-Defendants did not have Ameripro's authorization to use (or even to possess) any of the Ameripro records on the June 3, 2015 thumb drive.

Pursuant to Tex. R. Civ. P. 58, Ameripro also adopts herein by reference its response to Interrogatory Nos. 2-5, and 11-14 above as they relate to damages, and its answer to Interrogatory No. 18, which are also responsive to this interrogatory. Damages relating to Counter-Defendants' misappropriation of Ameripro's confidential records while they were setting up a competing office in the same locale income, in particular, include disgorgement damages. Ameripro will supplement its response to this interrogatory once Counter-Defendants produce records in response to Ameripro's second set of requests for production.

Persons with knowledge of Counter-Defendants' conduct include Chad Overhauser, President, Ameripro Funding, Inc., 8300 N. Mopac Expressway, Suite 120, Austin, Texas 78759 c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin,

---

[3] *Hill, supra,* 2011 WL 56061 *5; *Conley, supra,* 1999 WL 89955 *5; *IAC, supra,* 160 S.W.3d at 200.

40

Texas 78701, (512) 480-5738; James Anagnos, Director, Information Technology, Tenura Holdings, Inc., 8300 N. Mopac Expressway, Suite 220, Austin, Texas 78759, c/o Susan P. Burton, Graves Dougherty Hearon & Moody, 401 Congress Ave., Ste. 2200, Austin, Texas 78701, (512) 480-5738, and (as shown by admissions against interest at the Temporary Injunction hearing and in depositions) Michael H. Nasserfar, Vice President, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Michael E. Task, Austin Area Sales Manager, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; Tycord R. Gosnay, Residential Mortgage Loan Originator, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338; James Holden Thomas, Chief Executive Officer, Oak Mortgage Group, Inc., c/o Wm. Charles Bundren, Wm. Charles Bundren & Associates Law Group, PLLC, 2591 Dallas Parkway, Suite 300, Frisco, Texas 75034, (972) 624-5338.

41

51

## VERIFICATION

STATE OF TEXAS        §
                                   §

COUNTY OF TRAVIS     §

       BEFORE ME, the undersigned authority, on this day personally appeared Chad Overhauser, President of Ameripro Funding, Inc., known to me to be the person whose signature is affixed below, and upon his oath, stated that he answered the foregoing/interrogatories in the capacity therein set out and that such answers (excluding legal conclusions) are within his personal knowledge and are true and correct.

AMERIPRO FUNDING, INC.

By: _____ Chad Overhauser
Its:      President

       SWORN TO AND SUBSCRIBED before me by Chad Overhauser on the 17th day of August, 2015.

_____
Notary Public, State of Texas

MARY ELLEN ROWAN
My Commission Expires
July 5, 2017

42

CASE NO. 03-15-00416-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN TEXAS

OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR,
MICHAEL E. TASK, AND TYCORD R. GOSNAY

Appellants

V.

AMERIPRO FUNDING, INC.

Appellee

Appeal from the 345th Judicial District Court
of Travis County Texas

**APPELLANTS' APPENDIX**

# EXHIBIT 6

APPLICANT'S EXHIBIT NO. 11



## EMPLOYMENT AGREEMENT
### Producing Branch Manager – Commission Off-Set

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of January 1, 2014, (the "Effective Date") by and between Ameripro Funding, Inc., a Texas corporation (the "Company"), and Michael H. Nasserfar, an individual resident of the State of Texas (the "Employee").

### RECITALS:

A.     The Employee has experience in the business of residential mortgage lending (the "Business").

B.     The Company desires that the Employee serve as Producing Branch Manager for the Company's branch designated as Branch #152180 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.     The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.     Position

(a)     At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

(b)     Position. Employee shall serve as the Producing Branch Manager for the Company's branch designated as Branch #152180, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) remaining familiar with and ensuring that all loans originated by the Branch are handled in accordance with the Company's policies, guidelines, quality control, applicable federal, state, and local laws, and investor guidelines; (ii) ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Company's discretion; (iii) informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Branch operations;     (iv) informing Company of all expenses on a timely basis in order to ensure prompt payment thereof and adhering to the Company's accountable expense reimbursement plan ; (v) forwarding all fees, checks, deposits, etc. in the possession of Manager to Company's Corporate Headquarters in a timely manner; (vi) ensuring that all closed loan documents are stored in Company's document storage system and accessible to Company upon demand; (vii) hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Branch profit and minimize risk; (viii) ensuring that all persons performing any services for the Company through the Branch are Company employees, properly licensed and registered, as applicable, and are approved to start by Company and, as applicable approved by the Company to originate loans; (ix) ensuring that all employee activity including but not limited to hiring, firing, position change, pay changes, leaves of absence, etc., takes place in accordance with policy, practice, and appropriate corporate level pre-approval; (x) ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules; (xi) ensuring that all websites or other social media used by the Branch or any Branch

January 1, 2014

Applicant's Injunction Hearing Exhibit 011

CONFIDENTIAL

APF00000152

Employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public; (xii) ensuring that any and all email communications on behalf of Company shall be sent from and directed through corporate email. Private email is not to be used for any official Company business; (xiii) ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan; (xiv) ensuring that all employees are performing duties consistent with their classification (i.e. exempt/nonexempt) and that the Company is advised of any inconsistencies respecting duties and classification; and (xv) ensuring that all timekeeping policies are followed and records maintained; (xvi) ensuring all up-to-date local, state, and federally required employment posters are prominently displayed in a common area accessible by all employees; (xvii) ensuring all required HUD, state, federal, and Agency licenses/certifications are displayed in the branch lobby as prescribed by law; (xviii) ensuring there are signs displaying the branch name at all entry points and the hours of operation must be posted per state law; (xix) ensuring the office must be for the sole use of the Company and may not share space/signage with any other business; (xx) ensuring all phone and fax lines must be listed in the name of the Company and the branch (AmeriPro Funding, Inc., Branch #) and must be answered and displayed accordingly; and (xxi) ensuring there is always a staff of at least two employees and be open during normal business hours. All branches are subject to an annual onsite inspection, with or without notice, to ensure compliance with all applicable regulations.

(c)     Notwithstanding any provision of this Agreement to the contrary, without the prior written consent of Company, Manager is not authorized on behalf of Company to (i) sell, lease, trade, exchange or otherwise dispose of any capital asset of the Company; (ii) grant a security interest in, hypothecate or otherwise encumber any asset of Company; (iii) incur any debt, sign any lease, or borrow money in the name of or on behalf of the Company;(iv) confess a judgment against the Company or settle or compromise in any manner any legal action, claim or litigation in the name of the Company brought by or against the Company, nor may Employee take any action in furtherance of any attempt to accomplish such actions without the Company's prior knowledge and consent; (v) implement material changes to the operation of the Branch; (vi) open any bank, savings, credit, or investment account in the name of Company or any DBA, parent, subsidiary or affiliate thereof; (vii) deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Company; (viii) acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing; (ix) accept any funds or wire transfers intended or for the benefit or on behalf of the Company; (x) conduct any Realtor activities or hold an active Realtor license during the period of employment or permit or allow other loan officers of the Company to engage in such activities; (xi) pay any expenses for the branch out of any personal funds, or pay or promise payment to any person for services associated with the origination or processing of loans, who is not an approved employee of the Company; (xii) issue or allow others to issue a commitment of financing without proper prior underwriting approval; (xiii) waive any commitment fees or fees for appraisals, credit reports, title policies, flood certifications or surveys; (xiv) undertake any financing or origination of loans in contravention of company policies, including but not limited to straw financing, flip financing, or the transfer of loans from or to Company without proper approval; (xv) deviate from approved compensation plans for any loan officers or other employees; (xvi) encourage or permit loan officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that the borrower is able to repay the loan; (xvii)     encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture; (xviii) use the Company's name except in furtherance of his/her duties on behalf of the Company; (xix) supply Company information or comment to the media without express approval. Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement, Manager shall cease using the Company's name or any semblance thereof.

(d)     Company Rules.  Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating

Employment Agreement - Page 2                                    January 1, 2014

CONFIDENTIAL

APF00000153

Subsidiaries Employee Handbook and Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Employee has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

(e) Licensure. Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.
b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

2. Compensation.

(a) Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule, which will be a draw against commissions and other compensation earned as set forth below. The Employee will also be eligible to receive commissions/bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions. It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision. As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations. In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A. Employee agrees that in the event he/she believes there is any error in

Employment Agreement - Page 3                                                  January 1, 2014

CONFIDENTIAL                                                  APF00000154

connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 30 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be scheduled by mutual agreement of the Company and Employee.

3. Representations.

(a) The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b) The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

4. Assignment; Binding Agreement. This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

5. Confidentiality; Ownership of Works.

(a) The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b) The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "Confidential Information"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 5 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

**CONFIDENTIAL**                                                    **APF00000155**

(c)     For purposes of this Section 5, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d)     During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

(e)     For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)      solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii)     solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii)    recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv)    otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f)     Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours

CONFIDENTIAL                                                                    APF00000156

or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

(h)     The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal-website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i)     The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 5 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j)     The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k)     If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 5 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 5 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

6.     Non-Disparagement.     The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

CONFIDENTIAL                                                                                    APF00000157

7. Indemnification. Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 3(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

8. Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Company:
Ameripro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759


If to the Employee:
Michael H. Nasserfar
4109 Hookbilled Kite
Austin, TX 78738-6571


9. Entire Agreement. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, s/he does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

10. Waivers and Amendments. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11. Governing Law. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

12. Submission to Jurisdiction; Consent to Service of Process. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas

CONFIDENTIAL

APF00000168

and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

13.     Assignment. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale of all or substantially all of the Company's assets, without the Employee's consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

14.     Withholding. All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

15.     Facsimile Execution and Delivery. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

16.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

17.     Severability. If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

18.     Interpretation. The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in

CONFIDENTIAL

APF00000159

the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

19. Effective Date. After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
Larry Crisp, Regional Sales Manager – TX, OK

EMPLOYEE:

_____
Michael H. Nasserfar

CONFIDENTIAL                                      APF00000160

## EXHIBIT A

### Commission & Bonus Schedule
### Producing Branch Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation** – Allocable Revenues for the entire Lakeway Branch (152180) (BPS x volume from commission schedule below) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

**Effective for all loans funded on or after:** __January 1, 2014__

| Loan Volume | Basis Points |
|---|---|
| $0 - $1,437,473 | 0 |
| $1,437,474 - $2,874,944 | 21.7 |
| $2,874,945 - $5M | 53 |
| $5,000,001 - $7.5M | 65 |
| $7.5M - $10M | 71 |

The above mentioned commission schedule:

-does not apply to any loan that contains borrower paid compensation

-applies only to first lien closed end forward transactions unless otherwise approved by the Company in writing

*Commission Pay Schedule*:

Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 15th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*

-Loans where AmeriPro Funding, Inc. is the creditor: funding date

-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

**CONFIDENTIAL**

**APF00000161**

2) **Guidelines**
   a) Should the Lakeway Branch (152180) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i. 70% to Michael H. Nasserfar
      ii. 30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__Yes _____No

   _Michael H. Nasserfar signature_

   Michael H. Nasserfar

   Date: 2/27/14

CONFIDENTIAL                                                    APF00000162